UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COMPUTER SCIENCES CORPORATION, § § § | | |
| *Plaintiff*, § § | | |
| v. § § | Civil Action No. 3:19-CV-0970-X | |
| TATA CONSULTANCY SERVICES LIMITED, et al., § § § § | | |
| *Defendants.* § | | |

**MEMORANDUM OPINION AND ORDER**

Computer Sciences Corporation ("CSC") alleges that Tata Consultancy Services Limited and Tata America International Corporation (collectively, "Tata") misappropriated CSC's trade secrets. Tata moves for summary judgment [Doc. No. 304], and CSC moves for partial summary judgment [Doc. No. 307]. In addition, Tata moves to exclude the testimony of CSC's damages expert, Brian Napper [Doc. No. 302]. For the reasons below, the Court **DENIES** Tata's motion for summary judgment, **DENIES** Tata's motion to exclude, and **GRANTS IN PART AND DENIES IN PART** CSC's motion for partial summary judgment.

### I.  Factual Background

For over twenty years, CSC[1] licensed two of its software platforms—Vantage and CyberLife—to Transamerica Corporation ("Transamerica"), a life-insurance holding company. At some point, Tata began "provid[ing] . . . maintenance [] services

---

[1] CSC now identifies as DXC. For consistency, the Court uses CSC.

for . . . Vantage and CyberLife."[2] In 2014, to allow third parties like Tata to work on CSC's software, CSC and Transamerica signed a Third Party Access Addendum (the "2014 Addendum"). The 2014 Addendum allowed Tata to "access, copy, execute and use" CSC's software "solely for the benefit of" Transamerica and "to copy" and "modify" CSC's software if CSC's earlier agreement with Transamerica permitted such modifications.[3]

Trouble arose in 2016. Transamerica decided that its software needed a refresh, so it initiated a vendor-selection process. CSC bid for the spot. Tata—which had now developed its own software platform called BaNCS—also bid for the spot. Tata won, so Transamerica began to "transition [] from CSC's software platforms to Tata's BaNCS platform."[4] That transition precipitated three relevant events.

First, CSC sent Transamerica a letter demanding that it "cease and desist from this transition to the extent it involves [CSC] technology and information."[5] But Transamerica had already provided Tata with information concerning CSC's software, and it continued to do so after that letter.

Second, Tata and Transamerica executed a Master Services Agreement along with myriad separate Service Agreements. The Master Services Agreement allowed

---

[2] Doc. No. 253-6 at 12.

[3] Doc. No. 305-3 at 67.

[4] Doc. No. 253-6 at 13.

[5] Doc. No. 307-1 at 64.

Tata to "use, access, manage or maintain" CSC's software "in connection with its performance" of the required services.[6]

Third, Tata hired over 2,000 Transamerica employees. According to CSC, these "rebadged employees" accessed "CSC's source code and technical documents"[7] and "provided CSC trade secrets to . . . Tata's development team that oversees the development and coding of BaNCS."[8]

All of that came to a head in 2019, when Tata and Transamerica inadvertently copied a CSC employee on an e-mail that, according to CSC, showed that Tata was accessing CSC source code and confidential documents to develop BaNCS. CSC sued for, *inter alia*, trade-secret misappropriation under the Defend Trade Secrets Act ("DTSA").

## II. Legal Standard

Courts can grant summary judgment only if the movant shows "there is no genuine dispute as to any material fact."[9] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material* fact."[10] Although the movant has the burden, "the summary

---

[6] Doc. No. 306-1 at 11.

[7] Doc. No. 253-6 at 14.

[8] *Id.* at 18.

[9] FED. R. CIV. PROC. 56(a).

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case."[11]

## III. Analysis

The Court considers (A) Tata's motion for summary judgment, (B) Tata's motion to exclude, and (C) CSC's motion for partial summary judgment.

### A. Tata's Motion for Summary Judgment

Tata asks the Court to grant it summary judgment because (1) it didn't misappropriate any trade secrets and (2) CSC has failed to identify some trade secrets with sufficient specificity.

#### 1. Misappropriation

"To succeed on the merits of [a] misappropriation of trade secrets claim, [a plaintiff] must show that (1) a trade secret existed, (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means, and (3) the defendant used the trade secret without authorization from the plaintiff."[12] Tata attacks the "improper means" portion of that second element with three arguments.

First, because "the 2014 Addendum gives [Tata] [] rights . . . to access any CSC confidential information," Tata contends that it didn't access CSC's confidential information through improper means.[13] And it's true that the 2014 Addendum

---

[11] *Soto v. William's Truck Serv., Inc.*, No. 3:11-CV-3242-B, 2013 WL 487070, at *1 (N.D. Tex. Feb. 8, 2013) (Boyle, J.).

[12] *CAE Integrated, L.L.C. v. Moov Techs., Inc.*, 44 F.4th 257, 262 (5th Cir. 2022) (cleaned up) (emphasis omitted).

[13] Doc. No. 304 at 22.

4

allowed Tata to "access, copy, execute and use" CSC's software ("the access provision").[14]

But Tata tells only a fraction of the story. To begin, the 2014 Addendum allows Tata to access CSC's software only when it does so "solely for the benefit of" Transamerica.[15] *Solely* means "to the exclusion of all else."[16] In addition to that plain meaning, the Court must consider the "commercial context."[17] Tata asserts that third parties must be able to receive some benefit from their access to CSC's software because, otherwise, Transamerica wouldn't be able to pay third parties for their time spent maintaining CSC's software. The Court agrees: Third parties must be able to receive pecuniary gain for their services under the 2014 Addendum—so *solely* can't prohibit such arrangements. But *solely* still prohibits uses that inure to a third party's benefit in a manner beyond ordinary pecuniary benefit for services.

In short, a third party's use of CSC's trade secrets to develop a platform that it can market elsewhere could violate the access provision of the 2014 Addendum. And, here, CSC provides evidence that Tata used CSC's trade secrets to develop its BaNCS

---

[14] Doc. No. 305-3 at 67.

[15] *Id.*

[16] *Solely*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/solely (last visited Jan. 17, 2023). Tata appears to disagree, insinuating that its use of CSC's code could violate the 2014 Addendum only if it used that code "*exclusively* for BaNCS development." Doc. No. 304 at 24. But that's wrong. *Solely* means that the use must be for Transamerica's exclusive benefit—not that the use cannot be for the exclusive benefit a third party.

[17] *Reliant Energy Servs., Inc. v. Enron Canada Corp.*, 349 F.3d 816, 822 (5th Cir. 2003).

platform.[18] Thus, CSC raises a genuine dispute of material fact concerning whether Tata's use was "solely for the benefit of" Transamerica.[19]

What's more, Tata's argument ignores another critical provision of the 2014 Addendum. Although the access provision governs Tata's ability to "access, copy, execute and use" CSC's software, a separate provision governs Tata's ability to "copy, change, modify, supplement, amend, and prepare Derivative Works of [CSC's] Software" ("the modification provision").[20]

The modification provision is more difficult to satisfy than the access provision because it also requires that the modification at issue be "permitted in" CSC's earlier agreements with Transamerica.[21] And those earlier agreements aren't permissive. For instance, a 1994 agreement prohibits Transamerica from allowing third parties "to transmit or reproduce [CSC's software] in whole or in part"[22] or "reverse engineer, reverse assemble[,] or reverse compile [CSC's software]."[23]

The modification provision is relevant because CSC provides evidence that Tata not only **accessed** its source code, but also **copied** and **modified** that code.[24]

---

[18] Doc. No. 253-11 at 47–56 (showing an email chain from Tata employees analyzing CSC's code to determine the proper "approach to communicate to the BaNCS team" and the proper method "to emulate" a particular calculation).

[19] Doc. No. 305-3 at 67.

[20] *Id.* Curiously, both provisions apply to "copy[ing]" of CSC's information. Whatever the reason for that redundancy, the Court cannot ignore the modification provision's additional requirement.

[21] *Id.*

[22] Doc. No. 253-12 at 150.

[23] Doc. No. 253-12 at 151.

[24] Doc. No. 253-9 at 197 (showing a Tata employee's plan to "create duplicate copybooks for all Cyberlife segments" but then to "rename them" and "expand some fields" in order to create "a format that is not considered [CSC] Proprietary").

6

Accordingly, CSC has shown a genuine dispute of material fact concerning whether Tata's alleged modification of CSC's code violated the 2014 Addendum.

Second, Tata contends that its use of CSC's trade secrets could not have been "improper" because Transamerica authorized that use. Thus, the argument goes, Tata "ha[d] no reason to know that the very access and use Transamerica requires to perform contractually obligated services is not authorized."[25] And Tata is correct that a defendant's knowledge can be relevant to show misappropriation.[26] But CSC has provided evidence that Tata knew that it improperly accessed CSC's trade secrets.[27] Thus, the Court finds that CSC raises a genuine dispute of material fact concerning Tata's knowledge of its alleged misappropriation.

Third, Tata cites *Hogan Systems, Inc. v. Cybersource International, Inc.*, which involved a licensee allowing a third party to use a licensor's trade secrets pursuant to an agreement that permitted third parties to "use" those trade secrets.[28] But Tata strips *Hogan* of all relevant context. The *Hogan* plaintiff didn't object to "**what** is being done with [its] software . . . , just **who** is doing it."[29] Thus, because the *Hogan* plaintiff never argued that the defendants' use exceeded the scope of the licensing agreement, *Hogan* never reached the sort of contractual interpretation question at issue here.

---

[25] Doc. No. 304 at 25.

[26] *See* 18 U.S.C. § 1839(5)(A) (recognizing that misappropriation is present where the acquiring entity "knows or has reason to know that the trade secret was acquired by improper means").

[27] *See* Doc. No. 253-9 at 197 (recognizing that one of Tata's teams "can't touch [CSC's] code").

[28] No. 3:96-CV-2083-H, 1997 WL 311526, at *6 (N.D. Tex. June 2, 1997) (Sanders, J.).

[29] *Id.* at *4 (emphases added).

## 2. Specificity

To show misappropriation, a plaintiff must prove that "a trade secret existed."[30] CSC identifies its alleged trade secrets at three levels of specificity. First, CSC broadly defines its trade secrets as the "(1) [] source code for . . . and (2) [] confidential documentation describing the operation of . . . its Vantage and CyberLife products."[31] Second, CSC identifies "five [] categories of functionality within Vantage and CyberLife that Tata specifically targeted to develop [the] BaNCS platform: calculations; business rules; data structures; correspondence; and interfaces."[32] Third, CSC provides 116 examples of the trade secrets at issue. Tata objects to that second group, contending that CSC's "broad categories of functionality" lack the "precision and specificity" necessary to constitute trade secrets.[33] Tata thus requests partial summary judgment as to trade secrets outside the 116 exemplary trade secrets that CSC specifically identified.

But the Fifth Circuit has already rejected Tata's argument. In *GlobeRanger Corp. v. Software AG United States of America, Inc.*, the plaintiff showed that "at least some aspects of [its technological platform] constituted" a trade secret.[34] The defendant took issue with that "some aspects" language, contending that the plaintiff "needed to show more specific, concrete secrets."[35] The Fifth Circuit disagreed,

---

[30] *CAE Integrated*, 44 F.4th at 262 (cleaned up).

[31] Doc. No. 253-10 at 36.

[32] Doc. No. 253-6 at 36.

[33] Doc. No. 304 at 28, 30 (cleaned up).

[34] 836 F.3d 477, 482 (5th Cir. 2016).

[35] *Id.* at 493 (cleaned up).

concluding that no "Fifth Circuit or Texas case law requir[es] greater specificity."[36] A plaintiff can succeed by showing that its "technology contain[s] trade secrets," even if the plaintiff doesn't provide "a specific description of the trade secret."[37] Thus, under *GlobeRanger*, CSC's showing that its code and documents "**contain** CSC trade secrets" is sufficient.[38]

Tata tries to circumvent *GlobeRanger* in three ways. First, Tata cites the district court's opinion in *GlobeRanger* to show that the plaintiff there provided "far more detail than CSC" does.[39] But the Fifth Circuit only found that the evidence was sufficient to show that "at least some aspects of the [technological platform] constituted a" trade secret, so it didn't *sub silentio* adopt the district court's description.[40] The Court declines Tata's invitation to engraft the district court's factual descriptions onto the Fifth Circuit's reasoning.

Second, Tata suggests that *GlobeRanger* upheld the district court's ruling only because the plaintiff "had introduced specific evidence."[41] But that interpretation contradicts not only *GlobeRanger*'s plain language, but also a bevy of district courts that have applied *GlobeRanger*'s reasoning broadly. For instance, one court applied

---

[36] *Id.*

[37] *Id.* (cleaned up); *see also Vianet Grp. PLC v. Tap Acquisition, Inc.*, No. 3:14-CV-3601-B, 2016 WL 4368302, at *20 (N.D. Tex. Aug. 16, 2016) (Boyle, J.) (rejecting the argument that a party's "identification of trade secrets was too generic" where the party "identif[ied] specific groupings of information that contain trade secrets").

[38] Doc. No. 253-10 at 38 (emphasis added).

[39] Doc. No. 366 at 23.

[40] *GlobeRanger*, 836 F.3d at 492.

[41] Doc. No. 304 at 45 n.20.

9

*GlobeRanger*'s specificity standard to conclude that a plaintiff may "properly identif[y] its entire Platform as a trade secret."[42] Likewise, another court cited *GlobeRanger*'s specificity standard to hold that a plaintiff's identification of eight "categories" of "types of information and possible trade secrets within" was "sufficiently specific."[43]

Third, Tata cites two Northern District of Texas cases that, it claims, show that more specificity is necessary. Both are distinguishable. In *WeInfuse, LLC v. InfuseFlow, LLC*, the plaintiff alleged that "every aspect of the Software architecture" constituted a trade secret but "fail[ed] to point to specificities that convey the unique capabilities of the Software."[44] In other words, the lack of specificity was a problem only because it prevented the court from ascertaining whether "the [] features and functionalities" of the trade secrets "are [] generally known within the industry."[45] But CSC has identified the pertinent functionalities of its trade secrets, so *WeInfuse* is inapposite.

In *StoneEagle Services, Inc. v. Valentine*, the court prohibited "general categories of alleged trade secret information" and required "a list that separately

---

[42] *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2021 WL 3403935, at *4 (E.D. Tex. Aug. 4, 2021); *see also Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 875 (5th Cir. 2013) (recognizing that "software[ ]and, in particular, the underlying proprietary source code" can constitute a trade secret).

[43] *Utex Indus., Inc. v. Wiegand*, No. H-18-1254, 2020 WL 873985, at *9–10 (S.D. Tex. Feb. 21, 2020).

[44] No. 3:20-CV-1050-L, 2021 WL 1165132, at *3 (N.D. Tex. Mar. 26, 2021) (Lindsay, J.) (cleaned up).

[45] *Id.*

breaks out each of the individual [] trade secrets."[46] But *Valentine* did its best to distill a rule from out-of-circuit authority because "the Fifth Circuit . . . [had not] addressed" the issue before it.[47] Because the Fifth Circuit has since addressed the requisite specificity in *GlobeRanger*—three years after *Valentine*—*Valentine*'s reasoning cannot control the analysis.

The Court **DENIES** Tata's motion for summary judgment.

### B. Tata's Motion to Exclude

CSC retained an expert, Brian Napper, to render a damages opinion, and Tata seeks to exclude his testimony. An expert's opinion testimony is admissible if, among other things, it can "help the trier of fact to . . . determine a fact in issue."[48] Tata argues that Napper's testimony "is not helpful to the trier of fact" because he premised his damages model on "the functions of CyberLife and Vantage, not actual asserted trade secrets."[49] Confirming the Court's *déjà vu*, Tata concedes that that's the same argument "set forth in [Tata's] . . . motion for summary judgment."[50] Unsurprisingly, then, Tata's argument fails for two reasons.

First, as noted, the Fifth Circuit has already rejected the notion that a plaintiff must define the trade secrets at issue with precise granularity.[51] Tata's attempt to

---

[46] No. 3:12-CV-1687-P, 2013 WL 9554563, at *4 (N.D. Tex. June 5, 2013) (Horan, M.J.) (cleaned up).

[47] *Id.* at *2.

[48] FED. R. EVID. 702(a).

[49] Doc. No. 302 at 13, 11.

[50] *Id.* at 12.

[51] *See supra* Part III.A.2.

11

force CSC's damages expert to tether his damages calculation to specific trade secrets would, therefore, effectively end-run *GlobeRanger*.

Second, the Fifth Circuit takes a "flexible approach [] to calculate damages for claims of misappropriation of trade secrets."[52] Even if "damages are uncertain" or "only approximate," that "should [not] preclude recovery."[53] For instance, trade-secret damages experts can evaluate a company's worth without tethering those calculations to specific trade secrets.[54] Tata doesn't even attempt to reconcile that flexibility with its stringent specificity standard.

Because Tata's proposed specificity is inconsistent with Fifth Circuit precedent, the Court **DENIES** Tata's motion to exclude Napper's testimony.

### C. CSC's Motion for Partial Summary Judgment

In its answer, Tata lists nine affirmative defenses. CSC asks the Court to grant it summary judgment on each of those defenses. The defenses fall into three categories, and the Court considers each category in turn.

First, Tata "reserve[d] all affirmative defenses . . . that may now exist or in the future be available."[55] Although CSC objects, Tata now withdraws that defense.[56] Thus, the Court **FINDS AS MOOT IN PART** CSC's motion for partial summary judgment as to Tata's catch-all defense.

---

[52] *Wellogix*, 716 F.3d at 879 (cleaned up).

[53] *Id.* (cleaned up).

[54] *Id.* ("[The] expert . . . [testified] that the company was worth $27.8 million in 2005."); *accord Vianet Grp.*, 2016 WL 4368302, at *22 ("Damages may also take the form of lost business value.").

[55] Doc. No. 307-1 at 16.

[56] Doc. No. 350 at 25 (conceding that it "does not seek to present any unpled defense to the jury").

Second, CSC cites three of those defenses—(1) "failure to state a claim," (2) "lack of trade secrets," and (3) "consent"—asserting that those are "not actually affirmative defenses," but instead negations of CSC's prima facie case.[57]  Technically, CSC has a point.  Tata agrees that those defenses "attack elements of CSC's case-in-chief,"[58] and defenses that "negate an essential element of Plaintiff's prima facie case" are "not affirmative defenses."[59]

But Tata's erroneous labeling doesn't justify summary judgment.  Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[60]  A defendant's mislabeling of a negative defense doesn't demonstrate that the plaintiff is entitled to judgment as to that defense.[61]

Instead, the Court *sua sponte* strikes the improperly labeled defenses.  Under Federal Rule of Civil Procedure 12(f)(1), a court may *sua sponte* "strike from a pleading . . . any redundant [or] immaterial . . . matter."  And "it is inappropriate and redundant for [a] [d]efendant to rehash its general denials under the guise of affirmative defenses."[62]  Thus, the Court strikes Tata's improperly labeled

---

[57] Doc. No. 352 at 6; *see also* Doc. No. 307-1 at 14–15.

[58] Doc. No. 350 at 5.

[59] *F.D.I.C. v. Niblo*, 821 F. Supp. 441, 460 (N.D. Tex. 1993) (Cummings, J.); *accord In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense.").

[60] FED. R. CIV. PROC. 56(a).

[61] *Cf. Atlin v. Mendes*, No. 3:06-CV-1909-L, 2009 WL 306173, at *2 (N.D. Tex. Feb. 6, 2009) (Lindsay, J.) ("[G]ranting summary judgment on a procedural ground that is easily remedied would elevate form over substance.").

[62] *Twin Rivers Eng'g, Inc. v. Fieldpiece Instruments, Inc.*, No. 2:15-CV-1838-JRG, 2016 WL 7042232, at *2 (E.D. Tex. Apr. 6, 2016).

"affirmative defenses" of (1) failure to state a claim, (2) lack of trade secrets, and (3) consent. Tata is still "free to challenge these elements of [CSC's] case-in-chief at trial."[63]

Third, CSC objects to Tata's equitable defenses of (1) laches, (2) failure to mitigate, (3) unclean hands, (4) equitable estoppel, (5) waiver, and (6) acquiescence. The Court examines each in turn.

### 1. Laches

"[L]aches requires a showing of both unreasonable delay and prejudice to the party who raises the defense."[64] CSC contends that Tata can't prove laches because "CSC filed suit . . . within six weeks of first becoming aware of Tata's trade secret misappropriation."[65] Tata responds by arguing that CSC knew of Tata's actions and yet "delayed in filing suit . . . for at least 10 months"—from June 2018 to April 2019.[66]

Tellingly, however, Tata doesn't cite any caselaw concerning what sorts of delays are unreasonable. The Fifth Circuit has found that "eight months was [not] an inexcusable delay."[67] Likewise, courts in this circuit have found that "a time

---

[63] *Id.*

[64] *In re Henderson*, 577 F.2d 997, 1001 (5th Cir. 1978).

[65] Doc. No. 307 at 9–10. The Supreme Court has held that, "in [the] face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014). Because 18 U.S.C. § 1836(d) imposes a three-year statute of limitations on trade-secret misappropriation claims, Tata can't raise laches as a merits defense. And Tata appears to agree, contending that it only seeks to invoke laches "[t]o the extent CSC seeks an equitable remedy." Doc. No. 350 at 20.

[66] Doc. No. 350 at 20; *see also* Doc. No. 252-15 at 6 (providing evidence that "the CSC folks were completely aware" that Tata was "using CSC confidential information to write requirements for the Transamerica customer layer of BaNCS" as early as June 2018).

[67] *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998).

14

period of approximately nine to ten months . . . is not inherently inexcusable."[68] Some have even held that "[a] delay of under two years is not unreasonable as a matter of law."[69] Thus, even assuming CSC waited ten months to file suit, that was not an unreasonable delay as a matter of law. The Court **GRANTS IN PART** CSC's motion for summary judgment as to Tata's laches defense.

### 2. Failure to Mitigate

"[M]itigation is a method of apportioning damages where the party . . . fails to reasonably avoid loss."[70] The parties treat failure to mitigate as a negative defense. That's wrong. Although the Fifth Circuit has been less than clear on whether failure to mitigate constitutes an affirmative defense,[71] failure to mitigate is an "equitable doctrine" that reduces damages—it doesn't negate any element of CSC's prima facie case.[72] Thus, the Court declines to *sua sponte* strike that defense with the above negative defenses.

In any event, CSC claims that "Tata has failed to identify . . . facts that CSC allegedly failed to mitigate its damages."[73] Tata's analysis of mitigation leaves much

---

[68] *Gruma Corp. v. Mexican Restaurants, Inc.*, No. 4:09-CV-488, 2010 WL 5390139, at *6 (E.D. Tex. Dec. 2, 2010), *report and recommendation adopted*, No. 4:09-CV-488, 2010 WL 5387624 (E.D. Tex. Dec. 22, 2010).

[69] *RE/MAX Intern., Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 711 (S.D. Tex. Sept. 3, 2009).

[70] *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 274 (5th Cir. 2020).

[71] *Compare Carrizales v. State Farm Lloyds*, 518 F.3d 343, 350 (5th Cir. 2008) ("[T]he duty to mitigate damages is . . . not an affirmative defense."), *with Energy Intelligence*, 948 F.3d at 268 (describing the "affirmative defense of mitigation").

[72] *Carrizales*, 518 F.3d at 350.

[73] Doc. No. 307 at 22.

to be desired. Although Tata focuses on the fact that its "actual revenues . . . have increased as time has passed," CSC's conduct—not Tata's revenue—determines the mitigation analysis.[74] And Tata's only statement concerning CSC's conduct is that "CSC unreasonably delayed in filing suit" as shown in Tata's "laches defense."[75] But, as noted above, any such delay was reasonable as a matter of law. Accordingly, the Court **GRANTS IN PART** CSC's motion for summary judgment as to Tata's failure-to-mitigate defense.

### 3. Unclean Hands

Under the unclean-hands defense, "one tainted with inequitableness or bad faith relative to the matter in which he seeks relief is barred from a court of equity."[76] Tata asserts that CSC has unclean hands because it brought "this suit as an anticompetitive weapon despite its recognition that Transamerica . . . had[] authorized [Tata]'s access to the alleged trade secrets."[77] To support that claim, Tata cites evidence indicating that CSC wished to exclude Tata from the United States market and rehashes its argument that the 2014 Addendum gave Tata the right to use CSC's confidential information.

But the Court has already rejected Tata's argument that the 2014 Addendum gave Tata the right to copy and modify CSC's confidential information to develop a competing platform. Further, although Tata bemoans CSC's anticompetitive motive,

---

[74] Doc. No. 350 at 12; *Energy Intelligence*, 948 F.3d at 274 (requiring the court to analyze whether the party that alleged failed to mitigated "fail[ed] to reasonably avoid loss").

[75] Doc. No. 350 at 11.

[76] *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 794 (5th Cir. 1999) (cleaned up).

[77] Doc. No. 350 at 24.

16

it doesn't argue that CSC filed this suit in "bad faith" or otherwise committed an "unlawful" antitrust violation.[78] And when the facts do not show any "willful, egregious, or unconscionable conduct or bad faith," this Court must reject the unclean-hands defense.[79]

Accordingly, the Court **GRANTS IN PART** CSC's motion for partial summary judgment as to Tata's unclean-hands defense.

### 4. Equitable Estoppel, Waiver, and Acquiescence[80]

Under each of these defenses, if a plaintiff knowingly takes an action in contravention of its rights, it cannot exercise those rights in a subsequent suit.[81] CSC argues that Tata can't win on any of those defenses because it has no "evidence [] that CSC . . . had full knowledge of Tata's . . . use of CSC's . . . Vantage and CyberLife platforms to develop Tata's [] BaNCS platform."[82] But Tata has provided such evidence. For instance, Tata provides evidence that a CSC employee sent a "[c]ode snippet" to Tata employees in April 2019.[83] CSC even admits that that employee "provide[d] information on how certain policy information was calculated in

---

[78] *Alcatel USA*, 166 F.3d at 794, 796, 797 (cleaned up).

[79] *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 F. App'x 361, 362 (5th Cir. 2004) (per curiam).

[80] Tata considers these defenses together, so the Court will as well.

[81] *See Kaneb Servs., Inc. v. Fed. Sav. & Loan Ins. Corp.*, 650 F.2d 78, 81 (5th Cir. 1981) ("[U]nder the doctrine of equitable estoppel a party with full knowledge of the facts, which accepts the benefits of a transaction . . . may not subsequently take an inconsistent position to avoid the corresponding obligations or effects."); *Long v. Gonzales*, 420 F.3d 516, 520 (5th Cir. 2005) (per curiam) ("Waiver is an intentional relinquishment or abandonment of a known right or privilege."); *Capece*, 141 F.3d at 206 ("[A]cquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induce[] reliance by the defendant." (cleaned up)).

[82] Doc. No. 307 at 15.

[83] Doc. No. 252-11 at 33.

17

Vantage."[84]  Accordingly, Tata has shown a genuine dispute of material fact concerning CSC's knowledge of Tata's use of its platform to develop the BaNCS platform.

The Court **DENIES IN PART** CSC's motion for summary judgment as to Tata's equitable estoppel, waiver, and acquiescence defenses.

## IV. Conclusion

The Court **DENIES** Tata's motion for summary judgment.  The Court **DENIES** Tata's motion to exclude the testimony of Brian Napper.  The Court **GRANTS IN PART, DENIES IN PART, AND FINDS AS MOOT IN PART** CSC's motion for partial summary judgment.  Specifically, the Court **GRANTS** CSC's motion for summary judgment as to Tata's laches, failure-to-mitigate, and unclean-hands defenses.  The Court **DENIES** CSC's motion for summary judgment as to Tata's equitable-estoppel, waiver, and acquiescence defenses.  The Court **STRIKES** Tata's failure-to-state-a-claim, lack-of-trade-secrets, and consent defenses.  And the Court **FINDS AS MOOT** CSC's motion for summary judgment as to Tata's withdrawn, catch-all affirmative defense.  By a subsequent order, the Court will set a trial date and pretrial deadlines.

---

[84] Doc. No. 352 at 21.

**IT IS SO ORDERED** this 21st day of January, 2023.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE