UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| COMPUTER SCIENCES CORPORATION, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Civil Action No. 3:19-cv-0970-X |
| TATA CONSULTANCY SERVICES LIMITED, et al., | § § § § | |
| *Defendants.* | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court are the parties' motions for entry of judgment. (Docs. 506, 509). From November 8, 2023 to November 17, 2023, this Court presided over a trial before an advisory jury. The jury found Defendant Tata Consultancy Services Limited ("TCS") liable for willful and malicious trade secret misappropriation under the federal Defend Trade Secrets Act of 2016 ("DTSA") and awarded Plaintiff Computer Sciences Corporation ("CSC") $70,000,000 in compensatory damages and $140,000,000 in exemplary damages.[1]

After careful consideration, the Court **GRANTS IN PART** CSC's amended motion for entry of judgment (Doc. 509) and **DENIES** TCS's motion (Doc. 506). As discussed more fully below, CSC's damages expert testified at trial that TCS was unjustly enriched in the amount of $56,151,583, and the Court finds that he testified

---

[1] Doc. 488.

1

credibly. However, in its post-trial motion for entry of judgment, CSC contends that, by accounting for inflation, TCS was actually unjustly enriched by at least $56,151,583 to $74,870,716, therefore supporting the advisory jury's $70,000,000 compensatory damages award. The role of an advisory jury is to assist the judge, but it is the duty of the judge to make findings of fact and enter judgment in accordance with the record before the Court.[2]  And as the factfinder, the Court cannot consider disputed evidentiary facts on paper when it did not have the opportunity to examine the credibility of that evidence at trial.[3]  However, the Court is awarding pre-judgment interest at a rate of 8.5% (totaling $25,773,576.60), which accounts for a majority of the roughly $42 million delta CSC seeks.

Accordingly, after a thorough review of the evidentiary record, the Court finds that the evidence supports no more than a $56,151,583 compensatory damages award in light of the expert testimony in the evidentiary record and an award of $112,303,166 in exemplary damages. Likewise, the Court cannot hold Tata America International Corporation ("TAIC") jointly and severally liable with TCS given that CSC did not present adequate proof of liability against TAIC at trial. Finally, the Court concludes CSC is entitled to costs and attorney's fees, and the Court awards prejudgment interest and injunctive relief.

In accordance with Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law:

---

[2] *See Aetna Ins. Co. v. Paddock*, 301 F.2d 807, 811 (5th Cir. 1962).

[3] *See Lifshen v. 20/20 Acct. Sols., L.L.C.*, 858 F. App'x 704, 708–09 (5th Cir. 2021) (per curiam).

## FINDINGS OF FACT

1.     The facts below were all proven by at least a preponderance of the evidence.

2.     The facts below supporting willful and malicious misappropriation were also proven by clear and convincing evidence.

### A.     Parties

3.     CSC provides information technology services and business solutions software to its customers, including customers in the life, wealth, and annuities industry.[4]

4.     CSC was founded in 1959, is a Nevada corporation, and has a principal place of business in Ashburn, Virginia.[5]

5.     CSC is a wholly owned subsidiary of DXC Technology Company ("DXC").[6]

6.     TCS is a global company offering technology and consulting services to its customers, including customers in the insurance industry.[7]

7.     TAIC is a wholly owned subsidiary of TCS Limited.[8]

---

[4] Doc. 492 at 246:1–8, 246:18–247:1.

[5] Doc. 451 at 4.

[6] Doc. 492 at 326:16–18.

[7] Doc. 496 at 1213:2–11.

[8] Doc. 451 at 5.

8.    Through its subsidiaries, Transamerica Corporation provides life insurance, annuities, and other long-term savings and investment products to its customers.[9]

9.    Transamerica Corporation is a wholly owned subsidiary of Aegon N.V.[10]

10.    MSI is a wholly owned subsidiary of Transamerica Corporation.[11]

11.    For many years, CSC has licensed Vantage and CyberLife—two CSC software platforms used to administer and process annuities and life insurance policies—to Transamerica pursuant to license agreements.[12]

12.    In December 1994, CyberTek Corporation ("CyberTek") entered into an Enterprise License Agreement with MSI under which CyberTek would license certain software systems to MSI (as amended, the "CyberLife Agreement").[13]

13.    Effective September 1999, CyberTek and MSI amended the CyberLife Agreement to include certain CyberLife software as part of the licensed system.[14]

14.    In 2000, CSC acquired CyberTek's successor.[15]

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] Doc. 492 at 246:22–247:4, 252:6–15, 291:1–8, 253:8–17.

[13] Doc. 451 at 5.

[14] *Id.*

[15] Doc. 492 at 271:9–14.

15. In December 1998, CSC entered into a CSC Customer Agreement with Transamerica's predecessor, Aegon USA, Inc. ("Aegon USA"), under which CSC would license certain software systems to Aegon USA (as amended, the "Vantage Agreement").[16]

16. Effective June 2005, CSC and MSI, as assignee of Aegon USA, amended the Vantage Agreement to include certain Vantage software as part of the licensed system.[17]

17. In or around 2013, TCS began providing maintenance services to Transamerica for Vantage and CyberLife pursuant to a 2013 Master Services Agreement between TCS and MSI.[18]

18. In 2014, to allow third parties like TCS to work on CSC's software with certain restrictions, CSC and Transamerica entered into a Third-Party Access Addendum to Software License Agreements (the "TPAA") effective February 2014.[19]

19. The TPAA is an "Addendum" to the "Software license agreements set forth on Exhibit A," which are the CyberLife Agreement and the Vantage Agreement.[20]

---

[16] Doc. 451 at 5.

[17] *Id.*

[18] *Id.*; Doc. 381 at 2–3.

[19] Doc. 381 at 2–3; Doc. 451 at 5.

[20] PX081 at 1, 6.

20.    The TPAA allowed TCS to "access, copy, execute and use" CSC's software "solely for the benefit of" Transamerica.[21]

21.    The TPAA also allowed TCS "to copy" and "modify" CSC's software only if CSC's earlier agreement with Transamerica permitted such modifications.[22]

22.    In 2016, Transamerica decided its software needed a refresh, so it initiated a vendor-selection process through which both CSC and TCS bid for the work.[23]

23.    At that time, TCS was looking for a client to enter the third-party administrator market in the U.S. insurance industry.[24]

24.    BaNCS is the software platform that TCS uses to, among other things, administer and process annuities and life insurance policies.[25]

25.    As of 2017, TCS was still building its U.S. geography layer for BaNCS, and there was no company using BaNCS to administer life insurance and annuity products in the U.S. because BaNCS was not ready to administer such products in the U.S.[26]

---

[21] *Id.* at 3; Doc. 381 at 2–3.

[22] PX081 at 3; Doc. 381 at 2.

[23] Doc. 495 at 865:16–25.

[24] Doc. 493 at 440:15–18, 441:7–11.

[25] *Id.* at 481:25–482:6.

[26] *Id.* at 440:19–441:6, 441:12–22; Doc. 496 at 1378:16–1379:1, 1379:2–13, 1531:10–14.

26.    TCS believed that landing Transamerica as an anchor client would create an opportunity to adapt BaNCS for the U.S. market.[27]

27.    TCS won the selection process, and Transamerica began to transition from CSC's software platforms to TCS's BaNCS platform.[28]

28.    On August 3, 2017, TCS and MSI entered into Service Agreement No. 75 ("Project Chess – Due Diligence") to the 2013 Master Services Agreement.[29]

29.    On January 11, 2018, TCS entered into agreements with MSI to, among other things, administer Transamerica's U.S. life insurance and annuity business lines using BaNCS.[30]

30.    The January 2018 agreements were TCS's first contracts with a U.S. insurance company wherein it would be licensing BaNCS to administer and process annuities and life insurance policies.[31]

31.    As part of the January 2018 agreements, TCS hired over 2,200 people who were formerly employed by Transamerica ("TCS Rebadged Employees"), including former Transamerica employees who maintained Vantage and CyberLife at Transamerica.[32]

---

[27] Doc. 493 at 441:15–22.

[28] Doc. 495 at 866:20–22, 878:12–14; Doc. 492 at 291:9–14.

[29] Doc. 451 at 6; PX115.

[30] Doc. 451 at 5; PX094.

[31] Doc. 496 at 1379:17–22.

[32] Doc. 451 at 5; Doc. 494 at 753:14–17.

7

32.   TCS promised to convert around 10.5 million Transamerica policies to BaNCS in three to five years.[33]

33.   This promise was aggressive.[34]

34.   Paul Ko—CSC's current Account Manager for the Transamerica account, whose testimony the Court finds credible and reliable— testified that he had never heard of a conversion of over 10 million policies before the 2018 TCS-Transamerica contracts.[35]

35.   The Transamerica conversion to BaNCS was a "black box" conversion, which is more difficult and expensive.[36]

36.   A black box conversion is when a company converts from one or more source systems (here, Vantage and CyberLife) to a target system (BaNCS) and the target company (TCS) does not have permission to access the source code or technical documents of the source systems to complete the conversion.[37]

37.   TCS's promise was also ambitious because no U.S. insurance company had ever used BaNCS and TCS was still building BaNCS for use in the U.S.[38]

---

[33] Doc. 494 at 802:17–22.

[34] *Id.* at 802:8–803:5, 804:8–12.

[35] *Id.* at 804:5–7.

[36] *Id.* at 804:13–805:23.

[37] *Id.* at 804:13–805:3.

[38] Doc. 496 at 1378:16–1379:13; Doc. 493 at 440:19–441:6, 441:12–14.

38.    Even as late as April 14, 2021—more than three years after TCS's promise to Transamerica—many carrier-agnostic functions necessary for BaNCS to be able to administer life insurance and annuity products in the U.S. were missing and still needed to be developed.[39]

### B.    Trade Secret Misappropriation

39.    CSC treats its proprietary source code and confidential documentation for its VANTAGE–ONE® / Wealth Management Accelerator™ ("Vantage") and CyberLife® ("CyberLife") software platforms (the "Trade Secrets") as trade secrets, and in the opinion of CSC's technical expert Paul Pinto, whose qualifications are discussed below and whose opinions are credible and support the Court's findings of fact, the Trade Secrets qualify as trade secrets under the requirements of the DTSA.[40]

40.    CSC owns the Trade Secrets.[41]

41.    CSC owns the Vantage software platform, including any modifications made to it by Transamerica.[42]

42.    The Vantage Agreement provides that "[a]ll copies of and intellectual property rights in" Vantage, "includ[ing] all computer code" and

---

[39] Doc. 496 at 1382:10–1385:18; PX451.

[40] Doc. 494 at 796:17–24; Doc. 492 at 254:13–9, 260:6–10; Doc. 495 at 931:21–932:1; 932:9–950:25; 948:4–949:20; 950:3–950:25.

[41] PX069; PX088; PX081; Doc. 495 at 933:8–11; 935:12–936:2; 936:12–937:18; 939:3–942:16; 947:12–19, 949:7–9.

[42] Doc. 492 at 251:21–23; PX010 at 1; Doc. 494 at 799:9–800:21, 833:14–18; PX069; PX081; Doc. 494 at 779:15–780:5.

"Documentation . . . provided by CSC with" Vantage, "including translations, adaptions, compilations, partial copies within other software, upgrades, corrections, modifications, enhancements, and derivative works, whether made by [Transamerica] or CSC, shall be the property of CSC."[43]

43.     The Vantage Agreement further provides that "[Transamerica] understands that [Vantage] (including the program code, Documentation, specifications, logic and design of [Vantage] and any translations, adaptions, compilations, partial copies within other software, upgrades, corrections, modifications, enhancements, and derivative works of [Vantage]) are confidential trade secrets of CSC, developed at great expense."[44]

44.     CSC owns the CyberLife software platform, including any modifications made to it by Transamerica.[45]

45.     The CyberLife Agreement provides that "any modified or merged version of [CyberLife]," including the "computer programs for [CyberLife] and its subcomponents designated herein, and all materials related thereto provided to [Transamerica] under this Agreement, which

---

[43] PX069 at 3.

[44] *Id.* at 8.

[45] Docs. 492–93 at 251:24–252:2, 272:13–22, 428:7–20; PX088 at 4; PX010 at 1; Doc. 494 at 797:24–799:8; Doc. 495 at 933:8–11; 935:12–936:2; 936:12–937:18; 939:3–942:16; 947:12–19; PX523 at 1–2; PX088; PX081.

may include but not be limited to . . . documentation, source codes, object codes, specifications and materials of any type whatsoever (tangible or intangible and machine or human readable) which incorporate or reflect the design, specifications, or workings of [CyberLife] and any changes, additions or modifications," "shall remain subject to the LICENSE AND TITLE, POSSESSION AND USE and TERMINATION provisions of this Agreement."[46]

46.     The CyberLife Agreement further provides that it "does not grant [Transamerica] any legal or equitable title or other right in [CyberLife] or any modifications of [CyberLife]."[47]

47.     In the CyberLife Agreement, Transamerica "acknowledge[d] that [CyberLife] contain[s] unique, confidential and secret information and is a trade secret and confidential proprietary product of [CSC]."[48]

48.     CSC created voluminous technical manuals for Vantage and CyberLife.[49]

49.     CSC owns these technical manuals.[50]

---

[46] PX088 at 2–3, 5.

[47] *Id.* at 4.

[48] *Id.*

[49] Doc. 492 at 255:23–256:3, 256:23–257:2, 258:12–16.

[50] Doc. 492 at 255:23–256:3, 256:23–257:4, 258:12–18, 275:1–6; PX002 at 20; PX010 at 1.

50.    Transamerica also created technical manuals for Vantage and CyberLife.[51]

51.    Under its agreements with Transamerica, CSC owns the confidential information regarding Vantage and CyberLife in these technical manuals.[52]

52.    CSC created source code, including copybooks, for Vantage and CyberLife.[53]

53.    CSC owns this source code, including any modifications made by Transamerica.[54]

54.    Pinto conducted an investigation into whether the Trade Secrets are generally known, including searches of the public domain, and opined that the Trade Secrets are not generally known.[55]

55.    Jon Taute—a former CSC employee who worked in the insurance software industry for over 40 years and for CSC or one of its predecessors for 35 years, and whose testimony the Court finds credible and reliable—also testified that he would not provide the Trade Secrets

---

[51] PX549; PX550; PX551; PX552.

[52] PX069 at 3–4, 8; PX088 at 2–5.

[53] Doc. 492 at 266:7–9; PX534 at 1–983.

[54] Doc. 492 at 261:22–262:1, 264:7–11, 265:17–25, 266:10–11; PX534 at 1; PX002 at 20; PX010 at 1; PX069 at 3–4, 8; PX088 at 2–5.

[55] Doc. 495 at 933:12–21, 949:10–950:7.

to employees of a competitor building a competing policy administration system.[56]

56. The Trade Secrets consist of or relate to highly specialized and complex software systems with millions of lines of code.[57]

57. Pinto evaluated the Trade Secrets and opined that they are not readily ascertainable through proper means.[58]

58. CSC has one of the largest insurance software businesses in the world.[59]

59. CSC receives hundreds of millions of dollars in revenue per quarter from its insurance group, including software licensing fees, maintenance and support fees, and fees for software enhancements and modifications.[60]

60. From 2015 to 2020, CSC's third-party software administration business grew from $100 million to $250 million, largely due to Vantage and CyberLife.[61]

61. CSC's insurance business process outsourcing ("BPO") services consist of providing end-to-end processing for entire blocks of business, often including underwriting and death claims for millions of insurance policies.[62]

---

[56] Doc. 492 at 243:21–244:2, 245:7–10, 246:15–17, 254:20–255:4, 260:12–19, 266:20–267:4.

[57] *Id.* at 252:6–20.

[58] Doc. 495 at 949:24–950:7.

[59] Doc. 493 at 569:19–23, 571:8–15.

[60] Doc. 492 at 267:12–268:8; Doc. 493 at 569:19–23.

[61] Doc. 493 at 571:8–572:2.

[62] Doc. 492 at 269:8–270:1.

62.    CSC administers BPO services for approximately 20 million insurance policies through CyberLife and approximately 18 million insurance policies through Vantage.[63]

63.    CSC would not be able to offer these BPO services without Vantage and CyberLife.[64]

64.    CSC would lose millions of dollars of revenue if a competitor improperly obtained the Trade Secrets.[65]

65.    BaNCS competes with Vantage and CyberLife in the U.S. life insurance and annuities market, and as found in Section IV.C below, TCS obtained economic value from the disclosure and use of the Trade Secrets, which demonstrates that another person could obtain economic value from the disclosure or use of the Trade Secrets.[66]

66.    Pinto opined that the Trade Secrets derive independent economic value because they are secret and not generally known or readily ascertainable through proper means.[67]

---

[63] *Id.* at 269:8–270:1.

[64] *Id.* at 270:2–4.

[65] *Id.* at 270:5–9.

[66] Doc. 495 at 946:8–15; Doc. 494 at 801:18–22.

[67] Doc. 495 at 933:12–21; 950:8–12.

67.    CSC securely stores its source code for Vantage and CyberLife in electronic form in source code libraries on servers used by CSC developers.[68]

68.    CSC marks its technical manuals for Vantage and CyberLife with statements that the information is owned by CSC and is trade-secret, confidential, and proprietary information, and marks its Vantage and CyberLife source code, including copybooks, with a banner at the beginning stating: "This program is proprietary, confidential and trade secret property of Computer Sciences Corporation and may not be copied or published without prior written consent."[69]

69.    The CyberLife Agreement allows Transamerica to use the Trade Secrets only to process data for Transamerica's own use, does not grant Transamerica any legal title or other rights to CyberLife or modifications made to CyberLife, and does not permit Transamerica to use its access to CyberLife to build a competing product.

70.    Section 1.1 of the CyberLife Agreement defines the "System" as "[a]n assembly of [CSC's] computer programs for a System and its

---

[68] Doc. 492 at 261:17–21, 263:16–20.

[69] Doc. 492 at 274:9–15, 275:1–10; Doc. 495 at 935:12–939:2; Doc. 493 at 490:19–491:8; PX474 at 2; PX475 at 2; PX476 at 2; PX477 at 2; PX478 at 2; PX479 at 2; PX480 at 2; PX481 at 2; PX482 at 2; PX483 at 2; PX484 at 2; PX485 at 2; PX486 at 2; PX487 at 2; PX489 at 2; PX490 at 2; PX491 at 2; PX492 at 2; PX493 at 2; PX494 at 2; PX495 at 2; PX496 at 2; PX505 at 2; PX506 at 1; PX507 at 2; PX509 at 2; PX510 at 2; PX511 at 2; PX514 at 2; PX515 at 2; PX517 at 3; PX519 at 2; PX520 at 2; PX521 at 2 and footer on 1–210; PX523 at 2; PX524 at 2; PX525 at 2; PX531 at 2; Doc. 492 at 261:22–262:1, 262:13–16, 264:7–11, 265:17–25; PX534 at 1.

subcomponents designated herein, and all materials related thereto provided to [Transamerica] under this Agreement, which may include but not be limited to, flow charts, logic diagrams, documentation, source codes, object codes, specifications and materials of any type whatsoever (tangible or intangible and machine or human readable) which incorporate or reflect the design, specifications, or workings of such programs and any changes, additions or modifications provided by [CSC] through Maintenance or Enhancements."[70]

71.    Under Section 4.1, the "License and Title" granted to Transamerica is that Transamerica "is entitled to use said mainframe Systems solely at the Authorized Location to process data for its own use and for the Authorized Companies."[71]

72.    Section 4.2 provides that the CyberLife Agreement does not grant Transamerica "any legal or equitable title or other right in the Systems or any modifications of the Systems," and that "[n]either this Agreement nor any of the Systems or related materials may be assigned, sublicensed, or otherwise transferred by [Transamerica], voluntarily or involuntarily, without prior written consent by [CSC]."[72]

---

[70] PX088 at 2–3.

[71] *Id.* at 4.

[72] *Id.*; Doc. 492 at 271:20–272:22.

73.     Under Section 5.1, Transamerica acknowledged that "the System(s) contain unique, confidential and secret information and is a trade secret and confidential proprietary product of [CSC]," and that Transamerica cannot "allow any person or entity to transmit or reproduce the System(s) in whole or in part in any manner except as permitted" in the agreement.[73]

74.     Under Section 5.3, Transamerica "may modify the Systems or merge the System with other computer programs; however, any modified or merged version of the System shall remain subject to the License and Title, Possession and Use, and Termination provisions of [the] Agreement."[74]

75.     Under Section 5.4, Transamerica "may not reverse engineer, reverse assemble or reverse compile any System or part thereof."[75]

76.     Under the Vantage Agreement, CSC provided Transamerica with a limited license to use Vantage, pursuant to the confidentiality provisions—the agreement did not provide Transamerica with any title or ownership in Vantage, but rather provides that CSC owns any works, modifications, enhancements, copies, software upgrades, corrections,

---

[73] PX088 at 4.

[74] *Id.* at 5.

[75] *Id.*

enhancements, and derivative works of Vantage, irrespective of who makes them.[76]

77.     Under Section 2 of the Vantage Agreement, "Documentation" is defined as "the formal documentation provided by CSC with a Software Product licensed by [Transamerica] as updated by CSC from time to time," and "Software Product" is defined as "any computer software package owned or marketed by CSC, and includes all computer code (whether machine readable or human readable), Documentation, and related materials identified by CSC as part of the package."[77]

78.     Under Section 3.1, Transamerica "receives only a limited license to use [the] Software Products," "[n]o title, ownership, or intellectual property rights are transferred to" Transamerica, Transamerica "may use Software Products licensed to [Transamerica] only in the manner and for the purposes expressly authorized by [the] Agreement," and "CSC reserves all rights not expressly granted to [Transamerica]."[78]

79.     Under Section 3.2, "[a]ll copies of and intellectual property rights in Software Products, including translations, adaptions, compilations, partial copies within other software, upgrades, corrections, modifications, enhancements, and derivative works, whether made by

---

[76] Doc. 495 at 941:16–942:16; PX069 at 3–4, 8.

[77] PX069 at 3.

[78] *Id.*

18

[Transamerica] or CSC, shall be the property of CSC and subject to the terms of [Transamerica's] license to the Software Products."[79]

80.     Under Section 9.1, Transamerica recognized "that the Software Products (including the program code, Documentation, specifications, logic and design of the Software Products and any translations, adaptations, compilations, partial copies within other software, upgrades, corrections, modifications, enhancements and derivative works of the Software Products) are confidential trade secrets of CSC, developed at great expense."[80]

81.     CSC's other license agreements for CyberLife and Vantage contain language similar to the restrictive language in the CyberLife Agreement.[81]

82.     Under Section 1 of the TPAA, "Licensor Competitor" is defined as "any person or division of an entity in the business of developing, licensing and marketing computer software systems for the administration of life insurance or annuity market that perform the same or similar function as the Software."[82]

---

[79] *Id.*

[80] *Id.* at 8.

[81] Doc. 492 at 271:20–272:9; 272:23–273:9.

[82] PX081 at 1.

83.    Under Section 2(i) of the TPAA, Transamerica "may disclose [CSC's] confidential information" to Licensor Competitors only "with [CSC's] prior written consent" and "only after [CSC], [Transamerica] and such Licensor Competitor have signed a non-disclosure agreement in substantially the form of the Non-Disclosure Agreement set forth in Exhibit B hereto."[83]

84.    Section 1 of Exhibit B to the TPAA, "Form of Non-Disclosure Agreement for Licensor Competitors," states that "[t]he Software Products (including the source code, program code, specifications, logic, design, ideas, techniques, know-how and procedures), all related documentation, any information about the Software Products (tangible or not tangible), pricing and terms of this Agreement (collectively, the 'Confidential Information') are confidential trade secrets of [CSC] . . . and protected by United States and international copyright laws."[84]

85.    Section 1 of Exhibit B further provides that "[t]he parties agree that (i) no Consultant employees who are working or who have worked in the past 9 months on core insurance applications, such as policy administration systems, compensation systems and new business systems, shall be included as Permitted Employees [who may access the Confidential Information to perform the services for Transamerica];

---

[83] *Id.* at 2.

[84] *Id.* at 7.

(ii) Permitted Employees may not work for Consultant on an insurance company engagement that involves access to CSC Confidential Information for 9 months before or after having been included as a Permitted Employee . . . ; and (iii) Permitted Employees may not work for Consultant on engagements related to Consultant-owned intellectual property for life and/or annuity insurance systems for 9 months before or after having been included as a Permitted Employee."[85]

86.   Section 2(iv) of the TPAA—which Transamerica and CSC signed before TCS began licensing and marketing BaNCS in the U.S. and therefore qualified as a Licensor Competitor—"excluded" TCS (but not its employees who qualify as Licensor Competitors) from the requirements of Section 2(i) of the TPAA, but states that TCS "shall be subject to obligations of confidentiality at least as stringent as those imposed on [Transamerica] herein and terms substantially similar to those set forth on Exhibit D hereto."[86]

87.   When CSC's clients request to share the Trade Secrets with a third party, if CSC agrees, CSC requires the third party to sign a non-disclosure agreement and places restrictions on how the Trade Secrets may be used.[87]

---

[85] *Id.*

[86] *Id.* at 3.

[87] *Id.* at 2–3; Doc. 492 at 273:10–274:3.

88.    All CSC employees sign a confidentiality agreement before receiving access to the Trade Secrets.[88]

89.    Under Section 3 of an example of such confidentiality agreements, titled "Receipt of CSC Property and Confidential Information," the employee agreed not to "disclose any Confidential Information to anyone other than CSC employees and CSC Customers, but only as is reasonably necessary for Employee's work on behalf of CSC."[89]

90.    CSC has an intellectual property policy that sets forth protections and requirements regarding ownership, access, and handling of CSC's intellectual property.[90]

91.    Under this policy, "[a]ll [CSC] personnel must exercise utmost vigilance to protect all [CSC] Intellectual Property.[91]

92.    Pinto opined that, under industry standards, CSC took reasonable measures to protect the secrecy of the Trade Secrets.[92]

93.    Pinto opined that a document authored by CSC that describes trade secrets in CSC's software would be understood by persons in the industry to be confidential and proprietary to CSC.[93]

---

[88] Doc. 492 at 275:11–17; PX002 at 20.

[89] Doc. 492 at 277:4–8; PX002 at 20.

[90] PX010 at 1.

[91] Doc. 492 at 278:7–16; PX010 at 1.

[92] Doc. 495 at 933:22–25; 935:12–950:25.

[93] Doc. 495 at 937:19–938:9.

94.    Pinto also opined that CSC's marking of its Trade Secrets compares favorably to other software companies in the industry.[94]

95.    Pinto further opined that CSC's employee agreements, non-disclosure agreements, customer agreements, and company policies and security restrictions are reasonable measures to protect the Trade Secrets.[95]

96.    Transamerica uses Vantage and CyberLife to administer millions of life insurance policies throughout the U.S.[96]

97.    CSC has sold Vantage and CyberLife across the U.S. and in foreign countries including Canada, Mexico, and Japan.[97]

98.    The products and services provided under the Vantage Agreement, including Vantage, are used in interstate commerce, as the agreement was originally between CSC, then located in Texas, and Aegon USA, then located in Iowa, and the agreement is now between CSC, located in Virginia, and Transamerica, located in Iowa.[98]

99.    The products and services provided under the CyberLife Agreement, including CyberLife, are used in interstate commerce, as the agreement was originally between CyberTek, then located in Texas, and MSI, then

---

[94] *Id.* at 938:10–939:2.

[95] *Id.* at 948:4–949:4.

[96] Doc. 493 at 482:3–6.

[97] Doc. 492 at 253:2–17.

[98] PX069 at 2; Doc. 451 at 5; Doc. 497 at 1600:21–23.

located in Iowa, and the agreement is now between CSC, located in Virginia, and Transamerica, located in Iowa.[99]

100. TCS was only authorized to access, copy, execute, and use the Trade Secrets on behalf of and solely for the benefit of Transamerica.[100]

101. Software companies sometimes give their customers the right to authorize certain third parties to access their software so the customer can host the software on their own infrastructure, and for application management, testing, or routine maintenance purposes.[101]

102. The purpose of the TPAA was to lay out the access that third-party vendors for Transamerica could have to CSC's software and the conditions for that access.[102]

103. When negotiating the TPAA, Transamerica did not intend to allow TCS to access or use CSC's Vantage and CyberLife source code to develop BaNCS.[103]

104. Section 3(a) of the TPAA grants Transamerica the authority to grant TCS "the right to access, copy, execute, and use the Software and all other rights granted to [Transamerica] under the Agreement

---

[99] PX088 at 1; Doc. 451 at 5; Doc. 492 at 271:9–19; Doc. 497 at 1600:21–23.

[100] Doc. 381 at 4–6.

[101] Doc. 493 at 569:14–18, 591:8–592:1.

[102] Doc. 493 at 591:1–6.

[103] Doc. 495 at 919:14–920:3; PX081 at 3.

(collectively, 'Access Rights'), on behalf of and solely for the benefit of [Transamerica]."[104]

105.    The term "solely" in the phrase "on behalf of and solely for the benefit of [Transamerica]" "means that the use must be for Transamerica's exclusive benefit.[105]

106.    Moreover, the "Access Rights" in the TPAA that may be granted by Transamerica to TCS under Section 3(a) do not exceed the rights granted to Transamerica by CSC in the CyberLife Agreement and the Vantage Agreement.[106]

107.    Section 3(c) of the TPAA grants Transamerica the authority to grant TCS "[t]he right to copy, change, modify, supplement, amend, and prepare Derivative Works of the Software, if and to the same extent permitted in the Agreement, on behalf of and solely for the benefit of [Transamerica]."[107]

108.    Because the "right to copy, change, modify, supplement, amend, and prepare Derivative Works of the Software" is restricted to "if and to the same extent permitted in the Agreement," the rights that may be granted by Transamerica to TCS under Section 3(c) of the TPAA do not

---

[104] PX081 at 3; Doc. 493 at 593:4–15; Doc. 495 at 942:17–944:4.

[105] Doc. 381 at 5 fn. 16.

[106] PX081 at 3.

[107] *Id.*

exceed the rights granted to Transamerica by CSC in the CyberLife Agreement and the Vantage Agreement.[108]

109. CSC also imposed conditions on "Authorized Service Providers," including TCS, before they could access the Trade Secrets.[109]

110. Section 2 of the TPAA states: "[Transamerica] may disclose [CSC's] confidential information to the following categories of Third Parties [described in Sections 2(i)–(iv)] which shall be included in the definition of 'Authorized Service Providers.'"[110]

111. Section 2(ii) does not apply to TCS because it is limited to "Third Parties . . . who have been approved by [CSC] as indicated by inclusion on Exhibit C hereto," and TCS is not identified in Exhibit C to the TPAA.[111]

112. Section 2(iii) does not apply to TCS because it applies only to "Third Parties . . . with ninety nine (99) or fewer employees," and TCS has more than 99 employees.[112]

113. Section 2(i) states that "with [CSC's] prior written consent, Transamerica may disclose CSC's confidential information to "Licensor Competitors, but only after [CSC], [Transamerica], and Licensor

---

[108] *Id.*

[109] *Id.* at 2–3.

[110] *Id.* at 2.

[111] *Id.*

[112] *Id.*

Competitor have signed a non-disclosure agreement in substantially the form of the Non-Disclosure Agreement set forth in Exhibit B hereto."[113]

114. Section 2(iv) states that Transamerica may disclose CSC's confidential information to certain entities which are set forth on Exhibit E hereto (that by definition may fall within (i),(ii) or (iii) above but are hereby being excluded and are subject to the provisions of this paragraph (iv)), that are providing services to [Transamerica] and required access to the Software, provided that such entities shall be subject to obligations of confidentiality at least as stringent as those imposed on [Transamerica] herein and terms substantially similar to those set forth on Exhibit D hereto."[114]

115. TCS is identified on Exhibit E to the TPAA.[115]

116. Exhibit D to the TPAA states: "[Transamerica] is a licensee of certain third party software products and their related documentation, source code, program code, specifications, logic, design, techniques, know-how and procedures (collectively 'Third Party Software')" that "is owned by [Transamerica's] licensors" and "is considered [Confidential Information/Proprietary Information] hereunder and shall be subject to

---

[113] *Id.*

[114] *Id.* at 3.

[115] *Id.* at 17.

all of the restrictions or obligations set forth herein with respect to [Confidential Information/Proprietary Information]."[116]

117.    Exhibit D further states: "Consultant agrees that any modification or derivative works of the Third Party Software, and the copyrights therein, shall be owned by [Transamerica's] licensor [CSC] pursuant to the underlying License Agreement."[117]

118.    Jeremy Frieden, a TCS rebadged employee, testified it was "not [his] understanding that TCS employees rebadged from Transamerica could use CSC's confidential information for TCS's benefit.[118]

119.    Frieden also testified that it is not appropriate for TCS Rebadged Employees to access CSC's confidential information, including CSC's technical manuals and copybooks, for the development of Transamerica's version of BaNCS.[119]

120.    Frieden further testified that it was his belief that CSC manuals for Vantage and CyberLife should not be shared with anyone at TCS drafting requirements, developing, or designing Transamerica's version of BaNCS. [120]

---

[116] *Id.* at 16.

[117] *Id.*

[118] Doc. 494 at 728:8–11.

[119] Doc. 494 at 728:23–729:6, 751:5–10, 785:12–22, 791:1–7.

[120] *Id.* at 731:2–11, 732:19–23, 736:6–18, 784:15–792:15.

121. Transamerica instructed TCS that TCS was not authorized to use the Trade Secrets to develop BaNCS.[121]

122. Transamerica told TCS, including TCS's Deputy General Counsel Vinod Verghese, not to use the Trade Secrets for the Transamerica customer layer of BaNCS unless it was expressly authorized.[122]

123. Specifically, Transamerica told TCS that "TCS will not incorporate the proprietary information or intellectual property of CSC or its predecessors, affiliates or successors or any other third-party software, information or intellectual property into the Customer Layer, except as expressly permitted in the Master Agreement between the Parties or directly by the third party."[123]

124. No such express permission was given by CSC or in any agreement between TCS and Transamerica.[124]

125. As early as April 2018, Transamerica's Vendor Management team also notified TCS Rebadged (or soon-to-be-rebadged) Employees, including Chethan Setty, that "any documentation that is proprietary to an external vendor, such as CSC, cannot be shared with TCS."[125]

---

[121] Doc. 495 at 1029:7–1032:16; PX327 at 2; PX438 at 1.

[122] Doc. 496 at 1213:25–1214:6, 1317:18–1319:8; PX127 at 1.

[123] Doc. 496 at 1320:12–1321:1; PX127 at 2.

[124] PX069; PX088; PX081.

[125] PX438 at 1.

126. Transamerica's Head of Experience, Execution, and Business Architecture Abby Canfield also "encouraged [TCS] employees not to leverage any CSC confidential information in building BaNCS."[126]

127. Transamerica's Lead Vendor Liaison Tom Blazek was "not aware of a specific authorization allowing TCS" to "access CSC's source code to help write requirements for BaNCS."[127]

128. Nor was he aware of "anyone at Transamerica authorizing" TCS Rebadged Employees to provide CSC proprietary manuals to TCS employees who were writing requirements for BaNCS.[128]

129. Before CSC filed this lawsuit, TCS sent letters to Transamerica asking for indemnification, which Transamerica refused to sign, further demonstrating that TCS knew its actions were wrong and that Transamerica did not authorize TCS's actions as found herein by the Court.[129]

130. On February 21, 2019, TCS sent a letter to Transamerica asking for indemnification.[130]

---

[126] Doc. 495 at 887:4–14.

[127] *Id.* at 895:15–24.

[128] *Id.* at 896:14–897:11.

[129] Doc. 496 at 1328:20–1332:2; PX136; PX128

[130] *Id.* at 1329:6–24; PX136 at 1.

30

131. The letter included an acknowledgement section where Transamerica was asked to acknowledge and sign.[131]

132. Transamerica did not sign or agree to the letter.[132]

133. On March 8, 2019, Transamerica responded to the letter.[133]

134. Transamerica told TCS that, "[f]or avoidance of doubt, [Transamerica] will have no indemnity obligation with respect to the [CSC] dispute if TCS does not comply with its obligations under the MSA and related agreements regarding the use, access and protection of [CSC] confidential and proprietary information and software platform"[134]

135. TCS concedes that, in this letter, Transamerica told TCS that Transamerica would not indemnify TCS if it misused CSC's intellectual property in a way that is not permitted under the Master Services Agreement.[135]

136. After CSC filed this case, TCS sent another letter to Transamerica asking for indemnification, which Transamerica refused to sign.[136]

137. TCS sent the letter on April 25, 2019, shortly after CSC filed this suit.[137]

---

[131] *Id.* at 1330:7–15; PX136 at 2.

[132] *Id.* at 1330:7–17; PX136 at 2.

[133] *Id.* at 1330:18–1331:10; PX128 at 1.

[134] *Id.* at 1331:12–22; PX128 at 1.

[135] *Id.* at 1331:23–1332:2.

[136] *Id.* at 1332:3–1335:15; PX133.

[137] *Id.* at 1332:21–25; PX133 at 1.

138.    Transamerica did not agree to indemnify TCS.[138]

139.    Transamerica stated that it did "not believe that the claims asserted [in this lawsuit] give rise to any indemnification or defense obligation on [Transamerica]'s part" because the claims CSC asserts rest on its allegation that "TCS has improperly accessed, used, and misappropriated CSC material (including trade secrets) to develop TCS' BaNCS for use in competing with CSC in the U.S. market."[139]

140.    CSC only allowed TCS to use the Trade Secrets for the sole benefit of Transamerica and did not expressly or impliedly consent to TCS using the Trade Secrets for any kind of development of BaNCS.

141.    There was no document or credible testimony showing any express consent by CSC for TCS to use the Trade Secrets for any purpose other than for the sole benefit of Transamerica.[140]

142.    CSC's license agreements with Transamerica do not contain any provisions giving Transamerica or any of its vendors the right to use the Trade Secrets to build a competing policy administration system.[141]

---

[138] *Id.* at 1333:8–1335:9; PX133 at 1; DTX777 at 1.

[139] DTX–0777 at 1; Doc. 496 at 1334:8–1335:9.

[140] *See* PX081 at 3.

[141] Doc. 493 at 430:7–16; PX088; Doc. 496 at 940:12–15, 970:6–9, 1029:7–13, 1120:24–1121:8.

143. Because Transamerica is not authorized to use the Trade Secrets to build a competing product, the TPAA does not allow TCS to use the Trade Secrets to do so.[142]

144. There was no document or credible testimony showing any implied consent by CSC for TCS to use the Trade Secrets for any purpose other than for the sole benefit of Transamerica.

145. To the contrary, after learning of the January 2018 contracts between Transamerica and TCS, CSC wrote a series of letters to Transamerica and TCS regarding its concerns about the treatment of its intellectual property.[143]

146. On February 8, 2018, CSC sent a letter to Transamerica detailing CSC's concerns regarding Transamerica's security and treatment of CSC's intellectual property.  In this letter, CSC requested confirmation that its intellectual property would be "protected from any improper disclosure or use by TCS of CSC confidential information."  CSC further requested to meet with Transamerica to discuss what CSC confidential proprietary information would be accessed by TCS under the January 2018 contracts and what steps would be taken to "appropriately protect CSC's confidential proprietary information."  CSC also discussed concerns regarding how TCS Rebadged Employees who had access to

---

[142] Doc. 494 at 832:15–833:9; PX069 at 3; Doc. 495 at 1120:4–1121:8.

[143] PX120; PX122; PX125.

CSC's proprietary information at Transamerica would handle that information once they became TCS employees.  Following this letter, CSC employees Phil Ratcliff and Darren Klauser met with Transamerica over the phone regarding CSC's concerns about its intellectual property, but this phone call did not resolve CSC's concerns.[144]

147.    On April 4, 2018, CSC sent Transamerica a follow-up letter regarding Transamerica's obligations to protect CSC's confidential information. This follow-up letter again discussed CSC's concerns regarding Transamerica's obligations to protect CSC's proprietary information, specifically emphasizing CSC's concerns that TCS may use CSC's proprietary information "to enhance its BPO offering to third parties in violation of the underlying agreements."  CSC informed Transamerica of its position that "TCS' permitted access and use of [CSC] confidential proprietary information is limited to only TCS' performance of certain services for [Transamerica] and for no other purpose."  CSC requested that Transamerica send information regarding TCS's use of CSC's proprietary information under the 2018 Transamerica-TCS contracts, including agreements between Transamerica and TCS regarding Transamerica's authorization for TCS to use CSC's proprietary

---

[144] Doc. 493 at 575:17–22, 576:3–16, 577:4–14; PX120 at 1–2; PX120 at 2; Doc. 493 at 577:4–25; PX120 at 2; Doc. 493 at 578:1–579:20; PX120 at 2; PX122 at 1; Doc. 493 at 579:24–580:3.

information, details regarding any disclosures of CSC's proprietary information to TCS, and any agreements and details regarding protections over TCS's use of CSC's proprietary information.[145]

148.  On June 22, 2018, CSC sent Transamerica and TCS a letter stating: "This letter also provides TCS, copied, with notice that [CSC] believes TCS's receipt or use of [CSC] technology or information constitutes tortious interference with [CSC]'s contractual rights, unfair competition, and misappropriation of trade secrets under both federal and state law, among other things."[146]

149.  CSC's decision to copy TCS on the June 2018 letter was deliberate and resulted from CSC not receiving adequate assurances regarding intellectual property protection from Transamerica.[147]

150.  In the June 2018 letter, CSC emphasized that the agreements between CSC and Transamerica "do not contemplate a transition of services being used as an improper vehicle for TCS to leverage [CSC] technology and information in order to develop a competing platform and service other customers."[148]

---

[145] PX122 at 1; Doc. 493 at 579:24–580:5, 581:4–20, 581:21–582:9.

[146] PX125 at 2; Doc. 493 at 583:14–584:2.

[147] Doc. 493 at 583:14–584:9.

[148] PX125 at 2; Doc. 493 at 584:25–585:19.

151.    CSC also wrote that it was "also particularly concerned about [Transamerica]'s apparent rebadging to TCS of thousands of employees with current access to [CSC] technology and information."[149]

152.    CSC was concerned that TCS would leverage CSC technology and information to develop a competing product due to the lack of assurances from Transamerica and TCS that CSC's intellectual property would be protected, the complexity of the Transamerica conversion, and TCS's and BaNCS' lack of experience in the U.S. insurance market.[150]

153.    At the time of this letter, TCS's heritage support team for Transamerica reported to Bonny Eappen, a Vice President at TCS.[151]

154.    After reviewing this letter, Eappen did not institute any new policies or procedures for the heritage support team for Transamerica.[152]

155.    Eappen was unaware of any actions taken by TCS after receiving this letter to ensure that the heritage support team was not violating restrictions on its access to the Trade Secrets.[153]

---

[149] Doc. 493 at 443:5–11; PX125 at 2.

[150] Doc. 493 at 585:20–586:14, 574:7–25.

[151] *Id.* at 451:1–5.

[152] *Id.* at 451:6–11.

[153] *Id.* at 451:12–16.

156.    Suresh Muthuswami, TCS's President of Banking, Financial Services, and Insurance Platforms, likewise could not recall whether TCS did anything to investigate CSC's concerns raised in this letter.[154]

157.    CSC sent the February, April, and June 2018 letters to Transamerica to ensure the Trade Secrets were protected.[155]

158.    In an August 2018 letter, CSC told both Transamerica and TCS that Transamerica's purported grant of a license to TCS "violates the 1994 and 1998 License Agreements as well as the 2014 Addendum."[156]

159.    Despite receiving CSC's notice that TCS violated these agreements, TCS and its Deputy General Counsel Verghese did not question whether TCS had authorization to do what it was doing.[157]

160.    Despite being told by Transamerica that use of the Trade Secrets for the Transamerica customer layer of BaNCS was only permitted if expressly authorized, which it was not, TCS and Verghese did not question whether TCS had authorization for what it was doing.[158]

---

[154] *Id.* at 440:9–14, 443:12–15.

[155] *Id.* at 588:13–17.

[156] PX138 at 2; Doc. 496 at 1322:20–1324:7.

[157] Doc. 496 at 1324:8–13.

[158] *Id.* at 1324:8–1325:4.

161.    TCS focused its misappropriation of the Trade Secrets on calculations, data structures, business rules, correspondence triggers, and software interfaces.[159]

162.    TCS improperly acquired the Trade Secrets in 2017 as part of its due diligence process to develop a bid to displace CSC at Transamerica and obtain a $2.6 billion contract.[160]

163.    As part of its due diligence, TCS requested and received documents from Transamerica at a shared location on Transamerica's servers.[161]

164.    Ordinarily, a customer will provide access to a data room (otherwise known as a shared location) to only a small number of personnel from a software developer, the data room will be hosted on the customer's servers, and files in the data room will not be permitted to leave the data room.[162]

165.    Rangarajan Sampathkumar was the only TCS employee who was provided access to the shared location stored on Transamerica's servers.[163]

---

[159] Doc. 495 at 934:7–935:11.

[160] Doc. 496 at 1412:12–19, 1412:23–1413:14; Doc. 495 at 931:21–932:8,953:15–954:6; Doc. 493 at 440:15–18.

[161] Doc. 496 at 1412:12–16, 1412:23–1413:14.

[162] Doc. 495 at 956:9–958:22, 961:21–962:9.

[163] Doc. 496 at 1413:23–1414:8.

166. Transamerica did not give Dipan Talukdar, TCS's Offshore Head for the Transamerica Customer Layer of BaNCS, or any of his direct or indirect reports access to this shared location.[164]

167. Sampathkumar downloaded more than 1,700 documents from the shared location set up by Transamerica and uploaded these documents to a TCS document repository called Knowmax.[165]

168. Then, on July 18, 2017, Sampathkumar sent an email to dozens of TCS employees, including Talukdar and Arindam Paul, the Delivery Manager for TCS BaNCS.[166]

169. In this email, Sampathkumar stated that "[Transamerica] ha[d] shared the following documents and I have uploaded the same in Knowmax," and he provided a "link" to Knowmax for the documents.[167]

170. On July 18 and 19, 2017, TCS employee Pankay Agarwal forwarded Sampathkumar's email to a number of TCS employees and included a link to the Knowmax folder containing the documents from the Transamerica shared space.[168]

171. One of the recipients of Agarwal's emails was Raghupathy N. Pasupathy, TCS's Director of the Transamerica Transformation

---

[164] *Id.* at 1410:14–17, 1413:16–22, 1414:12–15, 1415:17–20.

[165] *Id.* at 1410:14–17, 1413:17–1414: 5; Doc. 495 at 954:17–956:4; PX271 at 1; PX273.

[166] PX271 at 6; Doc. 493 at 674:6–10; Doc. 496 at 1410:14–21.

[167] PX271 at 6.

[168] PX271 at 5; Doc. 493 at 644:14–645:13.

Program who led the TCS team that gathered requirements for the Transamerica customer layer of BaNCS.[169]

172.    Pasupathy confirmed he had access to Knowmax in 2017 during TCS's due diligence process.[170]

173.    As a result of receiving the more than 1,700 documents, TCS acquired CSC's Trade Secret information regarding the functionalities and processes performed by Vantage and CyberLife.[171]

174.    TCS employee Abhijeet Mate created an index of the documents uploaded to Knowmax by Sampathkumar.[172]

175.    Mate's index shows that the documents available at the Knowmax link included extensive Vantage and CyberLife Trade Secret documents, including PX549 (CyberLife Overview CSFL), PX550 (CyberLife Overview – CUSTSCV), PX551 (Vantage P65), and PX552 (Vantage P75).[173]

176.    PX549, PX550, PX551, and PX552 are documents created by Transamerica using the Trade Secrets and contain CSC's Trade Secret

---

[169] PX271 at 5; Doc. 493 at 645:14–19; Doc. 493 at 457:21–458:2; Doc. 496 at 1407:3–6, 1419:10–19.

[170] PX271 at 5; Doc. 496 at 1417:1–6.

[171] Doc. 493 at 463:19–23, 464:7–14; Doc. 495 at 955:24–967:17; PX271; PX273; PX551; PX552.

[172] Doc. 496 at 1420:7–1421:5; PX271 at 1; PX273; Doc. 495 at 962:4–24.

[173] PX273 at Row 454; Doc. 496 at 1423:13–20, 1424:16–1425:17; Doc. 495 at 960:12–961:8.

information, including calculations, business rules, and data structures for Vantage and CyberLife.[174]

177.  PX549 is a 72-page "CyberLife Overview" manual that contains CSC's trade secret business rules for CyberLife.[175]

178.  PX550 is a 57-page "CyberLife Overview" manual that contains CSC's trade secret calculations, business rules, data structures, and screens for CyberLife.[176]

179.  PX551 is a 93-page "Vantage – P65" manual that contains CSC's trade secret calculations, business rules, data structures, and screens for Vantage.[177]

180.  PX552 is a 98-page "Vantage – P75" manual that contains CSC's trade secret calculations, business rules, data structures, and screens for Vantage.[178]

181.  TCS shared the Knowmax link containing the Trade Secrets to TCS employees not rebadged from Transamerica ("TCS Non-Rebadged Employees") who were not authorized to access or use the Trade Secrets.[179]

---

[174] PX549; PX550; PX551; PX552.

[175] Doc. 493 at 502:21–503:17; PX549.

[176] Doc. 495 at 965:13–966:20; Doc. 493 at 498:24–499:2, 499:14–500:19; PX550 at 46.

[177] Doc. 495 at 965:13–966:20; Doc. 494 at 789:12–17; PX551 at 3–93.

[178] Doc. 495 at 965:13–966:20; Doc. 494 at 787:9–25; PX552 at 6–96.

[179] Doc. 496 at 1416:20–22, 1417:25–1418:5, 1418:9–12; Doc. 493 at 501:18–502:1, 503:11–17, 513:5–10; Doc. 494 at 788:13–789:3, 789:18–790:3; PX271 at 6.

182.    For example, Talukdar had access to the more than 1,700 documents from Transamerica's shared location via the Knowmax link.[180]

183.    Talukdar is a TCS Non-Rebadged Employee.[181]

184.    Paul had access to the same documents.[182]

185.    Paul is a TCS Non-Rebadged Employee.[183]

186.    Pasupathy had access to the same documents.[184]

187.    Pasupathy is a TCS Non-Rebadged Employee.[185]

188.    TCS employee Shalini Kotian had access to at least some of the 1,700 documents, including PX549, PX550, PX551, and PX552.[186]

189.    Kotian is a TCS Non-Rebadged Employee.[187]

190.    Frieden testified that it would be against his team's practice to provide PX551 and PX552 to TCS Non-Rebadged Employees as part of the conversion process, and that Kotian should not have had access to PX552.[188]

---

[180] Doc. 496 at 1416:20–22, 1417:25–1418:5, 1418:9–12; PX271 at 6.

[181] Doc. 496 at 1389:19–25.

[182] *Id.* at 1416:23–25, 1418:6–12; PX271 at 6.

[183] Doc. 493 at 674:6–10; Doc. 494 at 733:3–13.

[184] PX271 at 5–6.

[185] Doc. 493 at 457:21–22, 458:13–19, 503:18–504:1; Doc. 494 at 732:11–23.

[186] Doc. 493 at 501:18–502:1, 503:11–17, 513:5–10; Doc. 494 at 788:13–789:3, 789:18–790:3.

[187] Doc. 493 at 501:18–502:1; Doc. 494 at 789:4–5.

[188] Doc. 494 at 788:1–12, 789:6–11, 790:4–7, 14–17.

191.    TCS employees removed the Trade Secrets from the Knowmax document repository and maintained them for years in other TCS repositories.  For example, PX549, PX550, PX551, and PX552 were obtained from Kotian's laptop.[189]

192.    TCS "decommissioned" the link to the Knowmax document repository containing the documents from the Transamerica shared location that contained CSC's Trade Secret information.[190]

193.    Decommissioning a Knowmax link means the site was discontinued or deleted at some point and is currently not available.[191]

194.    "TCS determined that no access information was available for the link," so TCS could not determine "who had access to the decommissioned Knowmax link."[192]

195.    TCS also cannot determine whether there were any restrictions on who could access documents in the decommissioned Knowmax link.[193]

196.    Because TCS deleted the Knowmax repository, it is impossible to know the full extent of TCS's misappropriation of the Trade Secrets in the more than 1,700 documents that TCS stored in that repository.[194]

---

[189] Doc. 493 at 501:18–502:1, 503:11–17, 513:5–10; Doc. 494 at 788:13–789:3, 789:18–790:3.

[190] Doc. 493 at 641:23–643:19; Doc. 496 at 1429:17–20.

[191] Doc. 493 at 642:15–19.

[192] *Id.* at 643:5–23.

[193] *Id.* at 643:24–644:2.

[194] *Id.* at 641:23–644:2.

197.    In addition to the Knowmax repository, TCS also used another repository called "Fresco" to keep other documents for the Transamerica project.[195]

198.    Like the decommissioned Knowmax link, the "Fresco" repository has been deleted.[196]

199.    In addition to the more than 1,700 documents on TCS's Knowmax repository, TCS Non-Rebadged Employees were in possession of 491 Trade Secret source code files for Vantage in the form of copybooks.[197]

200.    TCS employee Srinivasan Palanisamy had access to these 491 CSC copybooks (compiled in PX579), as the copybooks were found on his laptop.[198]

201.    Palanisamy was a TCS Non-Rebadged Employee.[199]

202.    Frieden testified that Palanisamy should not have had CSC copybooks on his laptop.[200]

---

[195] Doc. 496 at 1430:5–13.

[196] *Id.* at 1430:14–17.

[197] Doc. 495 at 963:14–964:9.

[198] Doc. 493 at 501:18–502:1, 503:11–17, 513:5–10; Doc. 494 at 788:13–789:3, 789:18–790:3; Doc. 495 at 963:14–17.

[199] Doc. 493 at 513:11–14; Doc. 494 at 792:3–6.

[200] Doc. 494 at 792:11–15.

203. Frieden further testified that it would be against TCS policies for CSC copybooks to be on the laptop of a TCS employee that was not part of his team.[201]

204. It was improper for TCS Non-Rebadged Employees to have been in possession of CSC source code files.[202]

205. TCS also possessed three separate copies of CSC's CyberLife Web Component Transaction manual.[203]

206. The CyberLife Enterprise System Web Component Transactions manual is 2,727 pages long.[204]

207. The second page of the manual states that "[t]he information contained in this document is considered by CSC to be a TRADE SECRET and CONFIDENTIAL," that "Authorization for use is limited by LICENSE AGREEMENT," and that "[t]his material is not to be viewed, printed, copied, or reproduced in any manner without LICENSE AGREEMENT or prior written permission of CSC."[205]

---

[201] *Id.* at 781:5–16.

[202] Doc. 495 at 964:10–25.

[203] *Id.* at 936:12–24, 1001:10–1003: 14; PX523; PX524; PX525.

[204] PX523; PX524; PX525.

[205] PX523, PX524, and PX525; PX523 at 2; Doc. 495 at 1001:10–1003:14.

45

208. The manual maps data from the internal databases and data elements of CyberLife to a standard web service set of transactions known as an ACORD standard.[206]

209. The manual acts as a roadmap for building the Cyberlife platform.[207]

210. Taute testified that the manual functions as "a roadmap on how to build an insurance processing system."[208]

211. Pinto testified that the manual effectively had the "keys to the kingdom" for CyberLife, as it tells "the reader everything they needed to know to essentially reverse engineer CyberLife."[209]

212. Frieden testified that it would be against his team's practice to upload CSC documents marked "trade secret and confidential," such as the Cyberlife Enterprise System Web Component Transactions manual, to Knowmax.[210]

213. Frieden further testified that he instructed his team of TCS Rebadged Employees "to not share information" marked as CSC's trade secrets, like the Cyberlife Enterprise System Web Component Transactions

---

[206] Doc. 492 at 259:1–10; Doc. 495 at 1001:22–1002:11 PX523; PX524; PX525.

[207] Doc. 492 at 258:12–25, 259:11–18, 260:6–8; Doc. 495 at 1002:12–24; PX523; PX524; PX525.

[208] Doc. 492 at 259:11–18; PX523; PX524; PX525.

[209] Doc. 495 at 1002:8–11.

[210] Doc. 494 at 786:1–6.

manual, with TCS employees not involved in administering Transamerica's products on CSC's system.[211]

214.    TCS should not have had any of the Trade Secrets, including confidential technical manuals for Vantage and CyberLife like CSC's CyberLife Web Component Transaction manual, on TCS's servers.[212]

215.    TCS used the Trade Secrets it acquired during due diligence to prepare its bid for the Transamerica contract in 2017 and to reduce its time and effort in migrating Transamerica's data to BaNCS.

216.    Palanisamy told Ajit Menon, TCS's Chief Security Officer, that he used the Trade Secrets on his laptop for data migration purposes and to do an effort estimation on how long the migration would take.[213]

217.    Talukdar also told Menon that TCS used the Trade Secret documentation stored in Knowmax to prepare TCS's bid to Transamerica in 2017.[214]

218.    Because TCS acquired the Trade Secrets to develop its bid to displace CSC at Transamerica, obtain a $2.6 billion contract, and reduce its time and effort in migrating Transamerica's data to BaNCS, TCS did not

---

[211] *Id.* at 785:12–22.

[212] Doc 495 at 962:25–963:13.

[213] Doc. 493 at 640:1–8, 640:9–15, 640:20–641:4, 644:25–645: 2, 646:2–8, 646:15–21.

[214] *Id.* at 639:21–25, 644:3–5, 646:9–14.

acquire the Trade Secrets "solely for the benefit of Transamerica," as required under the TPAA.

219.    TCS's acquisition of the Trade Secrets from the shared location at Transamerica, TCS's distribution of the Trade Secrets to TCS Non-Rebadged Employees, and TCS's use of the Trade Secrets to improve its bid to displace CSC at Transamerica, obtain a $2.6 billion contract, and reduce its time and effort in migrating Transamerica's data to BaNCS primarily, if not exclusively, benefitted TCS and therefore was not "solely" (or exclusively) "for the benefit of Transamerica," as required for authorization under the TPAA.

220.    TCS also improperly acquired the Trade Secrets to avoid costs and save time in developing BaNCS and performing under its $2.6 billion contract with Transamerica.[215]

221.    TCS's Transamerica conversion discovery report for Vantage, titled "BaNCS Migration Release 1.1 and Release 1.2" ("Transamerica Conversion Discovery Report"), shows that TCS's "[d]iscovery [process] was focused on analyzing source systems"—*i.e.*, Transamerica's existing software platforms, including Vantage.[216]

---

[215] Doc. 495 at 931:21–932:8, 934:7–935:11, 953:15–954:9, 1003: 15–1004:16.

[216] PX208 at 6; Doc. 495 at 970:10–971:19.

222.    The report states that "[t]he Discovery for this initial phase specifically cover[ed]," among other things, "Process," "Calculation," "Interface," and "Agency."[217]

223.    The report demonstrates that TCS's activities included "[l]isting 'calculations' and 'correspondences,'" "[l]isting interfaces," and "[u]nderstanding Data Structure of source systems," including Vantage.[218]

224.    The report further reveals that "[a]s part of the Discovery exercise for the Vantage systems," TCS performed "an analysis of calculations in the scope of the Vantage systems," and that "[t]he calculation specifications [would be] central to the operation of BaNCS" and would "dictate the value of the policy and payments made to customers."[219]

225.    As a result of this analysis, TCS was in possession of a spreadsheet indexing and describing "Calculations" and "Sub Calculations" used in Vantage, and identifications and descriptions of calculations performed by Vantage (and, later, CyberLife) were provided to the BaNCS requirements team, informing the team of the functionality being performed in Vantage (and, later, CyberLife).[220]

---

[217] Doc. 494 at 738:18– 24; PX207 at 6; PX208 at 5; Doc. 495 at 968:15–970:9; PX208 at 5.

[218] PX208 at 6; Doc. 495 at 971:20–972:6.

[219] PX208 at 20; Doc. 493 at 462:7–23, 466:2–12, 467:12–25, 471:15–19, 472:14–18; PX209; Doc. 495 at 967:18–979:8, 981:2–983:1; PX215; Doc. 494 at 739:5–13, 740:11–16, 740:22–741:4; PX203.

[220] PX215; Doc. 493 at 478:19–479:2, 479:7–14.

226.    There was no valid business reason for TCS to obtain a list of all the calculations in Vantage (and, later, CyberLife); rather, TCS wanted that information to identify gaps in functionality between BaNCS and Vantage (and, later, CyberLife), which CSC did not permit.[221]

227.    The Transamerica Conversion Discovery Report also lists "IT source code within Vantage system" as one of the calculation artifacts that would be needed for the requirements phase of TCS's Transamerica conversion project.[222]

228.    When converting an insurance company's data from a source system like Vantage to a target system like BaNCS, it is not proper for the employees of the company with the target system to obtain the source code or technical manuals of the source system, especially if the two systems are competing products.[223]

229.    The Transamerica Conversion Discovery Report also shows that TCS employees responsible for BaNCS, including Pasupathy, regularly met with TCS Rebadged Employees with access to the Trade Secrets, including "Vantage SME [Subject Matter Expert]" Frieden.[224]

230.    CSC did not authorize TCS employees working on requirements for

---

[221] Doc. 495 at 972:7–973:7.

[222] Doc. 493 at 466:13–467:8; PX208 at 20.

[223] Doc. 492 at 292:25–293:19.

[224] Doc. 495 at 968:15–969:8; PX208 at 2.

BaNCS to meet with former Transamerica employees about Vantage.

231. TCS Rebadged Employees with access to the Trade Secrets used that access to search for and analyze the calculations in Vantage and CyberLife to determine the number of calculations that BaNCS would have to support.[225]

232. A September 13, 2019 email chain involving TCS Rebadged Employee Mark Wisely reveals that another TCS Rebadged Employee, Setty, had scanned the Vantage code to determine the number of calculations in Vantage.[226]

233. Wisely then did the same thing as Setty to determine the number of calculations in CyberLife.[227]

234. Setty's and Wisely's use of CSC's source code for Vantage and CyberLife to determine the number of calculations that BaNCS would have to support was improper.[228]

235. TCS's written plan for the conversion of the Vantage system includes "Knowledge Sharing/Transition from CSC/DXC proprietary base manuals through Discussions and Meetings."[229]

236. In addition, during TCS's discovery exercise regarding Vantage, Paul

---

[225] Doc. 495 at 993:9–994:19.

[226] *Id.*

[227] *Id.*

[228] *Id.*

[229] Doc. 493 at 464:15–24; PX196 at Row 32.

asked other TCS employees to send him and members of the BaNCS development team various artifacts from Vantage.[230]

237.   On April 24, 2018, Paul sent an email asking TCS employee Vasanthi Jambulingam to "send all the latest consolidated artifacts from product, plan code, business rule, calculation, and process data for both Vantage and Life Pro systems" as part of TCS's discovery process for the Transamerica conversion.[231]

238.   In the same email, Paul asked TCS employee Sri P to "share all the latest consolidated artifacts from Source system data structure, any data driven user story/requirements for both Vantage and Life Pro."[232]

239.   In the same email, Paul asked TCS employee Srinivas M to "share all the latest artifacts consolidated so far from the Heritage agency system perspective."[233]

240.   The "Heritage agency system" refers to Transamerica's then-existing systems, including Vantage and CyberLife.[234]

241.   Members of the BaNCS development team, including BaNCS requirements lead Pasupathy and BaNCS Chief Architect Ayan

---

[230] Doc. 493 at 679:16–680:4, 680:11–21; PX203 at 1.

[231] Doc. 493 at 679:16–680:4; PX203 at 1.

[232] Doc. 493 at 680:11–21; PX203 at 1.

[233] Doc. 493 at 682:20–683:7; PX203 at 1.

[234] Doc. 493 at 682:20–683:7.

Mustafi, were copied on Paul's April 24, 2018 email.[235]

242. Paul requested information that would have included CSC's Trade Secret information—specifically, Vantage business rules, calculations, data structures, and interfaces— from a number of TCS personnel who should not have had access to that information.[236]

243. Paul did, in fact, receive artifacts regarding Vantage in connection with TCS's discovery process and sent these artifacts to TCS Non-Rebadged Employees.[237]

244. For example, the Transamerica Conversion Discovery Report contained discovery artifacts from TCS's discovery process.[238]

245. On April 10, 2019, Paul sent a zip file containing the Transamerica Conversion Discovery Report to Talukdar and Subrata Chaudhury, the enterprise architect for Transamerica's customer layer of TCS BaNCS.[239]

246. In March 2019, Ashish Barnwal—a CSC employee who supported Transamerica and had a Transamerica email address—was copied on an email chain in which TCS Non-Rebadged Employees, including Yogitha Kiran and Pasupathy, received excerpts of the Trade Secrets—

---

[235] Doc. 493 at 676:22–677:3; Doc. 495 at 982:6–8; PX203 at 1.

[236] Doc. 495 at 981:2–983:1; PX203 at 1.

[237] Doc. 493 at 689:4–15, 690:2–10, 691:16–22; PX207 at 1–2.

[238] Doc. 493 at 690:13–22; PX207 at 2–25; PX208 at 1–24.

[239] Doc. 493 at 689:4–22, 690:2–10; PX207 at 1–2.

specifically, Vantage source code and portions of Vantage confidential technical manuals.[240]

247. This email chain shows that TCS and Transamerica were trying to figure out how Vantage performed a "rate of return" calculation so they could determine whether or not to "emulate" Vantage's functionality in BaNCS.[241]

248. The way Vantage calculates a "rate of return" for a product is unique.[242]

249. CSC considers how Vantage calculates investment rates of return to be a trade secret.[243]

250. CSC invested millions of dollars in the annuity code and formulas disclosed in this email chain.[244]

251. In the email chain, TCS Rebadged Employees with access to the Trade Secrets, including Setty, provided screenshots of Vantage source code and confidential technical manuals to TCS Non-Rebadged Employees who were working to develop functional requirements for BaNCS.[245]

252. In particular, Kiran and Pasupathy received excerpts of CSC's Vantage source code and technical manuals pertaining to Vantage's rate of return

---

[240] PX228 at 1–2; Doc. 493 at 430:17–21; Doc. 494 at 805:24–806:5; Doc. 494 at 784:1–5.

[241] Doc. 495 at 983:9–987:21.

[242] *Id.* at 983:9–987:21; PX228 at 2–4.

[243] Doc. 492 at 295:24–296:5.

[244] *Id.* at 294:24–295:13.

[245] Doc. 495 at 983:9–987:21; PX228 at 1–11.

calculation.[246]

253.  Like Pasupathy, Kiran is a TCS employee who was on the BaNCS requirements team.[247]

254.  Frieden testified that Kiran should not have received source code for Vantage.[248]

255.  While this email chain was ongoing, on March 4, 2019, Setty had a conversation via Skype with Andrew Lockhart that shows that Setty knew BaNCS team members should not receive Vantage documentation.[249]

256.  In this conversation, Setty stated: "Hi Andrew, [I] shared Vantage system documentation on VALR screen."[250]

257.  This conversation referred to the same rate of return calculation Setty shared in the rate of return email chain that was eventually sent to Barnwal.[251]

258.  Setty told Lockhart: "Please do not share with BaNCS tea"[252]

259.  Setty told Lockhart "[t]hey are sensitive about anything Vantage," and

---

[246] Docs. 492–93 at 296:6–297:17, 432:22–433:2; Doc. 494 at 747:19–22, 748:2–751:10; PX228 at 1–4, 7–8.

[247] Docs. 492–93 at 295:19–21, 431:1–3, 431:25–432:6; Doc. 496 at 1455:4–13; Doc. 493 at 474:5–9; PX228 at 1; Doc. 496 at 1454:18–24.

[248] Doc. 494 at 747:19–748:1, 750:1–6.

[249] PX374 at 1.

[250] Doc. 493 at 668:23–669:6; PX374 at 1.

[251] Doc. 493 at 669:7–10; PX374 at 1.

[252] Doc. 493 at 669:11–13; PX374 at 1.

Lockhart responded: "Gotcha, thanks for sending over. I have to remember all the new rules about what we can share."[253]

260. Setty then responded: "[Y]eah, it is hard when the line keeps shifting depending on whom you talk to . . . ."[254]

261. After Barnwal received the rate of return email chain, he sent it to CSC employee Kaushik Gupta, who brought it to the attention of Ko.[255]

262. Ko alerted the senior management team at CSC, including Taute, Ratcliff, and CSC's lawyers.[256]

263. In response to this email chain, CSC filed this lawsuit on April 21, 2019.[257]

264. TCS Non-Rebadged Employees, including the TCS BaNCS team, viewed detailed information regarding the surrender penalty calculations performed by Vantage.[258]

265. On March 13, 2018, Transamerica and TCS employees met regarding TCS's discovery exercise.[259]

266. A Minutes of Meeting document details the participants, agenda, action

---

[253] Doc. 493 at 670:6–14; PX374 at 1.

[254] Doc. 493 at 671:3–672:16; PX374 at 1.

[255] Doc. 494 at 796:2–13, 806:6–10.

[256] *Id.* at 806:20–807:2.

[257] Doc. 493 at 635:8–12.

[258] PX432 at 2.

[259] *Id.* at 1.

items, and minutes for this meeting.[260]

267.    The listed participants for this meeting include "TCS BaNCS Team."[261]

268.    The agenda for this meeting includes "[d]iscussions with the Vantage team," an "[O]verview of the Vantage Features systems," and a "[d]eep dive in to [the] VTG-P65 application," in reference to a particular Vantage system.[262]

269.    The Minutes of Meeting document further states: "Sample screen Vantage for some Surrender Penalty calculations and the specific details was used to show the Maximums, Decreasing, and Cumulative, when zeroed out, Frequencies (ex Qtrly)."[263]

270.    Frieden testified that it would have been against his team's typical practices to show sample screens from Vantage to members of the BaNCS team.[264]

271.    TCS Non-Rebadged Employees also met with soon-to-be rebadged Transamerica subject matter experts to discuss variable annuity calculations, a calculation that is performed in Vantage.[265]

272.    This meeting involved TCS Non-Rebadged Employees working on

---

[260] Doc. 494 at 741:5–10; PX432 at 1–2.

[261] PX432 at 1; *see* Doc. 495 at 974:3–975: 23.

[262] Doc. 494 at 741:11–24; PX432 at 1.

[263] Doc. 494 at 742:7–15; PX432 at 2.

[264] Doc. 494 at 742:21–743:2.

[265] Doc. 495 at 974:3–975:23.

BaNCS (Kiran and Pasupathy) and soon-to-be TCS Rebadged Employees who had access to the Trade Secrets relating to Vantage.[266]

273.    TCS also had in its possession a document mapping approximately 30 interfaces from CyberLife to other systems that are internal within Transamerica.[267]

274.    PX548 contains CSC's Trade Secret information regarding CyberLife's interfaces.[268]

275.    It was improper for TCS to have this information about CSC's CyberLife interfaces.[269]

276.    TCS Non-Rebadged Employees also viewed and received CSC's Trade Secret information regarding data structures in Vantage.[270]

277.    On March 26, 2018, TCS conducted another "Discovery Phase – Conversion Discovery Meeting" in which Setty, who had access to the Trade Secrets, met with TCS personnel responsible for BaNCS (*e.g.*, Arnab Das and Pasupathy) to discuss Vantage data structures.[271]

278.    A Minutes of Meeting document details the participants, agenda, action

---

[266] *Id.* at 974:3–975:23.

[267] *Id.* at 1003:15–1005:3.

[268] *Id.*

[269] *Id.*

[270] PX536 at 1.

[271] *Id.*

items, and minutes for this meeting.[272]

279. According to this document, TCS employees Rajaraman, Das, and Pasupathy attended the meeting.[273]

280. Like Pasupathy, Das is involved in developing BaNCS.[274]

281. The Minutes of Meeting document lists three specific agenda items: (1) Data Model for Vantage System; (2) Data Dictionary for Vantage Systems; and (3) Data structure of party and roles for Vantage System.[275]

282. The "Data Model," "Data Dictionary," and "Data Structure" of Vantage are CSC's Trade Secret information related to the "Data Structure" category of the Trade Secrets that TCS targeted.[276]

283. The Minutes of Meeting document also contains "Action items," including Action item number 5, which was to "[p]rovide the copybooks for all the segments."[277]

284. Frieden testified that it would not have been appropriate for Setty to share information from CSC's technical manuals during a meeting with Das or Pasupathy.[278]

---

[272] Doc. 493 at 656:10–13; Doc. 494 at 731:15–18; PX536 at 1–2.

[273] PX536 at 1.

[274] Doc. 493 at 656:14–23; Doc. 493 at 457:21–458:7; Doc. 494 at 732:3–17.

[275] Doc. 493 at 656:24–657:10; PX536 at 1.

[276] Doc. 495 at 976:20–978:5,

[277] Doc. 493 at 657:15–18; PX536 at 1.

[278] Doc. 494 at 732:19–23; *see also* Doc. 493 at 460:13–18.

285.   Following this March 26, 2018 meeting, Setty sent an email containing CSC's trade secret information, including information on Vantage's data structures, to members of the BaNCS team.[279]

286.   Setty sent this email to Paul, Talukdar, Mustafi, Das, Arnoy Ganguly, Rittwick Ray, Santosh Sur, Sudip Sen, Uptal Sen, Subhadeep Ghoshal, and Subhasis Ghosh—all of whom were involved with the development of BaNCS.[280]

287.   Setty also copied Pasupathy on the email.[281]

288.   In the email, Setty included a snapshot of the data structure, labeled as the "VANTAGE-ONE Data Structure," that he shared during the March 26, 2018 meeting.[282]

289.   Setty also attached three documents that he shared with the TCS BaNCS team members at the March 26, 2018, meeting.[283]

290.   In the email, Setty wrote: "Attached are the documents I shared today. The P65-Contract segment copybook is an example of the data payout of one of the Vantage segments."[284]

---

[279] Doc. 493 at 658:4–660:4, 660:23–661:3, 661:10–662:11, 663:9–664:6; PX336 at 1.

[280] Doc. 493 at 684:19–685:22; Doc. 493 at 658:4–22; Doc. 494 at 733:3–13; PX336 at 1; PX172 at 1.

[281] Doc. 494 at 733:18–21; PX336 at 1; PX172 at 1.

[282] Doc. 493 at 660:23–25, 664:2–6; Doc. 494 at 735:5–8; PX336 at 2; PX172 at 1.

[283] Doc. 493 at 658:18–659:2, 659:17–21; PX336 at 1.

[284] PX336 at 1; PX172 at 1.

291.    The term "P65" refers to one of the Vantage systems.[285]

292.    The first attachment is Segment_Copybooks_Info.xlsx, which is a spreadsheet.[286]

293.    The second attachment is Rider Tables.vsd, which is a Visio format document.[287]

294.    The third attachment is P65 Contract Segment – CIUAFA11.txt.[288]

295.    Setty further stated that he was "unable to share the CSC manual since the mail server blocks due to some terminology in the documents. Instead, sharing a snapshot of the data structure that I shared during the meeting."[289]

296.    The CSC technical manual that Setty attempted to share with the TCS BaNCS team in his March 26, 2018 email is titled "Vantage Technical Guide V-1 Database & Tables 15.0."[290]

297.    This manual is a 210-page Vantage manual containing CSC's Trade Secret information, including calculations, business rules, data structures, and interfaces.[291]

298.    The manual is marked as "Computer Sciences Corporation Confidential

[285] Doc. 494 at 734:9–13; PX336 at 1; PX172 at 1.

[286] Doc. 493 at 659:3–8; PX336 at 1.

[287] Doc. 493 at 659:9–13; PX336 at 1.

[288] Doc. 493 at 659:14–16; PX336 at 1.

[289] Doc. 493 at 659:22–660:4; Doc. 494 at 734:23–735:4; PX336 at 1; PX172 at 1.

[290] Doc. 493 at 660:10–15; PX521 at 1; PX336 at 1; PX172 at 1.

[291] Doc. 495 at 996:18–998:8; PX521 at 1–2.

and Proprietary Information" on the footer of every page.[292]

299.   On the second page, the manual states "[t]his document contains trade secrets and confidential information which are proprietary to Computer Sciences Corporation," and "[t]he use, reproduction, distribution or disclosure of this document, in whole or in part, without the express written permission of Computer Sciences Corporation is prohibited."[293]

300.   Setty attempted to share this manual with the TCS BaNCS team even though it was marked as CSC proprietary and confidential, but he was not able to share the whole manual.[294]

301.   Page 172 of the manual contains the same VANTAGE-ONE data structure that Setty shared as a snapshot in his March 26, 2018 email.[295]

302.   That page of the manual contains a notice stating: "Computer Sciences Corporation, Confidential and Proprietary Information."[296]

303.   When Setty cut and pasted the snapshot of the VANTAGE-ONE data structure into his March 26, 2018 email, he did not include this notice that the data structure was confidential and proprietary CSC information.[297]

---

[292] Doc. 495 at 996:18–998:8; *see generally* PX521.

[293] Doc. 495 at 996:18–998:8; PX521 at 1–2; PX336 at 2.

[294] Doc. 493 at 662:8–11, 663:23–664:1.

[295] PX521 at 172.

[296] Doc. 493 at 661:16–21; PX521 at 172.

[297] Doc. 493 at 661:22–25; PX336 at 2.

304. After Setty sent his email, no one from TCS followed up to tell him that it was improper to share what he shared or not to do it again.[298]

305. Frieden testified that his team would not share information like the snapshot shared by Setty if the information came from CSC's technical manuals (which, in this case, it did).[299]

306. During TCS's discovery phase, TCS employees also received CSC's source code copybooks pertaining to data structures for Vantage.[300]

307. On May 4, 2018, Palanisamy sent Setty an email with the subject line "Vantage Copybooks [TLS]."[301]

308. In this email, Palanisamy stated: "As discussed, requesting you share the copybook layouts for P5, P6, P65 and P75 systems along with Data Dictionary and other relevant documents to Bruce and Leanne Cced in this email. They will evaluate and share it with us through secure FTP."[302]

309. Palanisamy then requested that Setty "let [him] know who can provide source copybooks for P12 system," and noted that Setty "can request them to share with Bruce and Leanne and they can evaluate and share with

---

[298] Doc. 493 at 662:1–4, 663:9–14; Doc. 493 at 687:3–8, 688:23–689:3.

[299] Doc. 494 at 731:4–11, 736:6–18; PX186.

[300] PX161 at 3–6.

[301] Doc. 493 at 666:2–5; PX161 at 6.

[302] Doc. 493 at 666:10–17; PX161 at 6.

us."[303]

310. On May 9, 2018, TCS employee Anil Kumar emailed the copybook layouts for Vantage systems to various TCS employees.[304]

311. On May 10, 2018, Bruce Fleming emailed Rajaraman that the Vantage copybook information had been copied over to a secure FTP site.[305]

312. This series of May 2018 emails shows that TCS personnel who had access to Vantage copybooks provided those copybooks to other personnel at TCS who did not have access to, or authorization to access, the copybooks.[306]

313. TCS also used the Trade Secrets to determine how Vantage performed its order of operations for the purpose of recreating Vantage's functionality in BaNCS.[307]

314. In a policy administration system, the order of operations controls the specific order in which transactions or activities are applied to a customer's policy.[308]

315. Because the order in which calculations are made impacts the end result, having an accurate order of operations is important for TCS in

---

[303] Doc. 493 at 666:18–24; PX161 at 6.

[304] Doc. 493 at 667:14–22; PX161 at 4.

[305] Doc. 493 at 667:23–668:6; PX161 at 3–4.

[306] Doc. 493 at 668:7–22; PX161 at 3–4.

[307] Doc 495 at 987:22–993:8; PX317at 1; PX319.

[308] Doc. 496 at 1447:24–1448:2.

developing BaNCS.[309]

316. The Vantage order of operations is a business rule and a Trade Secret.[310]

317. TCS and Charles Kirpes, a TCS Rebadged Employee with access to the Trade Secrets, created a comparison of Vantage's order of operations and compared it to BaNCS' order of operations to determine how to make BaNCS emulate the operation of Vantage.[311]

318. Kirpes testified that he "reference[d] the transaction order from Vantage" when developing requirements for the order of operations for BaNCS.[312]

319. Kirpes created a document comparing Vantage's order of operations with the order of operations in BaNCS.[313]

320. Kirpes did not ask CSC for permission to reference Vantage's order of operations when developing requirements for BaNCS.[314]

321. TCS and Kirpes' conduct regarding the Vantage order of operations was not permitted by any CSC contract with Transamerica.[315]

322. TCS's use of the Trade Secrets to develop BaNCS' order of operations was "not just a shortcut" but "a big shortcut" because it saved TCS from

---

[309] Doc 495 at 987:22–988:6.

[310] *Id.*

[311] Doc 495 at 988:16–989:1; Doc 496 at 1442:16–19.

[312] Doc. 496 at 1455:16–22; PX317at 1; PX319.

[313] PX319.

[314] Doc. 496 at 1455:23–25.

[315] Doc 495 at 989:2–6.

having to develop the order of operations on its own.[316]

323.    TCS also used the Trade Secrets to determine how Vantage performed its systematic pay-out options for the purpose of recreating Vantage's functionality in BaNCS.

324.    In an April 15, 2019 email, Zachary Voss, a TCS Rebadged Employee with access to CSC's technical manuals and user interfaces for Vantage, wrote: "Over the past couple of days, I've worked on a new table that I propose we add to the Claims module (see attached), which I feel contains most or all of the information needed to continue [systematic pay-out options] that are active in Vantage at the time of the conversion date within BaNCS."[317]

325.    In this email, Voss also wrote: "I understand that BaNCS will have different functionality than Vantage and a field in Vantage won't necessarily be a field in BaNCS.  The fields I included in the attached doc are the ones I feel are necessary in BaNCS to continue the [systematic pay-out options] as they are currently functioning in Vantage."[318]

326.    On April 17, 2019, Voss created and circulated tables with information on the systematic pay-out options for the P65, P75, and P6 Vantage

---

[316] *Id.* at 992:8–15.

[317] Doc. 494 at 743:14–744:11; PX372 at 3.

[318] Doc. 494 at 744:12–21; PX372 at 3.

syste[319]

327.  Frieden instructed Voss not to communicate in this manner going forward and, more specifically, not to instruct the BaNCS team on what data should be in BaNCS.[320]

328.  TCS Rebadged Employees with access to the Trade Secrets also sent TCS Non-Rebadged Employees a traditional life table guide for Vantage.

329.  In an email chain, Jane Bockenstedt, Jenny Mullen, and Eron Stokes of TCS contacted Frieden, who had access to the Trade Secrets.[321]

330.  Bockenstedt is a TCS Non-Rebadged Employee.[322]

331.  Mullen lists in her profile that her job is to develop requirements for BaNCS.[323]

332.  Bockenstedt acknowledged in her email to F r i e d e n that none of Bockenstedt, Stokes, or Mullen had the necessary "permissions" to access a traditional life table guide for Vantage.[324]

333.  Nonetheless, Bockenstedt requested the Vantage manual.[325]

334.  Frieden responded to Bockenstedt's email by stating "Here you go" and

---

[319] Doc. 494 at 746:7–747:7; PX372 at 1–2.

[320] Doc. 494 at 745:15–746:6, 781:25–782:13.

[321] Doc. 495 at 994:20–995:6, 995:21–25.

[322] *Id.* at 995:1–6.

[323] *Id.* at 995:7–996:5.

[324] *Id.* at 995:7–996:15.

[325] *Id.* at 995:7–996:5.

attaching the requested document.[326]

335.    The Vantage manual that Frieden sent to unauthorized TCS employees, including a member of the BaNCS requirements team, was a 661-page traditional life table guide.[327]

336.    This document contains CSC's Trade Secret information, including calculations, business rules, and data structures.[328]

337.    Bockenstedt's email also shows that Setty, another TCS Rebadged Employee with access to the Trade Secrets, had provided Bockenstedt with a .pdf of the Vantage table document for the P5 UL, which Pinto identified as PX521, the same Vantage manual that Setty had previously tried to send to unauthorized TCS Non-Rebadged Employees in March 2018.[329]

338.    Like during TCS's discovery process for Vantage, TCS BaNCS employees improperly received and accessed the Trade Secrets during TCS's discovery process for CyberLife.

339.    TCS's discovery process for CyberLife was similar to its discovery process for Vantage.[330]

340.    The "CyberLife Conversion, Life Discovery Functional Report" detailed

---

[326] *Id.* at 996:1–8.

[327] *Id.* at 996:6–17.

[328] *Id.*

[329] *Id.* at 996:18–998:8.

[330] *Id.* at 1000:10–1001:9; PX283 at 6.

that the "Focus Area" of TCS's discovery process for CyberLife was "Product Features, Process, Product/ Process Variations, Calculations, Correspondences, and Interfaces & Data," which relate to the five categories of the Trade Secrets that TCS was targeting in calculations, business rules, correspondence triggers, data structures, and software interfaces.[331]

341.  TCS's CyberLife Conversion-Life Discovery Functional Report contains an inventory of the calculations performed by CyberLife.[332]

342.  Pasupathy sent this document, including the list of CyberLife calculations, to TCS employees working on BaNCS, including Mustafi.[333]

343.  While TCS purported to segregate TCS employees developing BaNCS from TCS Rebadged Employees with access to the Trade Secrets, there was in fact no meaningful segregation and instead the TCS Rebadged Employees functioned like a "drive up service window" where TCS employees developing BaNCS could contact TCS Rebadged Employees to request the Trade Secrets to use in developing BaNCS.[334]

344.  TCS Rebadged Employees who had access to CSC's source code and

---

[331] Doc. 495 at 1000:10–1001:9; PX283 at 6.

[332] PX283 at 13–18; Doc. 493 at 471:14– 19.

[333] PX326 at 1; Doc. 496 at 1435:18–21.

[334] Doc. 495 at 994:21–1000:9; PX336 at 1–2; PX521.

confidential product documentation were able to, and did, communicate with TCS employees who were writing requirements for, developing, and coding the Transamerica version of BaNCS.[335]

345. For example, Pasupathy worked with TCS Rebadged Employees for the purpose of collecting business requirements for BaNCS.[336]

346. Indeed, TCS's governance team directed Pasupathy to work with TCS Rebadged Employees for the purpose of collecting business requirements.[337]

347. Under the instruction of TCS's governance team, Pasupathy asked TCS Rebadged Employees for information to draft business requirements for BaNCS before asking Transamerica subject-matter experts.[338]

348. Pasupathy received no training on the proper use of CSC's confidential information in connection with his role as the Director of the Transamerica Transformation Program.[339]

349. TCS acquired the Trade Secrets during discovery to (1) avoid time and costs in developing BaNCS and (2) enable TCS to perform under its $2.6 billion contract with Transamerica.[340]

---

[335] Doc. 494 at 737:13–19.

[336] Doc. 493 at 457:21–458:2, 458:20–459:2.

[337] *Id.* at 458:20–459:2.

[338] *Id.* at 475:14–476:1; 478:9–18.

[339] *Id.* at 459:8–12.

[340] Doc. 496 at 1526:20–1527:14; Doc. 495 at 953:15–954:9, 1003:16–1004:16.

350.     These benefits were primarily for TCS and not "solely" (or exclusively) "for . . . Transamerica," as required under the TPAA.

351.     TCS claims that Transamerica owns the Transamerica customer layer of BaNCS and, therefore, TCS's use of the Trade Secrets to develop the customer layer was solely for the benefit of Transamerica, but in fact TCS owns that layer.

352.     It is standard practice for TCS to retain ownership of BaNCS.[341]

353.     Muthuswami, who executed the First Amended and Restated Master Services Agreement dated January 18, 2018, with Transamerica (the "2018 MSA") and the Core Administration System License Agreement with Transamerica, understood that TCS retained ownership of the licensed BaNCS software.[342]

354.     TCS's Delivery Manager for TCS BaNCS, Paul, who was responsible for delivering the Transamerica customer layer of BaNCS, also understood that TCS—not Transamerica—owned the source code for that layer.[343]

355.     The 2018 MSA between Transamerica and TCS does not grant Transamerica ownership of the Transamerica customer layer of BaNCS.[344]

---

[341] Doc. 496 at 1309:24–1310:1

[342] Doc. 493 at 440:6–14, 442:5–8; DTX–0419 at 25; DTX–0672 at 1.

[343] Doc. 493 at 674:5–10, 674:24–675:5.

[344] DTX–0672 at 1, 66–68.

356.    Schedule G to the 2018 MSA lists the software that Transamerica either owns or licenses but does not mention a Transamerica customer layer of BaNCS.[345]

357.    Section 10.5, "Source Code," of the 2018 MSA states that "[a]ll software Deliverables will be provided to [Transamerica] in source code and object code form (including any Service Provider Software embedded therein)," and "[Transamerica] shall be entitled to receive the source code of any Service Provider Owned Software which is licensed under the Core Administration System License Agreement solely in accordance with the terms of such Core Administration System License Agreement."[346]

358.    TCS did not deliver source code for the Transamerica customer layer of BaNCS to Transamerica.[347]

359.    Instead, TCS provided Transamerica with only object code for the Transamerica customer layer, as required by the Core Administration System License Agreement.[348]

360.    Because TCS provided Transamerica with only object code and not source code for the Transamerica customer layer of BaNCS, the Transamerica customer layer of BaNCS is not considered a software

---

[345] Doc. 496 at 1310:18–1311:6; *see generally* DTX–0672.

[346] DTX–0672 at 66.

[347] Doc. 496 at 1489:15–1490:20, 1576:7–1580:23.

[348] *Id.* at 1490:10–16; DTX–0419 at 6.

deliverable under the 2018 MSA, but rather, as explained below, it is a Licensed Product under the Core Administration License Agreement.[349]

361.   Section 10.7(a)(i) of the 2018 MSA is the "Ownership of Work Product" clause.[350]

362.   Section 10.7(a)(i) lists the items that Transamerica owns.[351]

363.   Section 10.7(a)(i) also states that, "[f]or clarity, Work Product does not include any Service Provider Owned Software (including any enhancements, modifications or derivative[] works of such Service Provider Owner Software or documentation related thereto) which is licensed under the Core Administration System License Agreement even if such Software, enhancements, modifications or derivatives are referred to as deliverables, work product or any other similar term in any Service Agreement."[352]

364.   Debarati Mukhopadhyay, TCS's Product Head of BaNCS, stated in a TCS article that "the customer layer acts as a repository for modifications specific to a single organization or business unit," and that "[t]hese customer modifications are forward-compatible by design and easily adaptable to successive updates to the core, business or geography

---

[349] DTX–0419 at 6.

[350] Doc. 496 at 1313:3–13; DTX–0672 at 67.

[351] Doc. 496 at 1313:22–24; DTX–0672 at 67.

[352] Doc. 496 at 1314:1–1315:2; DTX–0672 at 67.

layers of TCS BaNCS."[353]

365.    Because Transamerica does not own "any Service Provider Owned Software (including any enhancements, modifications or derivatives works of such Service Provider Owner Software or documentation related thereto) which is licensed under the Core Administration System License Agreement," Transamerica does not own the Transamerica customer layer of BaNCS.[354]

366.    The Core Administration System License Agreement between TCS and Transamerica applies to the Transamerica customer layer of BaNCS and grants ownership of that layer to TCS.[355]

367.    Schedule 1, "Definitions," to the Core Administration System License Agreement states that (1) "'Licensed Products' means [TCS] BaNCS application identified in Schedule 6 and embedded Third Party software identified in Schedule 2" and "includes associated Documentation, Source Code Documentation (subject to the Release License), and object code and the Source Code (subject to the Release License);" and (2) "'Release Event' means any one or more of [identified] events or sets of circumstances."[356]

---

[353] Doc. 496 at 1315:22–1316:1; Doc. 496 at 1342:9–15; Doc. 496 at 1537:16–1539:9; DTX–0538 at 6.

[354] DTX–0672 at 67; *see* Doc. 496 at 1315:22–1316:1; DTX–0538 at 6.

[355] DTX–0419 at 5, 29–30.

[356] *Id.* at 28–29.

368.   Under Section 2.1.6.1 of the Core Administration System License Agreement, "[Transamerica] acknowledge[d] that the ownership of and the title in and to Intellectual Property Rights in the Licensed Products (including Third Party software embedded therein and all enhancements, developments and derivative works of the Licensed Products and Third Party software embedded therein) . . . prior to a Release Event, are and shall at all times remain with [TCS] or the relevant Third Party (as applicable)," and "[s]ave for the license rights granted herein, [TCS] and the relevant Third Party (as applicable) own all rights and title, including all Intellectual Property Rights, in and to the Licensed Products."[357]

369.   TCS did not assert or present any evidence that a "Release Event" has occurred.

370.   Under Section 2.1.6.2 of the Core Administration System License Agreement, "[TCS further] acknowledge[d] that ownership of and the title in and to Intellectual Property Rights in any enhancements, developments and other work product created by or on behalf of [Transamerica] or any of its Affiliates as part of the Services (excluding in respect of the Licensed Products and Third Party software embedded therein), are governed by and subject to the terms and conditions of the

---

[357] *Id.* at 5.

MSA and the Service Agreements."[358]

371.    Under Section 2.1.8 of the Core Administration System License Agreement, TCS is only obligated to deliver various "object code" to Transamerica for "Licensed Products."[359]

372.    TCS only delivered object, or executable, code for the Transamerica customer layer of BaNCS to Transamerica.[360]

373.    Under the Core Administration System License Agreement between TCS and Transamerica, TCS retains full ownership of TCS BaNCS.[361]

374.    Pinto also testified that he reviewed source code for BaNCS and there was no indication that there were any different layers in the code, which supports the conclusion that Transamerica could not and does not own any layer of that code.[362]

375.    TCS also improperly acquired the Trade Secrets to avoid costs and save time in transferring Transamerica data from CSC's software platforms to BaNCS.[363]

376.    As part of Transamerica's January 2018 contracts with TCS, Transamerica's policy data had to be converted from Vantage and

---

[358] *Id.* at 5.

[359] *Id.* at 6.

[360] Doc. 496 1489:15–1490:20.

[361] *Id.* at 1309:8–15, 1310:2–5; *see* DTX–0419 at 5–6, 29–30.

[362] Doc. 495 at 959:4–960:11.

[363] *Id.* at 934:7–935:11, 953:15–954:6, 1003:16–1004:16.

CyberLife to BaNCS.[364]

377. TCS was not authorized to access the source code or technical documents of Vantage or CyberLife to complete this data conversion.[365]

378. Nevertheless, TCS used the Trade Secrets to prepare for the conversion.[366]

379. As explained above, Palanisamy told Menon that he used the Trade Secrets for data migration purposes—specifically, to give him "information about the structure of data, as it exists today, so he can then plan for the migration."[367]

380. TCS Rebadged Employees who had access to the Trade Secrets also improperly provided CSC source code, in the form of duplicate copybooks, to non-rebadged TCS "offshore" employees to save time and money in transferring Transamerica data from CyberLife to BaNCS.[368]

381. Wisely and his team of TCS Rebadged Employees understood that TCS's offshore resources were not allowed to access source code for CyberLife.[369]

382. As of February 2019, Wayne Taylor and Bruce Gross were part of

---

[364] Doc. 493 at 573:2–13, 573:25–574:5; DTX–0672.

[365] Doc. 494 at 805:7–13.

[366] Doc. 493 at 646:22–647:6.

[367] *Id.* at 646:22–647:6.

[368] Doc. 495 at 1005:4–1017:21; PX166.

[369] Doc. 493 at 516:20–23; PX166 at 3.

Wisely's team at TCS.[370]

383.    Taylor stated that for the conversion process, because TCS's offshore resources were not allowed to touch CSC code, they would have to "be creative."[371]

384.    Gross understood that CSC was "being touchy on the COBOL copybooks names."[372]

385.    Wisely understood this statement to mean that CSC did not want TCS Rebadged Employees to share CSC's copybooks with TCS offshore resources.[373]

386.    Wisely did not ask CSC whether it would agree to allow TCS Rebadged Employees to create duplicate CyberLife copybooks and provide these duplicate copybooks to TCS offshore resources.[374]

387.    Wisely also admitted that he did not ask CSC for permission to use the Trade Secrets to build TCS's BaNCS system.[375]

388.    There are also no documents or credible testimony showing that Transamerica authorized Wisely and his team of TCS Rebadged Employees to create the duplicate CyberLife copybooks.[376]

---

[370] Doc. 493 at 518:3–16.

[371] *Id.* at 516:20–23; PX166 at 3.

[372] PX166 at 2.

[373] Doc. 493 at 526:20–25.

[374] *Id.* at 525:1–5, 528:10–19.

[375] *Id.* at 492:10–16, 493:1–494:3.

[376] *Id.* at 562:6–11.

389.    Wisely's team of TCS Rebadged Employees created "duplicate" versions of CSC's CyberLife copybooks, where only the names and prefixes were changed and some of the fields were expanded.[377]

390.    Wisely's team provided offshore TCS resources with these "duplicate" versions of CSC's CyberLife copybooks, which the TCS offshore resources received.[378]

391.    PX581 through PX588 are examples of the "duplicate" versions of CSC's CyberLife copybooks created by Wisely's team and provided by them to offshore TCS resources.[379]

392.    TCS offshore employees created alleged "Neutral" versions of CSC's CyberLife copybooks that still contained all the markings of CSC's original copybooks.[380]

393.    In a February 12, 2019 email, Taylor proposed creating "neutral" copybooks by taking the "duplicate copybooks" and creating a new file layout to convert them into MWB (MySQL Workbench) files.[381]

394.    Wisely's team of TCS Rebadged Employees and TCS offshore employees carried out the plan proposed by Taylor in his February 12, 2019

---

[377] *Id.* at 528:23–529:7; PX166 at 1–3.

[378] Doc. 493 at 520:21–521:10, 524:1–13; PX166 at 1–3.

[379] Doc. 493 at 529:21–24, 530:5–15, 531:4–14; PX581; PX582; PX583; PX584; PX585; PX586; PX587; PX588.

[380] Doc. 495 at 1012:1–13; PX166 at 3; Doc. 493 at 523:17–25.

[381] PX166 at 3.

email.[382]

395.   The TCS "duplicate" and alleged "neutral" copybooks were near wholesale copies of CSC's source code with only insignificant aspects changed.[383]

396.   Pinto compared these copybooks to CSC's copybooks and discovered extensive copying by TCS of CSC's source code in both the "duplicate" and alleged "neutral" copybooks.

397.   Pinto testified that, in his experience, there is no such thing as a "neutral" copybook because copybooks contain data structures; instead, there is only neutral data that is removed and "neutralized" to remove the data structures.[384]

398.   TCS's alleged "neutral" copybooks were not "neutral" because they directly copied CSC's source code from CSC's copybooks.[385]

399.   TCS's use of CSC's source code to create "duplicate" copybooks was improper, as was TCS's sharing of CSC's source code to TCS Non-Rebadged Employees through the "duplicate" copybooks.[386]

400.   At trial, TCS argued that it had no reason to misappropriate the Trade Secrets because BaNCS is superior to Vantage and CyberLife, but the

---

[382] Doc. 493 at 524:1–13.

[383] Doc. 495 at 1005:4–1017:21.

[384] *Id.*

[385] *Id.*

[386] *Id.*

evidence detailed above demonstrates TCS's widespread misappropriation of the Trade Secrets.

401.    Moreover, TCS did not show that BaNCS is superior to Vantage and CyberLife.

402.    In the end, TCS did not convert a single product from any legacy platform at Transamerica to the purportedly superior BaNCS.[387]

403.    At the time of trial, Transamerica had terminated its relationship with TCS[388] and was using Vantage and CyberLife for the policies that had been slated for conversion and for new policies as well.[389]

404.    TCS acquired the Trade Secrets through theft by possessing the Trade Secrets despite knowing it should not be in possession of them.

405.    As found above, TCS possessed the Trade Secrets in its Knowmax document repository and on the laptops of TCS Non-Rebadged Employees, among other places.

406.    And as found below, TCS knew its possession of the Trade Secrets was improper, as evidenced by CSC's and Transamerica's communications to TCS, communications and testimony by TCS employees, and TCS's own intellectual property policies.

407.    TCS also acquired the Trade Secrets by misrepresenting its access to

---

[387] Doc. 496 at 1385:21–1386:4; Doc. 494 at 807:10–18; Doc. 496 at 1456:3–6, 1457:5–10.

[388] Doc. 494 at 807:19–22.

[389] *Id.* at 807:23–808:9; Doc. 494 at 779:19–22, 780:13–20.

and use of the Trade Secrets to Transamerica.

408.    On November 6, 2018, Eappen misleadingly responded to a request for information from Transamerica regarding TCS's use of the Trade Secrets.[390]

409.    In response to Transamerica's request that "TCS confirm no Transamerica or Transamerica rebadged employees are involved in any aspects of building requirements and/or functionality in TCS BaNCS related to U.S. product administration," TCS represented to Transamerica: "Yes, we confirm that no Transamerica or Transamerica rebadged employees are involved in any aspect of building requirements and/or functionality in TCS BaNCS related to U.S. product administration."[391]

410.    In response to Transamerica's request that "TCS confirm no Transamerica or Transamerica rebadged employees are using any third party intellectual property or proprietary information to build requirements and/or functionality for TCS BaNCS," TCS represented to Transamerica: "Yes, we confirm."[392]

411.    TCS's representations to Transamerica were false.

412.    Contrary to TCS's representations, TCS Rebadged Employees, including

---

[390] PX327 at 1–2.

[391] PX328; Doc. 495 at 869:23–870:22.

[392] PX328; Doc. 495 at 870:23:871:8.

Setty and Kirpes, were involved in building requirements and functionality in BaNCS related to U.S. product administration, shared the Trade Secrets with members of the BaNCS team, and used the Trade Secrets to help build requirements and functionality for BaNCS.

413.    TCS never informed Transamerica that it was accessing and using the Trade Secrets to develop requirements and functionality for BaNCS.

414.    Despite regularly meeting with Canfield regarding the BaNCS conversion process, TCS never told her that it had used the Trade Secrets to build requirements for BaNCS.[393]

415.    TCS also never told Canfield that TCS believed TCS Rebadged Employees could use the Trade Secrets to help build requirements for BaNCS.[394]

416.    Nor did TCS ever tell Transamerica about any violations of the restrictions that Transamerica had imposed on TCS's access to and use of the Trade Secrets.[395]

417.    For example, TCS never told Transamerica that (1) TCS Rebadged Employees shared CSC proprietary manuals and copybooks with TCS employees writing requirements for BaNCS;[396] (2) TCS Rebadged

---

[393] Doc. 495 at 871:9–20.

[394] *Id.* at 871:21–872:5, 899:20–25.

[395] *Id.* at 898:1–5.

[396] *Id.* at 898:6–23.

Employees shared calculations and sample screens from Vantage and Cyberlife with TCS employees writing requirements for BaNCS;[397] and (3) TCS Rebadged Employees analyzed CSC's proprietary source code and manuals to help prepare requirements for BaNCS.[398]

418. TCS also acquired the Trade Secrets through a breach of its duty to CSC to maintain the secrecy of the Trade Secrets.

419. TCS knew that CSC owned the Trade Secrets, and that CSC did not authorize TCS to acquire the Trade Secrets other than for the sole benefit of Transamerica.

420. Nevertheless, TCS Rebadged Employees shared the Trade Secrets with TCS Non-Rebadged Employees, who used the Trade Secrets to avoid time and costs in developing BaNCS and to enable TCS to perform under its $2.6 billion contract with Transamerica.

421. TCS also acquired the Trade Secrets by inducing Transamerica to breach its duty to CSC to maintain the secrecy of the Trade Secrets.

422. Under its agreements with CSC, Transamerica had a duty to maintain the secrecy of the Trade Secrets.

423. Under Section 5.1 of the CyberLife Agreement, Transamerica cannot "allow any person or entity to transmit or reproduce the System(s) in whole or in part in any manner except as permitted" in the agreement

---

[397] *Id.* at 899:4–14.

[398] *Id.* at 899:15–19.

and cannot "disclose or otherwise make the System available to any person or entity other than employees of [Transamerica] and employees of an Authorized Company required to have such knowledge for normal use of the System(s)."[399]

424.    Under Section 9.1 of the Vantage Agreement, Transamerica agreed to strict confidentiality provisions, including to "not allow any copies of the Software Products or related materials to leave its possession and control," and to "take all necessary steps to ensure that the provisions of this Agreement are not violated by any person under its control or in its service."[400]

425.    In the TPAA, CSC granted to Transamerica the right to authorize TCS to access and use the Trade Secrets only on behalf of and solely for the benefit of Transamerica.

426.    TCS induced Transamerica to breach its duty to maintain the secrecy of the Trade Secrets by, among other acts, misrepresenting its access to and use of the Trade Secrets, bypassing Transamerica's restrictions on TCS's access to and use of the Trade Secrets, and using the Trade Secrets to develop BaNCS.

427.    TCS knew it was not permitted to acquire and use the Trade Secrets to bid for work from Transamerica, develop BaNCS, and save time and costs

---

[399] PX088 at 4.

[400] PX069 at 8.

in performing under its January 2018 contracts with Transamerica.[401]

428.    TCS violated its own intellectual property policies when accessing and using the Trade Secrets to develop BaNCS and save time and costs in performing under its January 2018 contracts with Transamerica.[402]

429.    TCS has policies on how to handle third parties' intellectual property rights.[403]

430.    As of 2012, TCS's Intellectual Property Rights (IPR) Apex Manual stated: "TCS shall secure access to third-party IP assets, via in-licensing from partners, vendors, academic institutions or third-parties who own such IP assets."[404]

431.    Under this manual, TCS was supposed to get permission from the owner of third-party intellectual property assets to use such assets.[405]

432.    TCS's IP Safe Readiness Assessment Manual further states that there should be "[v]erification that the licenses of the third party software allow commercial use along with right use and right access."[406]

433.    Contrary to TCS's own intellectual property policies, TCS did not

---

[401] Doc. 495 at 949:5–979:8, 981:2–1033:17; PX271 at 1–7; PX273; PX551; PX552; PX215; PX536 at 1–3; PX203 at 1–7; PX228 at 1–11; PX317 at 1–3; PX319; PX336 at 1–3; PX283; PX523; PX524; PX525; PX166 at 1–4; PX451 at 1–20; PX125 at 1–3; PX327 at 1–2; PX328.

[402] Doc. 495 at 1121:9–1122:22.

[403] Doc. 496 at 1292:24–1293:1; Doc. 495 at 1121:9–1122:22.

[404] PX562 at 17; Doc. 496 at 1293:6–1294:20; Doc. 497 at 1558:13–1559:11; *see also* PX558 at 27; Doc. 496 at 1295:21–1296:11.

[405] Doc. 496 at 1296:19–1297:1; Doc. 495 at 1121:9–1122:22; Doc. 497 at 1558:13–1559:11.

[406] Doc. 493 at 449:8–17; PX559 at 19.

approach CSC with respect to TCS's rights to use and access CSC's software.[407]

434.    TCS never asked CSC whether Transamerica could give TCS access to the Trade Secrets.[408]

435.    Nor did TCS ever ask CSC for guidance on what, if anything, TCS was permitted to do with respect to the Trade Secrets.[409]

436.    Despite not asking CSC for permission or seeing a single contract from CSC giving TCS authorization to access and use the Trade Secrets in the ways it did, TCS purportedly decided it had authorization.[410]

437.    It was a violation of TCS's intellectual property policies not to ask CSC for permission before accessing and using the Trade Secrets.[411]

438.    As found above, CSC and Transamerica informed TCS that it was not authorized to provide the Trade Secrets to TCS Non-Rebadged Employees or use the Trade Secrets to develop BaNCS.

439.    Specifically, TCS knew as early as April 2018 of CSC's concerns regarding the rebadging of Transamerica employees to TCS employees.[412]

---

[407] Doc. 493 at 449:18–23; Doc. 495 at 1121:9–1122:22.

[408] Doc. 496 at 1297:2–17; Doc. 493 at 446:8–16; Doc. 495 at 1121:9–1122:22.

[409] Doc. 493 at 442:16–20; Doc. 495 at 1121:9–1122:22.

[410] Doc. 496 at 1297:24–1298:16, 1298:7–8, 1299:3–7; Doc. 493 at 443:16–20.

[411] Doc. 496 at 1297:18–23; Doc. 495 at 1121:9–1122:22.

[412] Doc. 496 at 1316:13–25.

440.    And TCS knew as early as June 2018 that CSC did not believe TCS was authorized to use the Trade Secrets in the ways it did.[413]

441.    TCS's failure to inform Transamerica of its use of the Trade Secrets to develop BaNCS and TCS's inaccurate representations to Transamerica about such use further show that TCS knew it was improper to use the Trade Secrets to develop BaNCS.

442.    Communications surrounding TCS's creation of the duplicate and so-called "neutral" copybooks show that TCS employees knew it was improper to share CSC's source code copybooks with TCS's offshore resources.[414]

443.    Frieden's testimony and TCS communications surrounding the email chain where Setty shared snapshots from CSC's proprietary manuals with the BaNCS team show that TCS employees knew it was improper to share information from CSC's proprietary manuals with the BaNCS team.[415]

444.    Communications surrounding the rate of return email chain show that TCS employees knew it was improper to share Vantage source code and documentation with the BaNCS team.

---

[413] *Id.* at 1299:8–15; Doc. 495 at 1027:11–1029:6; PX125.

[414] PX166 at 3.

[415] Doc. 494 at 731:4–11, 736:6–18; PX336 at 1–3; PX172 at 1–3.

445.    Frieden's testimony that it would have been against his team's practices to show sample screens from Vantage to members of the BaNCS team shows that TCS employees knew it was improper to share sample Vantage screens with the BaNCS team.

446.    As found above, TCS disclosed the Trade Secrets to TCS Non-Rebadged Employees and used the Trade Secrets to (1) develop a bid to displace CSC at Transamerica and obtain a $2.6 billion contract; (2) save time and costs in developing BaNCS and performing under its January 2018 contracts with Transamerica; and (3) save time and costs in transferring Transamerica data from CSC software to BaNCS.

447.    TCS did not have CSC's express or implied consent to do any of the above.

448.    As found above, at the time of disclosure and use, TCS knew it had acquired the Trade Secrets through improper means.

449.    At the time of disclosure and use, TCS knew its knowledge of the Trade Secrets was derived from or through a person who had used improper means to acquire the Trade Secrets.

450.    TCS knew its policy was to obtain authorization from the owner of third-party intellectual property before accessing or using such third-party intellectual property.

451.    TCS also knew that the Trade Secrets were marked as CSC confidential and/or proprietary, and that TCS Rebadged Employees could not share the Trade Secrets with TCS Non-Rebadged Employees developing

BaNCS.

452.   Nevertheless, TCS Rebadged Employees provided the Trade Secrets to TCS Non- Rebadged employees developing BaNCS.

453.   As found above， at the time of disclosure or use, TCS knew its knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets.[416]

454.   At the time of disclosure and use, TCS knew its knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to limit the use of the Trade Secrets.[417]

455.   TCS knew it was authorized to access, copy, execute, and use the Trade Secrets only on behalf of and solely for the benefit of Transamerica.[418]

456.   TCS also knew it could not use the Trade Secrets to develop a bid to displace CSC at Transamerica and secure a $2.6 billion contract from Transamerica, or to develop BaNCS.

---

[416] Doc. 495 at 931:21–932:8, 935:17–939:2, 943:15–944:4, 956:1–957:25, 961:9–962:9, 963:4–13, 964:22–965:5, 968:15–970:5, 970:22–971:15, 971:20–974:2, 974:10–979:8, 981:2–993:8, 994:20–1000:9, 1002:25–1008:4, 1010:12–1014:4, 1014:16–1017:21, 1020:4–1026:8, 1027:6–1033:17, 1044:20–1045:15, 1050:17–1052:5, 1053:10–16, 1086:13–1087:3, 1090:13–1092:4, 1097:13–1099:2, 1099:14–1102:4, 1120:4–11:24:19;   PX125 at 1–3; PX438 at 1–6; PX327 at 1–3; PX328; PX166 at 1–4.

[417] Doc. 495 at 931:21–932:8, 935:17–939:2, 943:15–944:4, 956:1–957:25, 961:9–962:9, 963:4–13, 964:22–965:5, 968:15–970:5, 970:22–971:15, 971:20–974:2, 974:10–979:8, 981:2–993:8, 994:20–1000:9, 1002:25–1008:4, 1010:12–1014:4, 1014:16–1017:21, 1020:4–1026:8, 1027:6–1033:17, 1044:20–1045:15, 1050:17–1052:5,1053:10–16, 1086:13–1087:3, 1090:13–1092:4, 1097:13–1099:2, 1099:14–1102:4, 1120:4–11:24:19;   PX125 at 1–3; PX438 at 1–6; PX327; PX328; PX166 at 1–4.

[418] PX081 at 3.

457.   Finally, at the time of disclosure or use, TCS knew its knowledge of the Trade Secrets was derived from or through a person who owed a duty to CSC to maintain the secrecy and limit the use of the Trade Secrets.[419]

### C.   Damages

458.   TCS was unjustly enriched in the amount of at least $56,151,583 as a result of its misappropriation of the Trade Secrets.[420]

459.   There are three different approaches that can properly calculate the amount of unjust enrichment damages for trade secret misappropriation: (1) the cost approach; (2) the income approach; and (3) the market approach.[421]

460.   The cost approach analyzes how much research and design costs a person avoided by misappropriating trade secrets.[422]

461.   The income approach calculates the profits a person expected from its misappropriation of trade secrets.[423]

462.   The market approach calculates how much the trade secret owner could receive by selling or licensing its trade secrets to another.[424]

---

[419] Doc. 495 at 931:21–932:8, 935:17–939:2, 943:15–944:4, 956:1–957:25, 961:9–962:9, 963:4–13, 964:22–965:5, 968:15–970:5, 970:22–971:15, 971:20–974:2, 974:10–979:8, 981:2–993:8, 994:20–1000:9, 1002:25–1008:4, 1010:12–1014:4, 1014:16–1017:21, 1020:4–1026:8, 1027:6–1033:17, 1044:20–1045:15, 1050:17–1052:5, 1053:10–16, 1086:13–1087:3, 1090:13–1092:4, 1097:13–1099:2, 1099:14–1102:4, 1120:4–11:24:19; PX125 at 1–3; PX438 at 1–6; PX328; PX166 at 1–4.

[420] Doc. 495 at 1126:6–1161:11; Doc. 495 at 1033:18–1041:2.

[421] Doc. 495 at 1131:16–24.

[422] Doc. 495 at 1133:11–15.

[423] Doc. 495 at 1133:16–25.

[424] Doc. 495 at 1134:3–9.

463.    Because CSC has never licensed or sold the Trade Secrets to a competitor for use to develop a competing product, the market approach is not a useful approach in this matter.[425]

464.    Both the cost and income approach show that TCS was unjustly enriched by its trade secret misappropriation.[426]

465.    CSC's damages expert, Brian Napper, whose qualifications are discussed below and whose opinions are credible and support the Court's findings of fact regarding TCS's unjust enrichment, opined that TCS has been unjustly enriched by $56,151,583.[427]

466.    To form his opinions, Napper assumed the Trade Secrets were misappropriated by TCS and relied on Pinto's expert report.[428]

467.    Napper used two approaches in calculating the amount of TCS's unjust enrichment: (1) the cost approach; and (2) the income approach.[429]

468.    Napper opined that, based on the cost approach, the amount of TCS's unjust enrichment is $56,151,583.[430]

469.    Napper opined that, based on the income approach, the amount of TCS's unjust enrichment is $55,484,165.[431]

---

[425] *Id.* at 1134:3–9.

[426] *Id.* at 1134:1–12.

[427] *Id.* at 1130:24–1131:2, 1160:23–1161:11.

[428] *Id.* at 1130:11–20, 1132:22–1133:2.

[429] *Id.* at 1131:3–1132:8.

[430] Doc. 495 at 1133:11–15.

[431] *Id.* at 1133:16–25.

470. Napper's analysis focused on valuing the categories of functionalities of Vantage and CyberLife that TCS was focused on in its misappropriation: calculations; business rules; data structures; correspondence; and interfaces.[432]

471. TCS used the Trade Secrets to help build a competing product and reduce its own operating costs associated with delivering the $2.6 billion contract to Transamerica.[433]

472. Because TCS did not actually develop the Trade Secrets, CSC's costs to develop the Trade Secrets, less any costs TCS actually incurred that would have reduced its costs to develop the misappropriated Trade Secrets, are a reasonable proxy for the development costs TCS avoided due to its misappropriation.[434]

473. There is no credible evidence that CSC's trade secrets were worth less at the time of misappropriation in 2017 and 2018 than at the time CSC acquired the Vantage and CyberLife platforms or at the time of the applicable software version releases.

474. Pinto testified that there had not been technological decay of the value of the Trade Secrets and that, instead, the age, maturity, and proven

---

[432] *Id.* at 1134:13–1135:8.

[433] *Id.* at 953:15–18, 953:25–954:6.

[434] *Id.* at 1134:15–1135:8, 1149:23–1150:11.

stability of Vantage and CyberLife created a great deal of value.[435]

475.   CSC's costs to develop the Trade Secrets include both its acquisition costs and its development costs since acquisition through the latest versions of software accessed by TCS at Transamerica.[436]

476.   CSC's cost to acquire CyberLife was at least $10.6 million.[437]

477.   CSC acquired CyberLife as part of its acquisition of a company called Mynd, which CSC acquired in 2000 for $572 million.[438]

478.   Seven years before CSC's acquisition of Mynd, in 1993, Mynd acquired CyberTek for $59.7 million.[439]

479.   At the time of Mynd's acquisition of CyberTek, CyberTek had multiple assets, including the software that became CyberLife.[440]

480.   A 1993 Mynd SEC filing stated that the software acquisition costs portion of that acquisition were $10.6 million.[441]

481.   The software costs in the Mynd acquisition were attributable to the CyberLife software.[442]

482.   Using Mynd's costs to acquire the CyberTek software in 1993

---

[435] Doc. 495 at 1040:2–19, 1140:2–13.

[436] *Id.* at 1135:9–18.

[437] *Id.* at 1137:13–15.

[438] *Id.* at 1136:4–7.

[439] *Id.* at 1136:2–4.

[440] Doc. 495 at 1136:4–6.

[441] *Id.* at 1136:20–1137:12.

[442] *Id.* at 1137:6–12.

understates CSC's costs to acquire CyberLife in 2000 because it does not include Mynd's development costs from 1993 through 2000.[443]

483.    CSC's cost to acquire Vantage was at least $23.6 million.[444]

484.    CSC acquired Vantage as part of its acquisition of a company called Continuum, which CSC acquired in 1996 for $1.47 billion.[445]

485.    Three years before CSC's acquisition of Continuum, in 1993, Continuum acquired Vantage Systems for $40.3 million.[446]

486.    Continuum's primary purpose for acquiring Vantage Systems was to acquire the Vantage software because, at the time, Continuum lacked  a comprehensive policy administration system for life insurance and annuities, and the Vantage software filled this market void for Continuum.[447]

487.    Continuum's 1993 SEC filing reflected that Continuum allocated $8.5 million of the Vantage Systems purchase price to software and $15.6 million to purchased research and development, which totals $24.1 million.[448]

---

[443] Doc. 492 at 285:25–286:7; Doc. 495 at 1141:9–16.

[444] Doc. 495 at 1139:14–16.

[445] *Id.* at 1137:16–1138:4.

[446] Doc. 495 at 1137:21–22.

[447] Doc. 492 at 251:11–17.

[448] Doc. 495 at 1138:5–23.

488. $23,633,000 of these purchase price allocations (*i.e.*, all but $467,000 attributable to property and casualty software) are attributable to Vantage.[449]

489. CSC has invested tens of millions of dollars in the development of the Trade Secrets since acquiring Vantage and CyberLife, and CSC continues to invest significant resources in the development of the Trade Secrets.[450]

490. CSC capitalizes some of its software development costs and expenses some of its software development costs.[451]

491. CSC does not have information reflecting its development costs before 2000 for CyberLife and Vantage.[452]

492. CSC's total capitalized development costs for labor for the Vantage platform from fiscal years 2000 to 2003 were $18.8 million.[453]

493. Vantage version 15.14—released in 2003—is the latest version of Vantage that TCS accessed at Transamerica.[454]

494. CSC's total capitalized development costs for labor for the CyberLife

---

[449] *Id.* at 1138:5–1139:16.

[450] Doc. 492 at 278:20–279:11; Doc. 493 at 578:13–20, 584:14–19.

[451] Doc. 495 at 1140:15–1141:8; Doc. 492 at 279:15–281:11, 281:22–282:11; 282:14–25, 284:16–285:2; PX145; PX146.

[452] Doc. 495 at 1141:9–16; Doc. 492 at 281:2–5, 282:1–6, 285:25–286:7.

[453] Doc. 495 at 1142:14–19.

[454] *Id.* at 1141:17–20.

platform from fiscal year 2000 to 2010 were $60.7 million.[455]

495.    CyberLife version 10.01—released in 2010—is the latest version of CyberLife that TCS accessed at Transamerica.[456]

496.    The acquisition and capitalized development costs for labor together total at least $71.3 million for CyberLife and $42.4 million for Vantage, which together totals at least $113.7 million.[457]

497.    TCS's misappropriation focused on five functionalities: calculations; business rules; data structures; correspondence; and interfaces.[458]

498.    These functionalities comprise approximately 65 percent of CyberLife and 39 percent of Vantage.[459]

499.    Napper asked Pinto to look into the portion of CSC's Trade Secrets that were the focus of TCS's misappropriation.[460]

500.    In response to Napper's request, Pinto evaluated an analysis performed by Taute of approximately 950 functions in the enhanced software releases for Vantage and CyberLife, where Taute identified which of the enhancements were for calculations, interfaces, business rules, correspondence, or data structures.[461]

---

[455] Doc. 495 at 1142:14–19.

[456] *Id.* at 1141:9–1142:5.

[457] Doc. 495 at 1142:20–1143:7.

[458] *Id.* at 934:7–935:5, 1143:9–1144:3.

[459] *Id.* at 1035:10–14, 1143:9–1144:3.

[460] Doc. 495 at 1033:18–1034:17.

[461] *Id.* at 1034:18–1035:20; Doc. 492 at 289:4–19.

501.     Analyzing the composition of the enhancements provided over the years
         is a reasonable way to estimate the composition of the software
         platforms accessed by TCS.[462]

502.     In an abundance of caution to limit the software to the functions that
         were the focus of TCS's misappropriation, Pinto reduced the number of
         functions Taute had identified as functions for calculations, interfaces,
         business rules, correspondence, or data structures by removing any
         function that dealt with another product that was internal to CSC.[463]

503.     TCS misappropriated through use at least 64.9 percent of CyberLife
         and 39.3 percent of Vantage.[464]

504.     This apportionment is conservative because TCS had access to all of
         Vantage and CyberLife, including everything contained in the source
         code and confidential product documentation, and Pinto narrowed that
         down to just the functionalities that would be impactful or meaningful
         to the development of BaNCS.[465]

505.     Applying these apportionment percentages to the cost calculation
         performed by Napper yields a total cost of at least $62,962,097.[466]

506.     While CSC's development costs could be a reasonable measure of TCS's

---

[462] Doc. 495 at 1034:14–25.

[463] *Id.* at 1034:18–1035:20.

[464] *Id.* at 1034:18–1035:14, 1035:21–1036:6.

[465] *Id.* at 1035:21–1036:6.

[466] *Id.* at 1144:8–24.

unjust enrichment, Napper then conservatively deducted TCS's estimated transformation costs associated with the functionality at issue—$6,810,514—from CSC's total costs.[467]

507. TCS estimated that it would earn $55.9 million in revenues from Transamerica for its transformation services (*i.e.*, moving Transamerica from its old software platforms onto BaNCS).[468]

508. Five of the nine transformation activities performed in each phase would benefit from access to the Trade Secrets, and three of the six phases included Vantage and CyberLife.[469]

509. It is conservative to adjust TCS's expected off-shore revenues (*i.e.*, charges to Transamerica) upward at an amount of 129 percent for purposes of this analysis, because CSC's costs were all based on U.S. labor, including U.S. engineers and employees.[470]

510. After making this adjustment, deducting TCS's expected profits from the revenues yields TCS's expected costs for the phases involving the misappropriated functionalities, which is $6,810,514.[471]

511. Deducting TCS's total cost ($6,810,514) from CSC's apportioned total

---

[467] Doc. 495 at 1146:16–1147:22, 1149:20–22.

[468] *Id.* at 1037:11–23.

[469] *Id.* at 1037:25–1038:18.

[470] *Id.* at 1148:13–1149:7.

[471] *Id.* at 1149:20–22.

costs ($62,962,097) equals $56,151,583.[472]

512. TCS's avoided costs are therefore at least $56,151,583.[473]

513. TCS misappropriated the Trade Secrets to help TCS win and implement a $2.6 billion contract with Transamerica.[474]

514. TCS's misappropriation positively impacted at least four of the revenue categories from TCS's $2.6 billion contract with Transamerica : (i) TCS's Transformation Charges for BaNCS, (ii) TCS's Platform Charges for the BaNCS Platform, (iii) BaNCS Production Support Charges, (iv) BaNCS IT Infrastructure Support Charges.[475]

515. The first category is revenue relating to transformation activities—the revenue that TCS was going to earn by transforming Transamerica's policies to BaNCS.[476]

516. TCS's estimated transformation charges for BaNCS were approximately $55.9 million.[477]

517. TCS's estimated profits for its transformation charges were $5,433,827.[478]

518. The other categories of revenue fall under TCS's usage charges for

---

[472] *Id.* at 1149:23–1150:18.

[473] Doc. 495 at 1149:23–1150:18.

[474] *Id.* at 932:2–5.

[475] Doc. 495 at 1038:19–1039:5, 1151:1–9.

[476] *Id.* at 1151:10–19.

[477] *Id.* at 1151:10–19; PX450.

[478] Doc. 495 at 1152:24–1153:8.

BaNCS—these are types of revenue TCS would charge generally on a per-managed-insurance-policy basis.[479]

519. TCS's estimated usage revenues included the following: BaNCS Platform Charges: License Fee of $20.16 million, Variable Policy Fee of $53.5 million, BaNCS Production Support Charges of $68.2 million, BaNCS IT Infrastructure Support Charges of $240.4 million.[480]

520. Of the $20.16 million license fee, 4.97 percent is for Vantage policies and 25.1 percent is for CyberLife policies, which results in approximately $1 million for Vantage and $5.06 million for CyberLife.[481]

521. Multiplying these percentages of the revenues attributable to Vantage and CyberLife by TCS's estimation of its gross margin for this revenue stream results in profits of $3,791,013.[482]

522. Of the $53.5 million variable policy fee, after apportioning both the closed- and open-book policies and applying TCS's estimated gross margin, the total expected profits for Vantage and CyberLife policies is $13,520,847.[483]

523. Of the $68.2 million in revenues for BaNCS production support, after

---

[479] *Id.* at 1151:20–24.

[480] *Id.* at 1151:25–1152:9.

[481] *Id.* at 1039:6–16, 1154:14–1155:2.

[482] *Id.* at 1155:3–11. Napper testified that the values came from the schedules in his expert report. *Id.* at 1155:12–15. Napper further testified that for his calculations, he rounded to the ten-thousandths place. *Id.* at 1155:16–1156:1.

[483] Doc. 495 at 1156:2–20.

apportioning both the closed- and open-book policies and applying TCS's estimated gross margin, the total expected profits for Vantage and CyberLife policies is $15,433,622.[484]

524.  Of the $240.4 million in revenues for IT Infrastructure Support, after applying the closed-book apportionment percentages and applying TCS's estimated gross margin, the total expected profits for Vantage and CyberLife policies is $21,085,779.[485]

525.  Totaling the above expected profits results in expected profits of $579,265,088.[486]

526.  Napper made one additional adjustment to discount TCS's total expected profits to January 2018 (the time of the announcement of the deal between TCS and Transamerica) because it was a 15-year agreement between TCS and Transamerica.[487]

527.  While TCS's estimated profits were not projected specifically into the future (and so the estimates could already have been discounted to present value), Napper calculated the total expected profits 15 years into the future and then discounted it back to 2018 at a risk-free rate, the T-

---

[484] *Id.* at 1156:22–1157:21.

[485] *Id.* at 1157:22–1158:17.

[486] *Id.* at 1158:19–1159:3.

[487] *Id.* at 1159:4–17, 1160:14–18.

bill rate of 0.9 percent.[488]

528.  Napper testified that under the income approach his final determination was $55,448,165.[489]

529.  TCS's expected profits from its misappropriation were therefore at least $55,448,165.[565]

530.  At trial, CSC proved $56,151,583 in damages from TCS's misappropriation under the cost approach, and it also proved $55,448,165 in damages under the income approach. CSC is entitled to the higher level of damages it proved at trial, $56,151,583.

## D.    Willful and Malicious Misappropriation

531.  TCS willfully and maliciously misappropriated the Trade Secrets.

532.  TCS knew its misappropriation of the Trade Secrets was wrong and intentionally misappropriated the Trade Secrets in conscious disregard of CSC's rights.[490]

533.  As found above, TCS violated its own intellectual property policies when accessing and using the Trade Secrets to develop BaNCS and save time and costs in performing under its January 2018 contracts with

---

[488] Doc. 495 at 1159:17–23. Napper selected the T–bill rate because, based on his discussions with Pinto, TCS having access to the Trade Secrets reduced TCS's risk associated with their Transamerica contract, making a risk–free T–bill rate was appropriate. *Id.* at 1159:25–1160:13.

[489] *Id.* at 1160:19–22.

[490] Doc. 495 at 931:21–932:8, 935:17–939:2, 943:15–944:4, 956:1–957:25, 961:9–962:9, 963:4–13, 964:22–965:5, 968:15–970:5, 970:22–971:15, 971:20–974:2, 974:10–979:8, 981:2–993:8, 994:20–1000:9, 1002:25–1008:4, 1010:12–1014:4, 1014:16–1017:21, 1020:4–1026:8, 1027:6–1033:17, 1044:20–1045:15, 1050:17–1052:5, 1053:10–16, 1086:13–1087:3, 1090:13–1092:4, 1097:13–1099:2, 1099:14–1102:4, 1120:4–11, 1124:4–19; PX125 at 1–3; PX438 at 1–6; PX327; PX166 at 1–4.

Transamerica.[491]

534.   CSC's Trade Secrets were marked with statements identifying both the confidential technical manuals and source code as CSC proprietary and/or trade-secret information.

535.   CSC notified TCS that CSC did not authorize TCS's use of CSC's Trade Secrets to develop BaNCS.[492]

536.   TCS refused to contact CSC in response to CSC's notices.[493]

537.   Muthuswami and Eappen were not aware of TCS ever contacting CSC regarding authorization for use of the Trade Secrets.[494]

538.   As found above Transamerica also notified TCS on multiple occasions that Transamerica did not authorize TCS's use of CSC's Trade Secrets to develop BaNCS.

539.   As found above, TCS made misrepresentations to Transamerica regarding TCS's access to and use of the Trade Secrets.

540.   TCS's own documents and witness testimony further show that TCS knew its misappropriation of the Trade Secrets was wrong.

541.   For example, TCS understood that "TCS off-shore resources . . . can't touch DXC code," but TCS nevertheless provided CSC source code

---

[491] Doc. 495 at 1121:9–1122:22.

[492] PX138 at 1–3; PX125 at 1–3; Doc. 495 at 1027:21–1029:6.

[493] Doc. 495 at 1028:18–1029:6.

[494] Doc. 493 at 442:16–20; Doc. 493 at 446:12–16; *see also* Doc. 496 at 1338:18–1339:13.

copybooks to TCS off-shore resources to create duplicate copybooks.[495]

542. When asked whether it would "be proper for [TCS] to access or use CSC source code or proprietary documentation as part of its development of the customer layer at Transamerica," Paul testified: "[A]s part of the [TCS] ethics and code and these rules, it is—definitely not proper."[496]

543. Wisely likewise understood that CSC's technical documentation for its systems are CSC's trade secrets.[497]

544. Finally, testimony from Frieden shows that TCS knew its misappropriation of the Trade Secrets was wrong.

545. For example, Frieden knew it was not appropriate for TCS Rebadged Employees to access CSC's confidential information, including CSC's technical manuals and copybooks, for the development of Transamerica's version of BaNCS,[498] and testified that it would be against TCS's policies for CSC copybooks to be on the laptop of a TCS employee that was not part of his team.[499]

546. Frieden also knew CSC technical manuals for Vantage and CyberLife should not be shared with anyone at TCS drafting requirements,

---

[495] PX166 at 1–4.

[496] Doc. 493 at 674:3–10; 692:13–22.

[497] *Id.* at 490:10–491:4, 507:14–16.

[498] Doc. 494 at 728:23–729:6, 751:5–10, 785:12–22, 791:1–7.

[499] *Id.* at 781:5–16.

developing, or designing Transamerica's version of BaNCS.[500]

547.    Despite purportedly having a zero-tolerance policy regarding TCS employees violating third parties' intellectual property rights, TCS did not discipline anyone for their conduct related to TCS's misappropriation of the Trade Secrets.[501]

548.    The appropriate amount of exemplary damages for TCS's willful and malicious misappropriation of the Trade Secrets is $112,303,166.[502]

### E.    Expert Qualifications

549.    Based on his knowledge, skill, experience, and training, CSC's technical expert, Paul Pinto, is an expert in software development, acquisition, and conversion in the banking, financial services, and insurance industry.[503]

550.    Pinto has more than 37 years of experience in the software and services business and specifically with outsourcing licensed software and policy administration systems, including CSC's Vantage and CyberLife.[504]

551.    Pinto is experienced as a software developer, including development for COBOL systems like Vantage and CyberLife.[505]

---

[500] *Id.* at 731:2–11, 732:19–23, 736:6–18, 784:15–792:15.

[501] Doc. 496 at 1338:1–17; Doc. 493 at 447:16–448:2.

[502] Doc. 487 at 11.

[503] Doc. 495 at 926:2–930:4.

[504] *Id.* at 926:2–23.

[505] *Id.* at 929:11–930:4.

552.    Pinto specializes in providing services to banking, financial services, and insurance companies, and his clients have included Citigroup, Barclays, Swiss RE, Somerset RE, Hanover Group, and Voya Financial.[506]

553.    Pinto spends the majority of his working time helping his clients select and implement software products and migrate and convert the data associated with them.[507]

554.    Pinto has experience representing both buyers and sellers of software licenses.[508]

555.    Pinto has experience with helping companies convert from one software application to another.[509]

556.    Pinto had access to all the discovery produced in this case, and his review included CSC contracts, CSC technical documentation, CSC source code, interviews with CSC subject-matter experts, documentation produced by TCS, and deposition transcripts from CSC, TCS, and Transamerica witnesses.[510]

557.    Pinto's testimony was credible and supports the Court's findings of fact.

558.    Based on his knowledge, skill, experience, training, and education, CSC's damages expert, Brian Napper, is an expert on trade secret

---

[506] *Id.* at 928:25–929:10.

[507] *Id.* at 928:13–24.

[508] *Id.* at 929:11–930:4.

[509] Doc. 495 at 927:20–928:12.

[510] *Id.* at 930:12–931:16.

misappropriation damages.[511]

559.    Napper earned a Bachelor of Science degree in Business Administration, Accounting and Finance from U.C. Berkeley.[512]

560.    Napper's educational background also included a Berkeley study program about Intellectual Property technology and transfer, which he later taught.[513]

561.    Napper currently works at Ocean Tomo, an intellectual property consulting firm, where he values intellectual property, including patents, copyrights, trademarks, and trade secrets.[514]

562.    Napper has been providing intellectual property consulting services for 35 years.[515]

563.    During those 35 years, Napper previously was Global Head of Intellectual Property at global consulting firm FTI, cofounder of a consulting company called Stone Turn Group, and Head of Intellectual Property globally for Deloitte.[516]

564.    Napper has received awards and recognition for his work, including being named by Intellectual Asset Management as one of the leading

---

[511] *Id.* at 1126:22–1130:10.

[512] *Id.* at 1128:8–14.

[513] *Id.* at 1128:15–21.

[514] *Id.* at 1126:22–1127:8.

[515] Doc. 495 at 1127:12–16.

[516] *Id.* at 1127:17–1128:6.

economic experts for Intellectual Property.[517]

565.    Napper has guest lectured at various law schools on intellectual property damages.[518]

566.    The clients that have retained Napper to consult on intellectual property valuation include Microsoft, Adobe, and John Deere.[519]

567.    Napper has previously testified in court on intellectual property valuation and damages fifty times, including in trade secret cases.[520]

568.    Napper relied on information produced in this case by both parties, legal filings, financial filings, and the deposition transcripts of witnesses in this case.[521]

569.    Napper's testimony was credible and supports the Court's findings of fact.

## F.    Affirmative Defenses

570.    CSC did not have full knowledge of TCS's use of the Trade Secrets to develop BaNCS.[522]

571.    TCS presented no evidence showing that CSC had full knowledge of TCS's use of the Trade Secrets to develop BaNCS.

---

[517] *Id.* at 1128:22–1129:2.

[518] *Id.* at 1129:3–11.

[519] *Id.* at 1129:12–25.

[520] *Id.* at 1130:1–10.

[521] Doc. 495 at 1132:9–21.

[522] *See generally* Docs. 488, 492–98.

572. Ko was surprised at trial that TCS had engaged in the activities shown during the trial, which Ko found out about during trial by watching the deposition videos of TCS's witnesses for the first time.[523]

### G.     Injunction

573. CSC has suffered irreparable injury as a result of TCS's misappropriation of the Trade Secrets.

574. As a result of misappropriating the Trade Secrets, TCS gained invaluable knowledge and information about the U.S. life insurance and annuities market, specifically regarding how to develop and implement a policy administration system to administer life insurance policies and annuities in the U.S.

575. Numerous TCS employees involved in developing, marketing, implementing, and using BaNCS, including a number of TCS executives, received the Trade Secrets.[524]

576. Before TCS's contracted with Transamerica to administer Transamerica insurance policies and annuities using BaNCS, many of these TCS employees had no experience with the U.S. life insurance and annuities market.

577. For example, before working on the Transamerica BaNCS transformation project, TCS employee Talukdar had no experience with

---

[523] *See* Doc. 494 at 797:7–19.

[524] Doc. 493 at 683:19–684:22; Doc. 493 at 658:4–22; Doc. 494 at 733:3–13; PX336 at 1; PX172 at 1.

the U.S. life insurance and annuities market.[525]

578.    After working on the project, Talukdar now has knowledge of the Trade Secrets and experience with implementing software in the U.S. life insurance and annuities market.[526]

579.    In misappropriating the Trade Secrets, TCS avoided years, if not decades, of development of, and significant financial investment in, BaNCS.

580.    CSC and its predecessor companies have been developing Vantage and Cyberlife for decades.[527]

581.    CSC has invested significant financial resources into developing Vantage and Cyberlife.[528]

582.    Since 2000, CSC has conservatively spent $64 million in capitalized costs developing Vantage and $80 million in capitalized costs developing Cyberlife.[529]

583.    As a result of TCS's misappropriation of the Trade Secrets, CSC risks losing market share to BaNCS, which was derived from the Trade Secrets.

584.    BaNCS was built to displace Vantage and Cyberlife at Transamerica and

---

[525] Doc. 496 at 1437:7–13.

[526] *Id.* at 1437:7–17.

[527] Doc. 492 at 278:20–279:2.

[528] *Id.* at 278:20–279:11.

[529] *Id.* at 281:2–16, 281:21–282:6, 285:15–23, 285:25–286:7; PX145; PX146.

in the U.S. market.[530]

585.   Absent an injunction, TCS would be free to (1) use its knowledge of the Trade Secrets to further develop BaNCS, and (2) sell a software platform that was developed using the Trade Secrets.[531]

586.   Remedies available at law, such as monetary damages, are inadequate to compensate CSC for TCS's misappropriation of the Trade Secrets.

587.   Because it is impossible to determine the full scope of TCS's misappropriation of the Trade Secrets, monetary damages are inadequate, and an injunction is necessary to fully compensate CSC.

588.   TCS admitted that it decommissioned a link to a TCS document repository called "Knowmax" that contained Trade Secrets and, as a result, it cannot determine who all "had access to the decommissioned Knowmax link."[532]

589.   It is also unknown how many TCS employees accessed the Trade Secrets uploaded to Knowmax.[533]

590.   Because it is unknown which TCS employees had access to the Trade Secrets through Knowmax (and Fresco), it is unknown whether those employees still possess the Trade Secrets.[534]

---

[530] Doc. 496 at 1335:16–1336:6.

[531] *Id.* at 1336:7–13.

[532] *See* Doc. 493 at 641:5–642:19, 643:5–23, 643:24–644:2; Doc. 496 at 1429:17–20.

[533] *See* Doc. 493 at 641:5–642:19, 643:5–23, 643:24–644:2; Doc. 496 at 1429:17–20.

[534] *See* Doc. 493 at 641:5–642:19, 643:5–23, 643:24–644:2; Doc. 496 at 1429:17–20.

591.    Furthermore, monetary damages would fail to compensate CSC for the future harm resulting from TCS's misappropriation of the Trade Secrets, including CSC's loss of market share, goodwill, and business advantages associated with the Trade Secrets.[535]

592.    CSC's hardship if an injunction were not granted would outweigh any hardship to TCS if an injunction were granted.

593.    An injunction would not unduly harm TCS.

594.    TCS is a subsidiary of Tata Group, which has dozens of entities and is one of the largest groups of companies in India.[536]

595.    Tata Group has combined revenues of over $150 billion per year.[537]

596.    TCS's revenue is $25–30 billion per year.[538]

597.    TCS provides a variety of services and products besides life insurance and annuities software for the U.S. market.[539]

598.    Absent an injunction, CSC would be forced to compete against a policy administration system built using CSC's own Trade Secrets, causing CSC to lose business advantages and value associated with the Trade Secrets.

---

[535] Doc. 496 at 1335:16–1336:13.

[536] *Id.* at 1287:25–1288:15.

[537] *Id.* at 1288:19–22.

[538] *Id.* at 1288:23–1289:6.

[539] *Id.* at 1213:2–6.

599.    CSC has competed against TCS for business administering life insurance and annuity products in the U.S., including competing for work for Transamerica and MetLife.[540]

600.    TCS currently is free to sell the current version of BaNCS—which was developed using the Trade Secrets—to any of CSC's current customers and could use that version of BaNCS to compete against CSC in the future.[541]

601.    The public interest would be served by entering a permanent injunction against TCS.

602.    BaNCS was derived from misappropriating the Trade Secrets.

603.    Without an injunction, CSC would be forced to compete against a policy administration system developed with CSC's own Trade Secrets, and against a competitor who bypassed the considerable time and resources CSC invested to develop those Trade Secrets.[542]

604.    The public interest is served by protecting trade secrets, and allowing TCS to do the activities prohibited by the injunction would not serve the public interest.

## Conclusions of Law

### A.  Burden of Proof

---

[540] Doc. 494 at 823:24–824:1; Doc. 495 at 865:21–25; DTX–0081 at 53.

[541] Doc. 496 at 1336:7–13; Doc. 492 at 278:20–279:11.

[542] *See* Doc. 496 at 1336:7–13.

1.    CSC had the burden of proving the following by a preponderance of the evidence: (1) whether the Trade Secrets qualify as trade secrets under the DTSA; (2) whether TCS misappropriated the Trade Secrets; (3) whether TCS willfully and maliciously misappropriated the Trade Secrets; (4) the amount of CSC's damages as a result of TCS's misappropriation of the Trade Secrets; and (5) the amount of exemplary damages to award CSC.[543]

### B.  Jury Verdict

2.    The findings of the advisory jury are not binding on the Court but support the Court's findings of fact.[544]

### C.  Misappropriation

3.    Under 18 U.S.C. § 1836(b)(1), "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

4.    Accordingly, the elements of trade secret misappropriation that CSC

---

[543] Fifth Circuit Pattern Jury Instructions (Civil Cases) § 3.2 (2020); *see* 18 U.S.C. § 1836(b)(3)(C) (no mention of a higher burden of proof for willful and malicious misappropriation); *Brackeen v. Haaland*, 994 F.3d 249, 429 (5th Cir. 2021) (explaining that where a statute says "nothing about a burden of proof," "[t]he presumption, then, is that the section incorporates, not a heightened standard of proof, but the normal preponderance standard"), *aff'd in part, vacated in part, rev'd in part*, 599 U.S. 255 (2023); *see also Grogan v. Garner*, 498 U.S. 279, 286 (1991) (statutory "silence" is "inconsistent with the view that Congress intended to require a special, heightened standard of proof").

[544] *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 122 (5th Cir. 1973) ("[The trial court] is not bound by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally disregard.").

had to prove were (1) CSC owns a valid trade secret; (2) that trade secret relates to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) TCS misappropriated that trade secret.[545]

5.   Under 18 U.S.C. § 1839(3), a trade secret is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A)   the owner thereof has taken reasonable measures to keep such information secret; and

(B)   the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

6.   Under 18 U.S.C. § 1839(4), "the term 'owner', with respect to a trade secret, means the person or entity in whom or in which rightful legal or

---

[545] 18 U.S.C. § 1836(b)(1); *see also* Doc. 486 at 9.

116

equitable title to, or license in, the trade secret is reposed."

7.    Use or intended use of a product or service in interstate commerce means that the product or service involves travel, trade, transportation, or communication between a place in one state and a place in another state, and use of a product or service in foreign commerce means that the product or service involves travel, trade, transportation, or communication between a place in the United States and a place outside of the United States.[546]

8.    Under 18 U.S.C. § 1839(5), "the term 'misappropriation' means—

(A)    acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B)    disclosure or use of a trade secret of another without express or implied consent by a person who—

(i)    used improper means to acquire knowledge of the trade secret;

(ii)    at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

---

[546] *See United States v. Morris*, No. 3:09-CR-101-D(01), 2010 WL 2900323, at *3 (N.D. Tex. July 19, 2010) (Fitzwater, J.) (defining interstate and foreign commerce as such under Title 18); *see also* Doc. 486 at 11.

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake."

9.    Under 18 U.S.C. § 1839(6), "the term 'improper means'—

(A)   includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

(B)   does not include reverse engineering, independent derivation, or any other lawful means of acquisition."

10.    Based on the Court's findings of fact, TCS is liable to CSC for trade secret misappropriation because CSC has proven by a preponderance of the evidence all elements of trade secret misappropriation under the DTSA.

11.   Because CSC has rightful legal title to the Trade Secrets, CSC is the owner of the Trade Secrets.

12.   The Trade Secrets qualify as trade secrets under the DTSA.

13.   The Trade Secrets are software platforms and confidential technical documents relating to the software platforms, and include calculations, business rules, codes, data structures, correspondence rules, and interfaces.[547]

14.   This information is "technical" information—namely, "compilations," "processes," "procedures," "programs," and "codes."[548]

15.   CSC has taken reasonable measures to keep the Trade Secrets secret because CSC's protections for its source code and technical documents include (1) confidentiality designations; (2) restricted access within CSC; (3) CSC employment agreements imposing confidentiality and non-disclosure restrictions; and (4) customer license agreements and non-disclosure agreements restricting use and imposing confidentiality and non-disclosure restrictions.[549]

16.   Because CSC has taken reasonable measures to keep the Trade Secrets secret, the Trade Secrets are not generally known to another person who

---

[547] *GlobeRanger Corp. v. Software AG United States of Am., Inc.*, 836 F.3d 477, 493 (5th Cir. 2016).

[548] *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2021 WL 3403935, at *4 (E.D. Tex. Aug. 4, 2021) ("A software platform is certainly a form or type of technical information. Further, a platform undoubtedly qualifies as a compilation or program.").

[549] *Id.* at *5.

can obtain economic value from the disclosure or use of the information.

17. Because it would have been extremely expensive and time consuming for anyone to duplicate the Trade Secrets through independent development and because the Trade Secrets are critical to CSC's insurance software business, the Trade Secrets derive independent economic value, actual and potential, from not being known to, and not readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18. Because CSC has sold Vantage and CyberLife across the U.S. and in foreign countries to insurance companies for their use in selling life insurance policies and annuities to customers all over the world and in different states in the U.S., the Trade Secrets relate to a product or service used in, or intended for use in, interstate or foreign commerce.

19. Under the TPAA, TCS was allowed to access, copy, execute, and use the Trade Secrets only on behalf of and solely for the benefit of Transamerica.[550]

   i. "[T]he [TPAA] allows [TCS] to access CSC's software only when it does so 'solely for the benefit of' Transamerica."[551]

   ii. "*Solely* means 'to the exclusion of all else.'"[552]

---

[550] PX081 at 3.

[551] Doc. 381 at 5 (quoting PX081 at 3).

[552] *Id.* (quoting *Solely*, MERRIAM-WEBSTER DICTIONARY, https:www.merriam-webster.com/dictionary/solely).

iii. "*Solely*," as used in the TPAA, "means that the use must be for Transamerica's exclusive benefit—not that the use cannot be for the exclusive benefit [of] a third-party" (*e.g.*, TCS).[553]

iv. The TPAA allows third parties "to receive pecuniary gain for their services under the . . . Addendum," "[b]ut *solely* still prohibits uses that inure to a third party's [*e.g.*, TCS's] benefit in a manner beyond ordinary pecuniary benefit for services."[554]

20. "[A] separate provision [in the TPAA] governs [TCS's] ability to 'copy, change, modify, supplement, amend, and prepare Derivative Works of [CSC's] Software' ('the modification provision')."[555]

i. "The modification provision is more difficult to satisfy than the access provision because it also requires that the modification at issue be 'permitted in' CSC's earlier agreements with Transamerica," and "those earlier agreements aren't permissive."[556]

ii. For example, the CyberLife Agreement "prohibits Transamerica from allowing third parties 'to transmit or reproduce [CSC's software] in whole or in part' or 'reverse engineer, reverse

---

[553] *Id.* at 5 & n.16.

[554] *Id.* at 5.

[555] *Id.* at 6 (quoting PX081 at 3).

[556] *Id.*

121

assemble, or reverse compile [CSC's software].'"[557]

21.    TCS acquired the Trade Secrets by improper means, including theft, misrepresentation, breach of a duty to maintain secrecy, and inducement of a breach of a duty to maintain secrecy, and knew that the Trade Secrets were acquired by improper means.

22.    TCS disclosed and used the Trade Secrets without CSC's express or implied consent, and such disclosure and use were not on behalf of and solely for the benefit of Transamerica.

i.    TCS used improper means to acquire knowledge of the Trade Secrets.

ii.    At the time of disclosure and use, TCS knew its knowledge of the Trade Secrets was derived from or through a person who had used improper means to acquire the Trade Secrets.

iii.    At the time of disclosure and use, TCS knew its knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the Trade Secrets.

iv.    At the time of disclosure and use, TCS knew its knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to limit the use of the Trade Secrets.

v.    At the time of disclosure and use, TCS knew its knowledge of the Trade Secrets was derived from or through a person who owed a

---

[557] *Id.* (quoting Doc. No. 253-12 at 151 (Under Seal Ex. 37), 1994 Enterprise License Agreement, at CSC_000575870).

duty to CSC to maintain the secrecy and limit the use of the Trade Secrets.

### D. Willful and Malicious Misappropriation

23. "Willful and malicious misappropriation" means "intentional misappropriation resulting from the conscious disregard of the rights of the owner of the trade secret."[558]

24. Based on the Court's findings of fact, TCS is liable for willful and malicious misappropriation under the DTSA.

25. TCS willfully and maliciously misappropriated the Trade Secrets because TCS knew its misappropriation of the Trade Secrets was wrong and intentionally misappropriated the Trade Secrets in conscious disregard of CSC's rights.

26. Despite the fact that the Trade Secrets were marked with statements identifying both the confidential technical manuals and source code as CSC proprietary and/or trade-secret information, TCS intentionally continued to misappropriate the Trade Secrets knowing it was wrong.

27. Despite receiving a formal letter from CSC's outside counsel warning TCS of its trade secret misappropriation and other warnings, TCS intentionally continued to misappropriate the Trade Secrets knowing it

---

[558] *See* TEX. CIV. PRAC. & REM. CODE § 134A.002(7) (defining "willful and malicious misappropriation" under TUTSA); *Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*, No. CV-H-20-2543, 2021 WL 4710813, at *7 (S.D. Tex. Oct. 7, 2021) ("The DTSA does not define the terms 'willful' or 'malicious.' District courts have looked to the relevant state's uniform trade secret act for the definition inasmuch as the two are substantively identical.") (cleaned up).

was wrong.

28. Despite being notified by Transamerica that Transamerica did not authorize TCS's use of the Trade Secrets to develop BaNCS, TCS intentionally continued to misappropriate the Trade Secrets knowing it was wrong.

29. TCS intentionally made misrepresentations regarding its use of the Trade Secrets in order to continue to misappropriate the Trade Secrets knowing it was wrong.

30. TCS admitted that it knew its misappropriation was wrong.

## E. Affirmative Defenses

31. TCS must establish the following five elements to prevail on its equitable estoppel defense against CSC: (1) CSC was aware of certain facts; (2) CSC concealed material facts; (3) CSC intended its alleged act or omission to be enacted upon; (4) TCS did not have knowledge of the facts; and (5) TCS reasonably relied on CSC's conduct to its substantial injury.[559]

32. The first element requires that CSC have "full knowledge" of the relevant facts.[560]

33. Based on the Court's findings of fact, TCS did not meet its burden in

---

[559] *See VRC, L.L.C. v. City of Dallas*, No. 3:03-CV-2450-B, 2004 WL 2958385, at *6 (N.D. Tex. Dec. 21, 2004) (Boyle, J.).

[560] *Kaneb Servs., Inc. v. Fed. Sav. & Loan Ins. Corp.*, 650 F.2d 78, 81 (5th Cir. 1981) (describing equitable estoppel with regard to "a party with full knowledge of the facts").

showing any of the elements of its equitable estoppel defense.

34.    "Waiver is an intentional relinquishment or abandonment of a known right or privilege."[561]

35.    TCS must show that the alleged waiver was not only voluntary "but constitute[d] a knowing and intelligent relinquishment or abandonment of a known right or privilege."[562]

36.    Based on the Court's findings of fact, TCS did not meet its burden in showing that CSC knowingly relinquished a right in order to establish TCS's affirmative defense of waiver.

37.    "Acquiescence involves the plaintiff's implicit or explicit assurances to the defendant which induce reliance by the defendant."[563]

38.    Under this defense, "if a plaintiff knowingly takes an action in contravention of its rights, it cannot exercise those rights in a subsequent suit."[564]

39.    Based on the Court's findings of fact, TCS did not meet its burden in showing that CSC knowingly relinquished a right in order to establish TCS's affirmative defense of acquiescence.

## F. Damages

40.    Under the DTSA, the Court may award the following for

---

[561] *Long v. Gonzales*, 420 F.3d 516, 520 (5th Cir. 2005) (per curiam).

[562] *Richardson v. Lucas*, 741 F.2d 753, 756 (5th Cir. 1984).

[563] *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 206 (5th Cir. 1998) (cleaned up).

[564] Doc. 381 at 17.

misappropriation of trade secrets: "(I) damages for actual loss caused by the misappropriation of the trade secret; and (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss."[565]

41.     Generally, "the measure of unjust enrichment damages is the benefit conferred to the defendant."[566]

42.     The Fifth Circuit takes a "'flexible and imaginative' approach" to damages calculation in trade secret misappropriation cases that allows calculation of damages based on the defendant's avoided costs.[567]

43.     Based on the Court's findings of fact, TCS was unjustly enriched in the amount of $56,151,583 as a result of TCS's misappropriation of the Trade Secrets.

44.     CSC is therefore entitled to $56,151,583 in compensatory damages.

45.     Under the DTSA, the Court may award the following for willful and malicious misappropriation of trade secrets: "exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B)."[568]

46.     The Due Process Clause of the Fourteenth Amendment "prohibits the

---

[565] 18 U.S.C. § 1836(b)(3)(B).

[566] *ResMan*, 2021 WL 3423345, at *7 (finding the measure of unjust enrichment damages in a DTSA case to be "Defendants' ill-gotten gains").

[567] *GlobeRanger*, 836 F.3d at 499 ("The costs a plaintiff spent in development—which is the method used by GlobeRanger's expert—can be a proxy for the costs that the defendant saved.").

[568] 18 U.S.C. § 1836(b)(3)(C).

imposition of grossly excessive or arbitrary punishments on a tortfeasor."[569]

47.   "The Supreme Court has established 'three guideposts courts should consider in determining whether a punitive damages award is unconstitutionally excessive: the degree of the defendant's reprehensibility or culpability; the disparity between the harm or potential harm suffered by the victim and the punitive damages award; and the sanctions authorized or imposed in other cases for comparable misconduct."[570]

48.   "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[571]

49.   "Reprehensibility" factors include "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."[572]

---

[569] *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

[570] *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 885 (5th Cir. 2013) (cleaned up).

[571] *State Farm*, 538 U.S. at 419 (cleaned up).

[572] *Id.*

50.     Under 18 U.S.C. § 1832(b), "[a]ny organization that commits any offense described in subsection (a) shall be fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided."

51.     Because 18 U.S.C. § 1832(b) authorizes fines "3 times the value of the stolen trade secret to the organization," there is a sanction for comparable misconduct that results in the same amount of money that TCS would have to pay if it paid $168,454,749 million for compensatory and exemplary damages here.

52.     Based on the Court's findings of fact, TCS's willful and malicious misappropriation of CSC's Trade Secrets satisfies the reprehensibility factors because the conduct involved repeated misappropriation of the Trade Secrets despite TCS knowing it was improper and it was not the result of mere accident.

53.     An award of $112,303,166 in exemplary damages[573] to CSC comports with due process because of (1) the reprehensibility of TCS's conduct; (2) the comparable sanctions authorized under 18 U.S.C. § 1832(b); (3) the DTSA expressly authorizing "2 times" the amount of compensatory

---

[573] *See infra* note 589.

damages; and (4) the fact that $112,303,166 is merely a ratio of 2:1 to compensatory damages.[574]

## G. Interest

54.    "Prejudgment interest is 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.'"[575]

55.    "There is a strong presumption in favor of awarding pre[]judgment interest" to account for the time value of money, and, consequently, to make the plaintiff whole.[576]

56.    "Federal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute."[577]

57.    "Federal courts apply a two-step analysis to determine whether an award of prejudgment interest is within a court's discretion: (1) whether the federal act that creates the cause of action precludes such an award; and (2) whether such an award furthers the congressional policies of the federal act."[578]

58.    Here, under step one, no federal statute precludes an award of

---

[574] *Lincoln v. Case*, 340 F.3d 283, 292 (5th Cir. 2003).

[575] *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528, (Tex. 1998) (cleaned up).

[576] *United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001).

[577] *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339 (5th Cir. 1995).

[578] *Id.*

129

prejudgment interest.[579]

59.   Under step two, an award of prejudgment interest furthers the congressional policies of the DTSA because Congress's purpose for the DTSA is to make the trade secret owner whole.

60.   Because the two-step test is satisfied, the Court exercises its discretion and awards prejudgment interest as outlined below.

61.   No federal statute specifies what rate of prejudgment interest applies when a plaintiff prevails on a claim under the DTSA.[580]

62.   Where federal law is silent on the prejudgment interest rate, "state law is an appropriate source of guidance."[581]

63.   Because this lawsuit was filed in a federal court located in the State of Texas, the Court will apply Texas law to determine the prejudgment interest rate.[582]

64.   The Texas Supreme Court has made clear that "prejudgment interest accrues at the rate for postjudgment interest."[583]

65.   Under Texas law, post-judgment interest accrues at the prime rate as

---

[579] *See generally* 18 U.S.C. §§ 1831–39.

[580] *See generally* 18 U.S.C. §§ 1831–39.

[581] *U.S. for Use & Benefit of Canion v. Randall & Blake*, 817 F.2d 1188, 1193 (5th Cir. 1987).

[582] *See, e.g.*, Doc. 1 at 5 (alleging that "Defendants and their agents may be found in this judicial district, both Defendants are subject to personal jurisdiction in this judicial district and a substantial portion of the events giving rise to this action occurred within this district"), 4 ("Texas is a 'key business hub' for TCS, which has more than 3,500 employees statewide.") (citing https://www.tcs.com/tcs-expands-operations- texas-welcoming-200-new-employees-to-plano).

[583] *Kenneco Energy*, 962 S.W.2d at 532.

published by the Federal Reserve System on the date of computation.[584]

66.     Because the Federal Reserve's prime interest rate is currently 8.50%, 8.50% is the appropriate prejudgment interest rate.[585]

67.     To determine the amount of prejudgment interest, "the proper equation the law mandates is . . . : Damages (D) multiplied by the interest rate (R) multiplied by the time (in years) since [accrual] (T): (D x R x T)."[586]

68.     Prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed.[587]

69.     CSC provided TCS written notice of its claim of trade secret misappropriation on June 22, 2018 and filed suit on April 22, 2019.[588] Therefore, prejudgment interest began accruing on December 19, 2018, 180 days after June 22, 2018 when TCS received written notice of the claim.

70.     On June 13, 2024, the date of this judgment, 2,003 days have elapsed since December 19, 2018, approximately 5.4 years (2,003 days divided by 365 = 5.487, rounded down).

---

[584] TEX. FIN. CODE § 304.003(c)(1).

[585] *See* Selected Interest Rates (Daily) – H.15, Board of Governors of the Federal Reserve System, May 20, 2024, *at* https://www.federalreserve.gov/releases/h15/.

[586] *Carter v. Transp. Workers Union of Am., Loc. 556*, 644 F. Supp. 3d 315, 330 (N.D. Tex. 2022) (Starr, J.) (collecting cases).

[587] *Kenneco Energy*, 962 S.W.2d at 531.

[588] PX125; Doc. 1.

71.    The appropriate amount of prejudgment interest is $25,773,576.60 through June 13, 2024 (*i.e.*, $56,151,583[589] X 8.5% X 5.4 years).[590]

72.    Based on the Court's findings of fact, prejudgment interest is awarded in the amount of $25,773,576.60 through June 13, 2024.[591]

### H. Attorney's Fees and Costs

73.    Under 18 U.S.C. § 1836(b)(3)(D), "if . . . the trade secret was willfully and maliciously misappropriated," a court may "award reasonable attorney's fees to the prevailing party."

74.    Thus, "[t]o be eligible, the party seeking fees (1) must prevail and (2) it must do so in one of the three listed scenarios that also require a showing of bad faith or malice."[592]

75.    In cases where a federal statute allows for attorney's fee recovery at the discretion of the court, the Fifth Circuit finds that the court should consider "(1) the degree of the opposing parties' culpability or bad faith;

---

[589] Generally, pre-judgment interest is compensatory in nature and should not be granted on punitive damages awards. *George v. Foster*, 129 F.3d 610 (5th Cir. 1997) ("Most other courts that have addressed the issue agree that prejudgment interest is basically compensatory and generally should not be granted on punitive damages. We adopt the view of these courts and hold that the district court erred in awarding prejudgment interest on plaintiffs' punitive damages award."). *see also Dunbar Med. Sys. Inc. v. Gammex Inc.*, 216 F.3d 441, 455 (5th Cir. 2000) ("Under Texas law, pre-judgment interest is not recoverable on an award of punitive damages."). And the DTSA does not state otherwise. Therefore, the Court assessed CSC's exemplary damages award prior to calculating prejudgment interest, and now the Court calculates pre-judgment interest on only CSC's compensatory damages award, $56,151,583, not its exemplary damages.

[590] *Kenneco Energy*, 962 S.W.2d at 528.

[591] *Id.*

[592] *Dunster Live, LLC v. LoneStar Logos Mgmt. Co.*, 908 F.3d 948, 952 (5th Cir. 2018) (citing 18 U.S.C. § 1836(b)(3)(D)).

(2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances; . . . and ([4]) the relative merits of the parties' positions."[593]

76.    Because of TCS's willful and malicious misappropriation of the Trade Secrets and actions before and during trial, TCS acted with a high degree of culpability and in bad faith.

77.    Given TCS's vast financial resources, TCS would easily satisfy an award of attorney's fees in this case.

78.    Although an award of attorney's fees against TCS would barely dent TCS's bottom line, it would serve as an effective deterrent to companies of any size from performing similar willful and malicious misappropriation of trade secrets.

79.    Given that TCS willfully and maliciously misappropriated the Trade Secrets, the relative merits of this case plainly favor CSC.

80.    Based on the Court's findings of fact, CSC is entitled to attorney's fees.

81.    The Court orders CSC to file a motion for attorney's fees with supporting evidence no later than 14 days from the date of this order.

82.    "Costs . . . should be allowed to the prevailing party, and the clerk may

---

[593] *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 821 (5th Cir. 1997).

tax costs on 14 days' notice."[594]

83.    "There's a strong presumption that the prevailing party will be awarded costs, and a court may reduce a prevailing party's request for cost only after first articulating some good reason for doing so."[595]

84.    A "losing party's good faith is alone insufficient to justify the denial of costs to the prevailing party."[596]

85.    The Court cannot reduce Defendants' costs based on the financial resources of either party.[597]

86.    Based on the Court's findings of fact, CSC is the prevailing party and is entitled to its costs.

87.    The Court orders CSC to file a bill of costs no later than 14 days from the date of this order.

## I. Joint and Several Liability

88.    Under the doctrine of joint and several liability, "when two or more persons cause an indivisible harm, each is subject to liability for the entire harm."[598]

89.    In order to hold defendants jointly and severally liable, however, "the

---

[594] *Clapper v. Am. Realty Invs., Inc.*, No. 3:14-CV-2970-X, 2023 WL 5618947, at *8 (N.D. Tex. Aug. 30, 2023) (Starr, J.) (citing FED. R. CIV. P. 54(d)(1)) (cleaned up).

[595] *Id.* (cleaned up) (citing *Pacheco v. Mineta*, 448 F.3d 783, 793–94 (5th Cir. 2006)).

[596] *Pacheco*, 448 F.3d at 795.

[597] *See Moore v. CITGO Refin. & Chems. Co., L.P.*, 735 F.3d 309, 320 (5th Cir. 2013).

[598] *Cox v. City of Dallas*, 256 F.3d 281, 301 n. 37 (5th Cir. 2001).

evidence supporting the verdict must be sufficient as to each defendant."[599]

90.    There is no evidence in the record supporting TAIC's liability.

91.    In fact, the only evidence CSC presented at trial as to TAIC was one stipulated fact: TAIC is a subsidiary of TCS Limited.

92.    Therefore, CSC did not meet its burden to hold TAIC jointly and severally liable.

## J. Injunction

93.    CSC is entitled to a permanent injunction because all elements of 18 U.S.C. § 1836(b)(3)(A) are satisfied and all factors for a permanent injunction weigh in favor of CSC.

94.    Under 18 U.S.C. § 1836(b)(3)(A), a court may "grant an injunction—

(i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not—

(I)    prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

(II)    otherwise conflict with an applicable State law prohibiting

---

[599] *Tompkins v. Cyr*, 995 F. Supp. 664, 682 (N.D. Tex. 1998).

restraints on the practice of a lawful profession, trade, or business;

(ii) if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and

(iii) in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited."

95. "The Fifth Circuit favors permanent injunctions for most misappropriation of trade secrets cases."[600]

96. A district court can award both compensatory damages and injunctive relief.[601]

97. A plaintiff seeking a permanent injunction "must demonstrate (1) that it has suffered irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[602]

98. To establish irreparable injury, "[a] plaintiff must allege specific

---

[600] *BarZ Adventures Inc. v. Patrick*, No. 4:20-CV-299, 2022 WL 4082464, at *5 (E.D. Tex. Sept. 6, 2022) (citing *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir. 1986)).

[601] *See ResMan*, 2021 WL 3423345, at *4.

[602] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

facts."[603]

99.    "An injury is irreparable and there is no adequate remedy at law [if] a multiplicity of suits would be required to gain relief."[604]

100.    Where a plaintiff has "invested decades of effort and significant financial resources to develop [its] software" and a defendant "attempted to bypass this process and produce a competing product at a lower price, essentially undercutting [the plaintiff] . . . [,]" the plaintiff "would suffer irreparable harm."[605]

101.    Based on the Court's findings of fact, CSC has suffered irreparable injury.

102.    "Often times the concepts of 'irreparable injury' and 'no adequate remedy at law' are indistinguishable."[606]

103.    Unlike the "irreparable injury" prong, "the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury."[607]

104.    Based on the Court's findings of fact and because the Court concludes

---

[603] *ITT Educ. Servs. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008) (cleaned up).

[604] *Moss v. Princip*, No. 3:14-CV-3088-BF, 2016 WL 9245113, at *3 (N.D. Tex. May 31, 2016) (cleaned up), *aff'd and remanded*, 913 F.3d 508 (5th Cir. 2019).

[605] *Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, No. 4:19-CV-1118, 2022 WL 2813069, at *8 (S.D. Tex. June 10, 2022), *report and recommendation adopted*, No. 4:19-CV-01118, 2022 WL 2806538 (S.D. Tex. July 18, 2022), *aff'd sub nom. Calsep A/S v. Dabral*, 84 F.4th 304 (5th Cir. 2023).

[606] *Lewis v. S. S. Baune*, 534 F.2d 1115, 1124 (5th Cir. 1976).

[607] *Id.*

that CSC has suffered an irreparable injury, the remedies at law are inadequate for CSC.

105.    Courts have found the balance of hardship factor to favor an injunction where "[p]laintiffs risk losing the business advantage, value, and goodwill connected to the development and lawful exploitation of their trade secrets" without an injunction.[608]

106.    Based on the Court's findings of fact, the balance of hardship between CSC and TCS weighs in CSC's favor.

107.    The Fifth Circuit has held that protecting against the misappropriation of trade secrets is aligned with the public interest.[609]

108.    Based on the Court's findings of fact, the public interest would be served by granting a permanent injunction against TCS.

109.    Because an injunction should be entered in favor of CSC, the injunctive relief set forth in paragraph 9 of the Court's Final Judgment is entered against TCS.

110.    A permanent injunction against TCS as set out in paragraph 9(b) of the Court's Final Judgment, including that "TCS Parties shall not" "access, attempt to access, use, or attempt to use any CSC Trade Secrets for any

---

[608] *See, e.g.*, *Philips Med. Sys. (Cleveland), Inc. v. Buan*, No. 19-CV-2648, 2023 WL 4533336, at *4 (N.D. Ill. July 13, 2023).

[609] *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 (5th Cir. 2014) (per curiam) (finding "that it was in the interest of public policy to prohibit the sale and use of M3 products containing infringing source code and that were derived from the improper misappropriation of trade secrets").

reason," "possess or retain any CSC Trade Secrets in any form in any location," or "access, attempt to access, use, or attempt to use any Post-Misappropriation BaNCS Materials for the design, development, enhancement, marketing, implementation, or use of any TCS I&A Products," is warranted because, as explained above, CSC has suffered and will continue to suffer irreparable harm caused by TCS's misappropriation.

111.  With respect to the Trade Secrets, TCS never should have accessed, possessed, or used the Trade Secrets without CSC's express consent—causing CSC irreparable harm—and it should not do so in the future.

112.  With respect to Post-Misappropriation BaNCS Materials, as defined in the Final Judgment, CSC would suffer irreparable harm if TCS could use the code for BaNCS or technical documentation describing actual or potential operation of BaNCS, in each case developed after July 18, 2017, for the design, development, enhancement, marketing, implementation, or use of TCS software providing solutions in the U.S. life insurance and annuities market.

113.  TCS's misappropriation of the Trade Secrets began no later than July 18, 2017, when Mr. Sampathkumar sent an email to dozens of TCS employees, including Mr. Talukdar and Mr. Paul, with a link to TCS's Knowmax document repository containing Trade Secrets.

114.  The code and documentation for BaNCS developed by TCS after that

time is irrevocably tainted because it was developed in part by accessing and using the Trade Secrets.

115. CSC should not be forced to compete against a policy administration system built using CSC's own Trade Secrets.

116. TCS will suffer no undue hardship or harm as a result of this permanent injunctive relief, as TCS will still be able to continue with legitimate business activities.

117. In particular, the permanent injunctive relief with respect to the Post-Misappropriation BaNCS Materials is limited only to designing, developing, enhancing, marketing, implementing, or using any TCS software providing solutions in the U.S. life insurance and annuities market, and, to compete in that market, TCS can revert back to the version of BaNCS before it began misappropriating the Trade Secrets.[610]

118. The harm to CSC substantially outweighs any potential harm to TCS, and the public interest weighs in favor of protecting trade secrets by permanently enjoining TCS.

119. A permanent injunction barring possession, access, and use of the misappropriated trade secrets and barring making, offering to sell, selling, or otherwise distributing products derived from misappropriated trade secrets is appropriate in cases, such as this one,

---

[610] Doc. 496 at 1378:16–19.

where a company misappropriated the trade secrets of a competitor and used those trade secrets in the development of a competing product.

120. An injunction of 18 months during which time "TCS shall not permit any TCS Parties who had access to any CSC Trade Secrets to work on, or assist in, directly or indirectly, the design, development, enhancement, marketing, implementation, or use of any TCS I&A Products, as set out in paragraph 9(c) of the Court's Final Judgment, is warranted to prevent "TCS Parties who had access to any CSC Trade Secrets" from using knowledge obtained from that access on the "design, development, enhancement, marketing, implementation, or use of any TCS I&A Products."

121. An injunction period of 18 months is appropriate because the 2014 TPAA expressly contemplated that "Consultant employees" of "Licensor Competitors" (*e.g.*, CSC competitors like TCS) could have access to CSC "Confidential Information" (including the CSC Trade Secrets) only if they had not worked on "core insurance applications, such as policy administration systems, compensation systems and new business systems" in the "past 9 months" and that such "Consultant employees" (also referred to as "Permitted Employees") could not "work for Consultant" (*e.g.*, TCS) "on engagements related to Consultant-owned" (e.g., TCS-owned) "intellectual property for life and/or annuity insurance systems for 9 months before or after" having had access to CSC

141

"Confidential Information."[611]

122.    Accordingly, for employees of a competitor to access CSC Trade Secrets under the 2014 TPAA, there was a mandatory 18-month window where such employees could not work on the competitor-owned intellectual property for life and/or annuity insurance systems.

123.    The same 18-month time period is appropriate for the injunctive relief set forth in paragraph 9(c) of the Court's Final Judgment.

124.    Transamerica terminated its agreement with TCS related to BaNCS and, at the time of trial, Transamerica was using CSC's Vantage and CyberLife for the policies that had been slated for conversion to BaNCS and for new policies.[612]

125.    "[T]o the extent Transamerica must use Post-Misappropriation BaNCS Materials for existing Transamerica products currently being administered on TCS I&A Products" during this transition period, an exception to the permanent injunction of paragraph 9(b) of the Final Judgment, set out in paragraph 9(e) of the Final Judgment, is warranted to avoid any potential disservice to Transamerica or the public interest (namely, customers of Transamerica).

126.    Paragraph 9(e) of the Final Judgment allows "TCS Transamerica Support Personnel" to "access and use the Post-Misappropriation

---

[611] PX081 at 1, 7–8.

[612] Doc. 494 at 807:19–23-808:9; Doc. 494 at 779:19–22, 780:13–20.

BaNCS Materials solely for the purpose of administering the existing Transamerica products currently being administered on TCS I&A Products," provided that "TCS shall maintain a list of the TCS Transamerica Support Personnel and provide it to CSC."

127. This exception ensures that Transamerica may continue to use "Post-Misappropriation BaNCS Materials," in the manner stated, as it winds down its use of BaNCS.

128. A monitoring period of 10 years, as set out in paragraph 9(d) of the Court's Final Judgment, is warranted to ensure TCS's compliance with the ordered injunctive relief.

129. A monitoring period of 10 years is warranted for at least the following reasons: (1) even TCS does not know the full extent of the TCS Parties who had access to the Trade Secrets and accordingly cannot know the full extent of the TCS Parties who still possess or retain the Trade Secrets; (2) TCS is a large company with thousands of employees; (3) TCS willfully and maliciously misappropriated the Trade Secrets for years.

**IT IS SO ORDERED** this 13th day of June, 2024.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

143